**E-FILED**
Monday, 10 September, 2007  01:30:31 PM
Clerk, U.S. District Court, ILCD

**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION**

| | | |
|---|---|---|
| SUN STRUCTURE DESIGNS, INC., | ) | |
| a/k/a, GLASS STRUCTURES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. |
| vs. | ) | |
| | ) | |
| FOUR SEASONS MARKETING CORP., | ) | |
| | ) | |
| Defendant. | ) | |

**NOTICE OF REMOVAL**

TO:  THE HONORABLE JUDGES OF THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF ILLINOIS

Defendant Four Seasons Marketing Corp. ("Four Seasons") by its attorneys Webber & Thies, P.C. states:

1.      Defendant desires to exercise its rights under the provisions of Title 28 U.S.C. §1441, *et seq*., to remove this action from the Circuit Court for the Sixth Judicial Circuit, Champaign County, in which said action is now pending as Case No. 07-CH-240.

2.      This is an action in which the District Courts of the United States have been given original jurisdiction upon the basis that the value of the remedies plaintiff Sun Structure Designs, Inc. a/k/a Glass Structures, Inc. ("Sun Structure") seeks exceeds $75,000.00 and the matter involves citizens of different states. In the underlying action, Sun Structure seeks $50,000.00 in damages and injunctive relief whose value exceeds $100,000.00.

3.      The value of injunctive relief for determining the amount in controversy for purposes of diversity jurisdiction is the value of the object of the litigation.  Macken ex rel. Macken v. Fenson, 2003 WL 21453868 (7th Cir. 2003).  The value of the object of the litigation

1

may be determined from either what the plaintiff stands to gain or the cost to the defendant to meet the plaintiff's demand.  Id.  Sun Structure seeks an injunction prohibiting Four Seasons from selling franchises in certain territories in the state of Illinois.  If the injunction is granted, Four Seasons could lose over $100,000.00 in franchise fees for these territories.

4.     Thus, the value of the amount in controversy in this action exceeds $75,000.00.

5.     Under the provisions of 28 U.S.C. § 1441, *et seq.*, the right exists to remove this action from the Circuit Court for the Sixth Judicial Circuit, Champaign County, to the United States District Court for the Central District of Illinois, which embraces the place where this action is pending.

6.     Pursuant to 28 U.S.C. § 1446, a copy of this notice of removal is being filed with the Circuit Court for the Sixth Judicial Circuit, Champaign County.

7.     Pursuant to the Fed R. Civ P. 81 the summons and complaint together with the Motion for Preliminary Injunction, attached hereto as Exhibit A, which are all docket entries in the Circuit Court for the Sixth Judicial Circuit, Champaign County.  All such documents were received by Four Seasons on August 9, 2007.

8.     Plaintiff Sun Structure Designs, Inc. is an Illinois corporation with a principal place of business at 505 East Chestnut, Champaign, Illinois.  Defendant Four Seasons is a corporation organized under the laws of Nevada with its principal place of business at 5005 Veterans Memorial Highway, Holbrook, New York.

9.     Four Seasons reserves the right to amend or supplement this notice of removal.

WHEREFORE, defendant hereby removes the action now pending against them in the Circuit Court for the Sixth Judicial Circuit, Champaign County, as Case Number 07-CH-240, to this Court.

2

Dated: September 10, 2007

WEBBER & THIES, P.C.
By: s/ Phillip R. Van Ness
    Phillip R. Van Ness
    *Attorneys for Defendant*
    PO Box 189
    202 Lincoln Sq.
    Urbana, Illinois 61803
    Telephone: (217) 367-1126
    Facsimile: (212) 367-3752
    E-mail: pvanness@webberthies.com

OF COUNSEL – Admission Motion Pending

    Michael Einbinder (ME-3930)
    Ross H. Gould (RG-8330)
    EINBINDER & DUNN, LLP
    *Attorneys for Defendant*
    104 West 40th Street
    New York, New York 10018
    (212) 391-9500

**PROOF OF SERVICE**

I, Phillip R. Van Ness, hereby certify that on September 10, 2007, I electronically filed

the foregoing **NOTICE OF REMOVAL** with the Clerk of the Court using the CM/ECF system

with the Clerk of the Court using the CM/ECF system which will send notification of such filing

to the following:

Lorna K. Geiler, Esq.

<u>s/ Phillip R. Van Ness</u>
Phillip R. Van Ness
Attorney for Defendant
WEBBER & THIES, P.C.
202 Lincoln Square
P.O. Box 189
Urbana, IL 61803
Telephone: (217) 367-1126
Facsimile: (217) 367-3752
E-mail: pvanness@webberthies.com

4

≈JS 44 (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

| I. (a)  PLAINTIFFS | DEFENDANTS |
|---|---|
| SUN STRUCTURE DESIGNS, INC. a/k/a GLASS STRUCTURES, INC. | FOUR SEASONS MARKETING CORP. |

**(b)** County of Residence of First Listed Plaintiff   Champaign, IL
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Lorna K. Geiler, Esq., Meyer Capel, P.C., 306 West Church Street Champaign, IL 61820 (217) 352-1800

Attorneys (If Known)
Phillip R. Van Ness, Webber & Thies, P.C., P.O. Box 189, Urbana, IL 61803-0189 (217) 367-1126

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1  U.S. Government Plaintiff

☐ 2  U.S. Government Defendant

☐ 3  Federal Question (U.S. Government Not a Party)

☒ 4  Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☒ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 900 Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | | | ☐ 950 Constitutionality of |
| | Other | | | | State Statutes |
| | ☐ 440 Other Civil Rights | | | | |

## V. ORIGIN (Place an "X" in One Box Only)

☐ 1 Original Proceeding
☒ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 USC 1441 (Removal) and 9 USC 4 (Arbitration)

Brief description of cause:
Motion to Compel Arbitration and Stay Judicial Proceeding

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $   75,000.00

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☐ Yes  ☒ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):   JUDGE _____   DOCKET NUMBER _____

DATE   09/07/2007

SIGNATURE OF ATTORNEY OF RECORD
/s Phillip R. Van Ness

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

**E-FILED**
Monday, 10 September, 2007  01:31:35 PM
Clerk, U.S. District Court, ILCD

**IN THE CIRCUIT COURT FOR THE SIXTH JUDICIAL CIRCUIT
CHAMPAIGN COUNTY, ILLINOIS**

FILED
SIXTH JUDICIAL CIRCUIT

AUG 0 1 2007

Linda S. Frank
CLERK OF THE CIRCUIT COURT
CHAMPAIGN COUNTY ILLINOIS

| | | |
|---|---|---|
| SUN STRUCTURE DESIGNS, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.:   07-CH- 240 |
| | ) | |
| FOUR SEASONS MARKETING CORP. | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## COMPLAINT

NOW COMES the Plaintiff, SUN STRUCTURE DESIGNS, INC, an Illinois

Corporation, by and through its attorneys at Meyer Capel, A Professional Corporation, and for its

Complaint against the Defendant, FOUR SEASONS MARKETING CORP., a Nevada

Corporation, states as follows:

### Count I: Permanent Injunction

1.       The Plaintiff, SUN STRUCTURE DESIGNS, INC. ("Sun Structure") is a

corporation doing business in the state of Illinois with its primary location in Bondville,

Champaign County, Illinois.

2.       Defendant, FOUR SEASONS MARKETING CORP. ("Four Seasons") is a

corporation doing business in the state of Illinois and properly registered pursuant to the Illinois

Franchise Disclosure Act of 1987 to engage in the sale of franchises within Illinois.

3.       At some point, prior to renewing its contractual relationship with Four Seasons,

Sun Structure contemplated changing its name to Glass Structures, Inc. and informed Four

Seasons of the same.

**EXHIBIT A**

4.    As a result of Sun Structures contemplating a change in its name, Four Seasons altered its record keeping system for franchisees to reflect that Glass Structures, Inc. had replaced Sun Structure as a franchisee in Four Seasons corporate records.  However, Sun Structure's name change never occurred; the parties hereto understand and have operated as if Sun Structure and Glass Structure, Inc. are one in the same.

5.    In 1991, Four Seasons granted a franchise to Glass Structures, Inc., an Illinois Corporation for the sale of Four Seasons Sunrooms in and around central Illinois which had a term of ten years.  The exact territory granted in the franchise agreement was delineated by zip codes referenced in the franchise agreement dated March 15, 1991 and several 'Satellite Territory Special Stipulations to Four Seasons Franchise Agreement Dated March 15, 1991, by and between Four Seasons Marketing Corp. and Glass Structures, Inc.'

6.    After its expiration, the original franchise agreement between the parties was renewed on April 25, 2001.  A copy of the current Franchise Agreement dated on April 25, 2001 (hereinafter, the "Franchise Agreement") is attached hereto and incorporated herein as Exhibit 1.

7.    At the time of the renewal of the franchise agreement, the parties also renewed the 'Satellite Territory Special Stipulations to Four Seasons Franchise Agreement Dated April 25, 2001, by and between Four Seasons Marketing Corp. and Glass Structures, Inc.' which are now at issue in this case.  Said satellite territory agreements (hereinafter, the "Satellite Agreements") are attached hereto and incorporated herein as Exhibits 2 through 5.

8.    At the time of the renewal of the Franchise Agreement and the Satellite Agreements and in the documents themselves, Four Seasons referred to Sun Structures as Glass Structures, Inc.

2

9.    Paragraph 5 of each Satellite Agreements contains identical language which states:

> "At all times after the first full month following the date first set forth above, and thereafter throughout the term of this Special Stipulation, Franchisee shall be required to purchase from or through Franchisor or an affiliate of Franchisor on a monthly basis for distribution in the Satellite Territory, Four Seasons Products having an aggregate wholesale value equal to not less than an amount calculated by multiplying the Total Stipulated Population of the Satellite Territory set forth in Paragraph 4 above times Five cents ($.05)."

10.    The total population listed in Exhibits 1 through 5 herein and subject to the minimum order amounts referred to in Paragraph 5 of the Satellite Agreements (hereinafter, "Minimum Payments") is 1,254,618.

11.    Four Seasons indicated early in the franchise relationship with Sun Structure, in a December 9, 1992 facsimile and May 18, 1993 letter, both of which are attached hereto as Exhibits 6 and 7 respectively, that the Minimum Payments would be paid and computed annually which is the practice followed by the parties since that time.

12.    The total population covered by the Franchise Agreements and the Satellite Agreements is 1,254,618.

13.    The total yearly fee due from Sun Structure and payable to Four Seasons based upon a population of 1,254,618 is $752,770.80 per year.

14.    In 2006, Sun Structure ordered a total of Eight Hundred Eighty Eight Thousand Six Hundred Seventeen and 00/100 Dollars($888,617.00) worth of products from Four Seasons in full satisfaction of the Minimum Payments requirement of the Franchise Agreement and Satellite Agreements.

3

15.    Due to the seasonal nature of the sale of sunrooms, it would be commercially unreasonable to expect orders to satisfy the Minimum Payments requirements on a monthly basis during the winter months in central Illinois.

16.    Neither the Satellite Agreements nor the Franchise Agreement contain statements as to the due date of the Minimum Payments.

17.    Neither the Satellite Agreements nor the Franchise Agreements contain language which prohibit carrying-over previous excess orders in order to satisfy future Minimum Payments due.

18.    On May 17, 2007, Four Seasons' Senior Director of New Business and Director of Franchise Compliance, Tony Russo, (hereinafter, "Russo") sent a Notice to Cure letter (hereinafter, "Notice Letter") to Jim Scott at Glass Structures, Inc. 505 East Chestnut Champaign, Illinois 61826 which referred to a default on the Minimum Payments by Sun Structure.

19.    On or before May 17, 2007, Russo and Four Seasons knew that Sun Structure had two addresses to receive mail. The first was 505 East Chestnut Bondville, Illinois 61815 and the second was P.O. Box 11146 Champaign, Illinois 61826.

20.    On or before May 17, 2007, Russo and Four Seasons knew that Jim Scott was no longer involved in the day-to-day operations of Sun Structure and had moved to Arizona.

21.    On or before May 17, 2007, Russo and Four Seasons knew that Joseph O'Bryan was the President of Sun Structure and ran its day-to-day operations.

22.    The Notice Letter was returned "Attempted, not Known" to Four Seasons by the United States Postal Service.

4

23.    The Franchise Agreement paragraph 13(a)(ii) requires Four Seasons to give a 30-day notice to cure any delayed financial obligation before the Franchise Agreement can be terminated.

24.    The Notice Letter was intended to satisfy Franchise Agreement Paragraph 13(a)(ii), but did not because it was not received by Sun Structure and was sent to the wrong address.

25.    On June 18, 2007, Russo sent a letter attempting to terminate (hereinafter, "Termination Letter") the Satellite Agreements to the same address listed in paragraph 15 herein.

26.    The Franchise Agreement paragraph 13(a) allows for a termination of the Satellite Agreements immediately upon proper notice by Four Seasons to Sun Structure.

27.    The Termination Letter was intended to satisfy Franchise Agreement Paragraph 13(a), but did not because it was not received by Sun Structures after the 30-day cure period had expired.

28.    On June 25, 2007, Russo sent a letter which included the Notice Letter and Termination Letter as enclosures to Mr. O'Bryan which was the first time Mr. O'Bryan and Sun Structure had been sent either the Notice Letter or the Termination Letter to the correct address. Attached hereto and incorporate herein as Exhibit 8.

29.    Sun Structure did not receive the Notice Letter until June 28, 2007.

30.    Sun Structure did not receive the Termination Letter until June 28, 2007.

31.    Four Seasons failed to give proper notice pursuant to the Franchise Agreement and Satellite Agreements.

32.    Four Seasons breached the Franchise Agreement and Satellite Agreements by improperly terminating the same.

5

33.    The Illinois Franchise Disclosure Act of 1987 (hereinafter, the "Act") states: "It shall be a violation of this Act for a franchisor to terminate a franchise of a franchised business located in this State prior to the expiration of its term except for 'good cause'..." 815 ILCS 705/19(a).

34.    The Act defines 'Good Cause' as follows: "[Good cause] shall include, but not be limited to, the failure of the franchisee to comply with any lawful provisions of the franchise or other agreement and to cure such default after being given notice thereof and a reasonable opportunity to cure such default, which in no event need be more than 30 days." 815 ILCS 705/19(b).

35.    Four Seasons did not provide Sun Structure with the 30-day notice required by the Act.

36.    Sun Structure received the Notice Letter and Termination Letter on the same day and were given no opportunity to dispute or cure the alleged default.

37.    Four Seasons improperly terminated the Satellite Agreements in violation of the Illinois Franchise Disclosure Act, 815 ILCS 705/19.

38.    On July 10, 2007, Russo informed Mr. O'Bryan that Peoria Siding and Window Company, Inc. (hereinafter, "Peoria Siding") had been granted a "dealership" by Four Seasons for a large portion of the territory formerly granted to Sun Structure pursuant to the Satellite Agreements.

39.    On July 18, 2007, Sun Structure sent a letter to Four Seasons outlining Four Seasons' breach of the Franchise Agreement and Satellite Agreements and pointing out Four Seasons' violation of the Act. Said letter was intended to provide Four Seasons with proper notice pursuant to paragraph 13(c) of the Franchise Agreement. This letter also informed Four

Seasons' of its violation of 815 ILCS 705/19. The July 18, 2007 letter is attached hereto and incorporated herein as Exhibit 9.

40.    Further, Sun Structure is not in breach of the agreements as claimed by the Defendant in the May 17, 2007 correspondence.

41.    Sun Structure has a duty to mitigate future damages in any claims related to Four Seasons' breach of contract and violation of the Act and has engaged in that duty by filing this claim.

42.    Sun Structure will be financially injured by Peoria Siding's relationship with Four Seasons and Peoria Siding's ability to conduct operations in and around central Illinois in an area that is exclusively granted to Sun Structure.

43.    Sun Structure has clearly ascertainable contractual rights pursuant to the Franchise Agreement and Satellite Agreements which are in need of protection from Four Seasons' allowance of a "dealership" to Peoria Siding in an area that is exclusively granted to Sun Structure.

44.    Sun Structure has clearly ascertainable contractual rights pursuant to the Franchise Agreement and Satellite Agreements which are in need of protection from Four Seasons' consideration of additional dealers or franchisees in the territory covered by the Satellite Agreements attached hereto as Exhibits 2 through 5.

45.    Four Seasons' current action in improperly terminating the Satellite Agreements for its own economic advantage interferes with Sun Structure's rights set out previously herein.

46.    In the absence of an injunction, Sun Structure would suffer irreparable harm since Four Seasons would be allowed to grant "dealerships" and franchises in a territory covered by the Satellite Agreements and given exclusively to Sun Structure.

7

47.     Sun Structure is unable to calculate the extent of its damages at this time due to Four Seasons' actions since those damages will result in future lost profits, as well as damages to Sun Structure's reputation and good will built up throughout its business activity over the last 16 years, not to mention the continued erosion of Sun Structure's customer base in areas where Peoria Siding is located.

48.     Sun Structure has no adequate remedy at law.

49.     Sun Structure is likely to succeed on the merits of its breach of contract claim.

50.     Sun Structure is likely to succeed on the merits of its claim based upon the Illinois Franchise Disclosure Act of 1987.

51.     The aforementioned facts in conjunction with the possible damages and potential liability placed on Sun Structure by Four Seasons demonstrates that on balance Sun Structure would suffer more without the entry of an injunction than Four Season would suffer with the entry of an injunction.

WHEREFORE, the Plaintiff, SUN STRUCTURE DESIGN, INC., an Illinois Corporation, respectfully prays this Honorable Court enter an order against the Defendant, FOUR SEASONS MARKETING CORP. as follows:

A.      Permanently restraining the Defendant from granting a franchise or dealership to any parties for the territory listed in the Satellite Territory Special Stipulation to Four Seasons Franchise Agreement Dated April 25, 2001 by and between Four Seasons Marketing Corp. and Glass Structures, Inc. attached hereto as Exhibits 2 through 5.

B.      Permanently restraining the Defendant from engaging in any business with Peoria Siding and Window Company, Inc. or any other company, entity or person in the territory listed in the Satellite Territory Special Stipulation to Four Seasons Franchise Agreement Dated April 5,

8

2001 by and between Four Seasons Marketing Corp. and Glass Structures, Inc. attached hereto as Exhibits 2 through 5.

      C.     For such further relief as this Court deems equitable and just.

### Count II: Breach of Contract

1-30.  Sun Structure incorporates and re-alleges herein Paragraphs 1 through 30 of Count I as the first thirty (30) paragraphs of this Count II.

31.     On July 18, 2007, Sun Structure sent a letter to Four Seasons outlining Four Seasons' breach of the Franchise Agreement and Satellite Agreement.  Said letter provided Four Seasons with proper notice pursuant to paragraph 13(c) of the Franchise Agreement.  (See Exhibit 8.)

32.     As of this date, Four Seasons has not reinstated the Satellite Agreements attached hereto as Exhibits 2-5.

33.     Sun Structure has performed all of its obligations under the Franchise Agreement and Satellite Agreements.

34.     On July 10, 2007, Russo informed Mr. O'Bryan that Peoria Siding and Window Company, Inc. (hereinafter, "Peoria Siding") had been granted a "dealership" by Four Seasons for a large portion of the are formerly granted to Sun Structure pursuant to the Satellite Agreements.

35.     Upon information and belief that Peoria Siding is placing orders with Four Seasons for products that would have been ordered from and through Sun Structure but for Four Seasons improper termination of the Satellite Agreements.

36.     Sun Structure has and will continue to suffer a financial damages due to Peoria Siding's operations.

37.    Sun Structure has and will continue to suffer financial damages due to increased competition from other sellers' of Four Seasons products who will now be able to operate in the territory covered by the Satellite Agreements.

WHEREFORE, the Plaintiff, SUN STRUCTURE DESIGN, INC., an Illinois Corporation, respectfully prays this Honorable Court enter judgment against the Defendant, FOUR SEASONS MARKETING CORP. as follows:

A.    Awarding damages in the amount greater than $50,000.00 and costs of suit to Plaintiff.

B.    Specific performance of the Franchise Agreement and Satellite Agreements by the Defendant which includes reinstating Plaintiff's status as exclusive franchisee in all the territories at issue herein.

C.    For such further relief as this Court deems equitable and just.

### Count III: Violation of 815 ILCS 705/19

1-37.    Sun Structure incorporates and re-alleges herein Paragraphs 1 through 37 of Count I as the first thirty-seven (37) paragraphs of this Count III.

38.    Four Seasons did not have 'good cause' to terminate the Satellite Agreements under the Act section 815 ILCS 70-5/19.

39.    Four Seasons did not provide proper notice pursuant to 815 ILCS 705/19(b).

40.    Pursuant to 815 ILCS 705/26, allows Sun Structure to seek damages for a violation of 815 ILCS 705/19 in this court.

41.    Upon information and belief that Peoria Siding is placing orders with Four Seasons for products that would have been ordered from and through Sun Structure but for Four Seasons improper termination of the Satellite Agreements.

10

42.    Sun Structure has and will continue to suffer financial damages due to Peoria Siding's operations.

43.    Sun Structure has and will continue to suffer financial damages due to increased competition from other sellers' of Four Seasons products who will now be able to operate in the territory covered by the Satellite Agreements.

WHEREFORE, the Plaintiff, SUN STRUCTURE DESIGN, INC., an Illinois Corporation, respectfully prays this Honorable Court enter judgment against the Defendant, FOUR SEASONS MARKETING CORP. as follows:

A.    Awarding damages in the amount greater than $50,000.00 and costs of suit to Plaintiff.

B.    Specific performance of the Franchise Agreement and Satellite Agreements by the Defendant which includes reinstating Plaintiff's status in all the territories at issue herein.

C.    For such further relief as this Court deems equitable and just.

Respectfully submitted,

SUN STRUCTURE DESIGN, INC.,
an Illinois Corporation, Plaintiff

By:  Meyer Capel, A Professional Corporation

Lorna K. Geiler

Steven A. Amjad

LORNA K. GEILER
STEVEN A. AMJAD
Meyer Capel, *A Professional Corporation*
306 West Church Street
Champaign, IL 61820
Phone:        (217) 352-1800
Fax:          (217) 352-1083
R:\SAA\Sun Structure\Four Seasons\Pleadings - Complaint REvised 7-30.doc

11

**VERIFICATION**

STATE OF ILLINOIS            )
                             ) SS
COUNTY OF CHAMPAIGN          )

I, Joseph O'Bryan, acknowledge that I have read the foregoing Complaint by myself subscribed, and under penalties of perjury as provided by law pursuant to Section 5/1-109 of the Code of Civil Procedure, the undersigned certifies that the statements set forth in this instrument are true and correct, except as to the matters therein stated to be on information and belief and as to such matters the undersigned certifies as aforesaid that he verily believes the same to be true.

_____
Joseph O'Bryan,
President, Sun Structure Designs, Inc.

Given under my hand and seal this
_____ day of July, 2007.

_____
Notary Public

My commission expires:

LORNA K. GEILER
Meyer Capel, *A Professional Corporation*
306 West Church Street
Champaign, IL 61820
Phone: (217) 352-1800
Fax: (217) 352-1083

12

## VERIFICATION

STATE OF ILLINOIS          )
                           ) SS
COUNTY OF CHAMPAIGN        )

I, Joseph O'Bryan, acknowledge that I have read the foregoing Complaint by myself

subscribed, and under penalties of perjury as provided by law pursuant to Section 5/1-109 of the

Code of Civil Procedure, the undersigned certifies that the statements set forth in this instrument

are true and correct, except as to the matters therein stated to be on information and belief and as

to such matters the undersigned certifies as aforesaid that he verily believes the same to be true.

Joseph O'Bryan,
President, Sun Structure Designs, Inc.

Given under my hand and seal this
26 day of July, 2007.

OFFICIAL SEAL
DEBRA NALE
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 5/29/11

Notary Public

My commission expires:

LORNA K. GEILER
Meyer Capel, *A Professional Corporation*
306 West Church Street
Champaign, IL 61820
Phone: (217) 352-1800
Fax: (217) 352-1083

E-FILED
Monday, 10 September, 2007  01:32:10 PM
Clerk, U.S. District Court, ILCD

FOUR SEASONS® SUNROOMS CENTER
FRANCHISE AGREEMENT

EXHIBIT A

Copyright 1990

FS/FA-3.00(#685943)

PLAINTIFF'S
EXHIBIT

1

FOUR SEASONS® SUNROOMS CENTER

FRANCHISE AGREEMENT

TABLE OF CONTENTS

| Paragraph | Heading | Page |
|---|---|---|
| 1. | Parties and Recitals | 1 |
| 2. | Grant of Franchise | 2 |
| 3. | Term | 3 |
| 4. | Operating Assistance | 3 |
| 5. | Fees | 6 |
| 6. | Licensed Marks | 7 |
| 7. | Standards of Operations | 8 |
| 8. | Confidential Operating Manual | 15 |
| 9. | Advertising and Marketing | 16 |
| 10. | Statements and Records | 18 |
| 11. | Covenants | 19 |
| 12. | Transfer and Assignment of Agreement | 20 |
| 13. | Default and Termination | 23 |
| 14. | Post Term Obligations | 25 |
| 15. | Insurance | 26 |
| 16. | Taxes, Permits, and Indebtedness | 26 |
| 17. | Indemnification and Independent Contractor | 27 |
| 18. | Written Approvals, Waivers, and Amendment | 27 |
| 19. | Enforcement | 28 |
| 20. | Notices | 28 |
| 21. | Governing Law | 29 |
| 22. | Severability and Construction | 29 |
| 23. | Acknowledgments | 30 |
|  | Guaranty | |
|  | Schedule A - Licensed Marks | |
|  | Schedule B - Premises, Ownership and Granted Territory | |
|  | Schedule C - Minimum Performance Standards | |
|  | Schedule D-1 - Satellite Business Special Stipulation | |
|  | Schedule D-2 - Satellite Territory Special Stipulation | |
|  | Rider A - Rider to Franchise Agreement (if applicable) | |

FS/FA-3.00(#685943)

## 1.    PARTIES AND RECITALS

(a)    This Franchise Agreement ("Agreement") is made as of _April 25_, 20_01_ by and between Four Seasons Marketing Corp., a Nevada corporation with its principal place of business at 5005 Veterans Memorial Highway, Holbrook, New York 11741 ("Franchisor"), and _GLASS STRUCTURES, INC._ ("Franchisee") with a place of business at _505 EAST CHESTNUT, CHAMPAIGN, IL, 61826_.

(b)    In connection with those words/marks more fully set forth on Schedule "A", which is attached hereto and made a part hereof by reference (the "Licensed Marks"), Franchisor has developed a proprietary plan and system (the "Four Seasons System") relating to the operation of outlets under the name and mark, "Four Seasons Sunrooms," which are authorized to distribute, install, service and maintain various glass-faced structures and component parts thereof which are used as greenhouses, conservatories, patio-sunrooms, room-additions, solariums, and related functions (specifically excluding modular homes) as well as other building and remodeling products and/or services as may now or hereafter be manufactured, designed, developed or authorized for use by Franchisor (collectively the "Four Seasons Product Line") which are manufactured according to standards, specifications and designs prescribed by Franchisor and well known for their high quality and reliability. The Four Seasons System includes site selection guidelines, store layout, equipment and product selection, patented and proprietary products distributed under the Licensed Marks, purchasing and inventory guidelines, accounting methods, merchandising, advertising, installation, maintenance, sales and promotional techniques, construction design, Solarcad (a computer assisted solarium design, drafting and estimating program) planning services and general contracting, personnel training and other matters relating to the efficient operation and supervision of those outlets operated under the Four Seasons System (the "Center(s)"), and the maintenance of quality standards.

(c)    To prevent customer confusion or deception, maximize promotion of the Licensed Marks, limit warranty claims, and reinforce consumer acceptance of the Four Seasons Product Line, this Agreement restricts the sale by Franchisee of any product(s) or service(s), either in whole or in part, which, in Franchisor's sole judgment, are the same as or similar to any element or component of the Four Seasons Product Line then currently manufactured or distributed by Franchisor or its affiliates ("Competing Product(s)"). Subject to Franchisor's prior approval and Franchisee's compliance with the terms and conditions of Paragraph 7(k) hereof, Franchisee may sell and distribute product(s) and service(s) which, in Franchisor's sole judgment, are not the same as or similar to any element or component of the Four Seasons Product Line then currently manufactured or distributed by Franchisor or its affiliates (Non-Competing Product(s)"). The terms "Competing Product(s)" and "Non-Competing Product(s)" may sometimes hereinafter be collectively referred to as "nonproprietary products." Franchisee desires, upon the terms and conditions set forth herein, to obtain a license to operate a business which will utilize the Licensed Marks and the Four Seasons System (the "Franchised Business"). Franchisee acknowledges that it is essential to the maintenance of the high standards of authorized Four Seasons System franchisees, and to the preservation of the integrity of the Licensed Marks and goodwill of Franchisor, that each franchisee in the Four Seasons System maintain and adhere to certain standards, procedures and policies described herein.

(d)    Franchisor is willing, upon the terms and conditions set forth herein, to license Franchisee to operate a business which will utilize the Licensed Marks and the Four Seasons System.

(e)    The parties intend that this Agreement be implemented in a fair and reasonable manner and all provisions hereof shall be interpreted accordingly.

- 1 -

FS/FA-3.00(#685943)

## 2.    GRANT OF FRANCHISE

(a)    Subject to all of the terms and conditions herein, Franchisor licenses to Franchisee the exclusive right to operate a business utilizing the Four Seasons System and the Licensed Marks, in connection with the sale of the Four Seasons Product Line from within the territory more particularly described on Schedule "B" (the "Granted Territory"), which is attached hereto and made a part hereof by reference; provided, however, Franchisor shall retain the right to sell the Four Seasons Product Line within the Granted Territory to national accounts which shall be defined as interstate restaurants, hotels and other similar multi-state businesses purchasing the Four Seasons Product Line as end-users and as interstate retailers purchasing the Four Seasons Product Line as re-sellers.  Franchisor reserves the right:

(i)    To redefine such national accounts in writing or in the Confidential Operating Manual (as hereinafter defined) or otherwise to include a reasonably similar group of businesses;

(ii)    To allocate any business related to the installation and maintenance of national accounts among, or to establish commissions based on sales to retailers for, Four Seasons System franchisees, as Franchisor in its sole discretion shall determine;

(iii)    To market products other than greenhouses, conservatories, patio-sunrooms or solarium type structures within the Granted Territory under a different brand name or mark through other distribution methods; and

(iv)    To use the Licensed Marks and other aspects of the Four Seasons System in conjunction with activities not contemplated by Franchisor as being conducted solely through Four Seasons Sunrooms; and to offer, distribute, use and/or sell the Four Seasons Product Line through facilities other than Four Seasons Sunrooms, within the Granted Territory of outside the Granted Territory including, but not limited to:  (i) the Internet, and (ii) other concepts currently in existence or as may be developed in the future, for example through advancements in technology.

Franchisor reserves the right, in its sole and absolute discretion, to make modifications, improvements or changes to the Four Seasons Product Line at any time during the term hereof to introduce new products or to discontinue the sale or distribution of existing products, without incurring any liability whatsoever to Franchisee or others as a result of any Product Line discontinuation.  If Franchisee is offering any product with Franchisor's prior approval which is deemed by Franchisor to be similar to any such addition, modification or enhancement to the Four Seasons Product Line, Franchisee shall have a reasonable period of time (but in no event more than six (6) months) following any such Four Seasons Product introduction to deplete its existing inventory of such nonproprietary product(s).  The rights herein granted are sometimes referred to in this Agreement as the "Franchise".

(b)    Within thirty (30) days of the date on which this Agreement is executed by all parties, Franchisee shall use its best efforts to select a site location for the Franchised Business within the Granted Territory and, subject to Franchisor's prior approval, Franchisee agrees to execute a lease at such site and to commence business operations as a Franchised Business within ninety (90) days of the execution of the lease agreement.  Franchisee hereby grants Franchisor an irrevocable power of attorney to amend this Agreement to include the legal description of the Premises in Paragraph 1 of Schedule B.  Franchisee acknowledges and agrees that this is a site license only for the operation of one (1) Center at the site specified in Schedule "B" (the "Premises"), and that Franchisor may itself

- 2 -

operate or license to others the right to operate businesses utilizing the Four Seasons System and the Licensed Marks at any location not within the Granted Territory.

(c)     Provided that Franchisee is not in default under this Agreement or any other agreement with Franchisor or its affiliate, and has complied with all provisions of such agreements during the Initial Term, Franchisee may distribute the Four Seasons Product Line through dealers, approved by Franchisor and not thereafter disapproved ("Dealers"), within the Granted Territory and, if approved in writing by the Franchisor, outside of the Granted Territory, upon such terms and conditions as may be determined solely by Franchisor.

## 3.   TERM

(a)     This Agreement shall take effect upon its execution by all parties hereto (the "Effective Date") and, unless previously terminated pursuant to Paragraph 13 hereof, its term shall extend for ten (10) years from the Effective Date (the "Initial Term").

(b)     If Franchisee is not in default under this Agreement and has complied with all of its provisions during the Initial Term, including the timely payment of all fees, Franchisee may, at its option, without the payment of any further initial or renewal fee, renew the Franchise upon the expiration of the Initial Term for an additional term of ten (10) years, in accordance with Franchisor's then current terms and conditions for granting renewal franchises, which may include: (i) execution of a new and modified agreement with a different fee structure, and (ii) a requirement that Franchisee refurbish or relocate the Premises within the Granted Territory to conform to then current standards for Four Seasons System Centers. Franchisee shall exercise its option to renew the Franchise by giving Franchisor written notice of Franchisee's election to renew not less than six (6) nor more than twelve (12) months prior to the expiration of the Initial Term.

## 4.   OPERATING ASSISTANCE

(a)     Prior to Franchisee's commencement of business, Franchisor shall provide Franchisee with such of the following and on the same basis as will from time to time be made available to similarly situated franchisees of Franchisor:

(i)     Information with respect to size and location of the Center, preliminary plans, layouts, and standards and specifications for all product displays, fixtures, furnishings, signs, leasehold improvements, equipment and other related facilities for use in typical or similar Centers;

(ii)     Such information as may be available to Franchisor concerning possible sources of signs, equipment, fixtures, furnishings, leasehold improvements and other products and services available in connection with the operation of the Center;

(iii)     A minimum of five (5) days of training in the operation of the Franchised Business for the manager and assistant manager of the Center. Such training shall include business, marketing and installation training which must be completed before the opening of the Center. All such training will be conducted exclusively by Franchisor or its designee either at Franchisor's headquarters in Holbrook, New York or at other sites to be designated by Franchisor; provided, however, Franchisee shall pay all costs and living expenses during and in connection with such training;

- 3 -

(iv)    Up to one (1) additional day of training at Franchisee's Center during its grand opening or within six (6) months thereafter. In addition, Franchisor agrees to furnish training at such locations as Franchisor shall designate for Franchisee's representatives in the use, installation and service of any new or modified elements of the Four Seasons Product Line introduced during the term of this Agreement. Enrollment in such training program shall be limited to a reasonable number of persons who are employed by Franchisee and who are qualified to receive such training. Franchisor shall pay only for the reasonable cost of materials and instruction during such training period and Franchisee shall be solely responsible for all expenses of travel, lodging and board during such training period;

(v)    One (1) set of the Confidential Operating Manual(s) (as hereinafter defined) which may be amended from time to time by Franchisor in accordance with Paragraph 8 hereof;

(vi)    Pre-opening operating materials, at no cost to Franchisee, including promotional materials, an illuminated sign, and stationery, of such value as Franchisor may determine in its sole discretion.

(vii)    Initial advertising materials, at no cost to Franchisee, including advertising copy, direct mail materials and television commercials of such value as Franchisor may determine in its sole discretion.

(viii)    Such equipment and supplies as may be designated by Franchisor in the Confidential Operating Manual to be used in connection with the commencement of the Franchised Business at wholesale prices then in effect for all similarly situated franchises, making allowances for varying volume discounts and costs of shipping and delivery.

(b)    Franchisor shall continue its efforts to maintain standards of quality, appearance and service at all Centers, thereby enhancing the public image and reputation of the Four Seasons System and the demand for the Four Seasons Product Line and services associated therewith, and to that end Franchisor may provide Franchisee with the following:

(i)    Continuing training for such periods and at such locations as may be designated by Franchisor;

(ii)    Periodic assistance in local advertising and marketing in such manner, form and frequency as Franchisor, in its sole discretion, may deem appropriate;

(iii)    Periodic individual or group counseling in the operation of the Center rendered in person, by seminar, or by newsletters or bulletins made available from time to time to all Four Seasons System franchisees, as Franchisor, in its sole discretion, may deem appropriate;

(iv)    Advice concerning Center operations, new techniques or operating methods disclosed by reports submitted to or inspections made by Franchisor as Franchisor, in its sole discretion, may deem appropriate;

(v)    Assistance as Franchisor, in its sole discretion, may deem reasonably required, including advice and guidance with respect to new and improved methods of operation or business procedures developed by Franchisor, use of the Confidential Operating Manual, management materials, promotional materials, advertising formats and the Licensed Marks;

- 4 -

(vi)    Enhancements to the Four Seasons Product Line including additional or different building and remodeling products and services as Franchisor, in its sole discretion, may deem appropriate;

(vii)    The opportunity to participate, on the same basis as other franchisees, in group purchasing programs for products, supplies, insurance and equipment which Franchisor may, from time to time, use, develop, sponsor or provide and upon such terms and conditions as may be determined solely by Franchisor. Franchisor may, from time to time, delegate to its affiliate, Four Seasons Solar Products Corp., or other designees of Franchisor, its responsibility to supply Franchisee the Four Seasons Product Line. In such event, Franchisee agrees that its obligation to make payments to any such affiliate or designee of Franchisor may at Franchisor's option be governed by and secured in accordance with the terms of this Agreement. Franchisor agrees to sell the Four Seasons Product Line to Franchisee at the prevailing gross price or prices then charged by Franchisor to other franchisees, making allowances for varying volume discounts and costs of shipping and delivery. Franchisor will use reasonable efforts to ship Four Seasons products to meet Franchisee's requested delivery dates provided, however, that Franchisor may, in its sole discretion, allocate distribution in the event that Franchisor is subject to production or shipping delays for any component parts of the Four Seasons Product Line. Shipments of the Four Seasons Product Line shall be F.O.B. Franchisor's or its designated supplier's manufacturing facility or warehouse. All risks of loss or damage to the products shall cease upon delivery to the carrier selected by Franchisor or designated by Franchisee in its order. Franchisor may, in its sole discretion, limit availability of any component of the Four Seasons Product Line to certain geographic areas or set minimum purchase levels for certain components of the Four Seasons Product Line.

Franchisee's orders for all Four Seasons products shall be submitted by formal purchase order in form and substance acceptable to Franchisor. Franchisor may, in its sole discretion, accept telephone orders. A purchase order shall not be deemed binding on Franchisor unless and until Franchisor accepts the same by sending written confirmation thereof to Franchisee, or in lieu of such confirmation, by shipping any products covered by the order. Franchisor may direct Franchisee to purchase various components of the Four Seasons Product Line from third-party sources which may set terms of sale according to their own standards, or such third-party sources may refuse or terminate business with Franchisee according to their own terms.

Franchisee shall be required to pay for products in accordance with the applicable terms of any invoice therefore, without any setoff or counterclaim, except for the amount of any written credit memorandum which has been issued by Franchisor to Franchisee prior to the due date of the outstanding invoice. Franchisor reserves the right to change such terms at any time. Without limiting any other rights Franchisor may have hereunder, if Franchisee's account is not current, or if, in Franchisor's sole discretion, Franchisee's credit standing deteriorates after the Effective Date, Franchisor may discontinue shipments or require advance payments on all shipments. Payment for all Four Seasons Products is due in accordance with the terms of sale set forth by Franchisor and in no event shall payment be withheld due to damaged, missing or defective parts in any shipment. In the event of any such problem, Franchisee shall notify Franchisor in writing within ten (10) days of such delivery and Franchisor shall use its best efforts to rectify such problem or credit Franchisee's account for any such damaged components. Franchisor assumes no liability for goods damaged in transit. Franchisee or a representative must be available to accept goods at their final destination, to thoroughly inspect goods for damage and/or completeness and to file any freight claims necessary. Franchisee waives any and all claims against Franchisor for actual, incidental and consequential damages arising from delays in the shipment or delivery of any products, incomplete deliveries, missing parts or other claims arising from Franchisor's defective delivery of products ordered by Franchisee; provided,

- 5 -

however, that such waiver shall be unenforceable to the extent that it violates the provisions of Articles 687.4 and 687.5 of the New York State Franchise Regulations.

(viii)     Periodic inspections of the Premises and all other Four Seasons System Centers and of the products and services they offer including inspections by Franchisor or its designee of actual Four Seasons Product Line installations.

(c)     Upon request of Franchisee, Franchisor shall make available to Franchisee during the term of this Agreement a current list of spare parts for the Four Seasons Product Line. Franchisor agrees to make available to Franchisee for a period of seven (7) years from the date of discontinuance of any component of the Four Seasons Product Line or for a period of seven (7) years from the date of the termination of this Agreement, whichever shall first occur, spare parts for any component of the Four Seasons Product Line; provided, however, that Franchisor may discontinue the stocking of any such spare parts provided that Franchisor has first given Franchisee three (3) months advanced written notice of its intent to discontinue such stocking and providing Franchisee with the opportunity to purchase a number of parts sufficient to meet its anticipated needs.

5.     FEES

(a)     In consideration of the execution of this Agreement, Franchisee agrees to pay Franchisor an initial franchise fee in the amount of _____ N/A _____ Thousand Dollars ($ ____ N/A ____) which shall be paid in full by the Effective Date. Upon execution of this Agreement by all parties, the initial franchise fee is non-refundable.

(b)     At all times after the commencement of operation of the Franchised Business, Franchisee shall pay to Franchisor the following continuing franchise fees:

(i)     There shall be no continuing franchise fee imposed upon any revenues derived by Franchisee from the sale, installation or servicing of the Four Seasons Product Line or any component thereof manufactured and sold to Franchisee by Franchisor or its affiliates or foundation work related thereto.

(ii)     Provided that, in Franchisor's sole judgment, Franchisee adequately separates the promotion, display and sale of Non-Competing Product(s) in the manner required pursuant to Paragraph 7(k) hereof, there shall be no continuing franchise fee imposed upon any revenues derived by Franchisee from the sale or service of any Non-Competing Product(s).

(iii)     If Franchisee is determined by Franchisor, in its sole judgment, not to have adequately separated the promotion, display and sale of Non-Competing Products in the manner required pursuant to Paragraph 7(k) hereof, Franchisee shall pay to Franchisor a continuing franchise fee equal to two and one-half percent (2-1/2%) of the Gross Volume of Business (as hereinafter defined) derived by Franchisee from the sale and/or service of all Non-Competing Products at, from or through the Center.

(iv)     Subject to Franchisee's compliance with the provisions of Paragraph 7(k) hereof, Franchisor may, in its sole discretion, approve the sale of Competing Product(s) which it determines are compatible and consistent with the Four Seasons System and image and which meet Franchisor's standards of quality and reliability. If Franchisee is determined by Franchisor to have sold any Competing Product(s) at, from or through the Premises or which in Franchisor's sole judgment, may

- 6 -

be associated with the operation of the Franchised Business, Franchisee shall pay to Franchisor a continuing franchise fee equal to fifteen percent (15%) of the Gross Volume of Business derived by Franchisee from the sale and/or service of all Competing Product(s). Franchisor's acceptance of any such fees shall not be considered a waiver or approval by Franchisor of any such sales which have not been previously approved by Franchisor in writing.

(c)     Unless otherwise provided, all fees and other amounts due to Franchisor hereunder shall be paid in the manner designated by Franchisor in the Confidential Operating Manual, and such payments shall be accompanied by a statement setting forth in reasonable detail the basis for the computation, as required under Paragraph 10 of this Agreement.

(d)     If any fee or any other amount due under this Agreement is not paid within five (5) days after such amount is due, Franchisee shall pay a service charge equal to the lesser of the daily equivalent of eighteen percent (18%) of such overdue amount per year or the highest rate then permitted by applicable law for each day such amount is past due.

(e)     The term "Gross Volume of Business," as used in this Agreement, shall mean the aggregate gross amount of all revenues, excepting those revenues specifically excluded in Paragraph 5(b)(i) and (ii) above, (less the price of any products previously sold by and returned to Franchisee) from whatever source derived (whether in the form of cash, credit, agreements to pay or other consideration), excluding only sales or other tax receipts, the collection of which is required by law which arise from or are derived by Franchisee or by any other person from business conducted or which originated in, on, from, or through the Premises, whether such business is conducted in compliance with or in violation of the terms of this Agreement.

6.    LICENSED MARKS

(a)     Franchisee expressly acknowledges that Franchisor is the sole and exclusive licensor of the Licensed Marks and agrees not to represent in any manner that Franchisee has acquired any ownership rights in the Licensed Marks. Franchisee agrees not to use any of the Licensed Marks, any formatives thereof including the individual words "Four" and/or "Season(s)", or any other marks, names or indicia which are or may be confusingly similar in its own corporate or business name except as authorized by Franchisor. Franchisee further acknowledges and agrees that any and all goodwill associated with the System and identified by the Licensed Marks shall inure directly and exclusively to the benefit of Franchisor and that, upon the expiration or termination of this Agreement for any reason, no monetary amount shall be assigned as attributable to any goodwill associated with Franchisee's use of the Licensed Marks.

(b)     Franchisee understands and agrees that any use of the Licensed Marks other than as expressly authorized by this Agreement, without Franchisor's prior written consent, is an infringement of Franchisor's rights therein and that the right to use the Licensed Marks granted herein does not extend beyond the termination or expiration of this Agreement. Franchisee expressly covenants that, during the term of this Agreement and thereafter, Franchisee shall not, directly or indirectly, commit any act of infringement or contest or aid others in contesting the validity of Franchisor's right to use the Licensed Marks or take any other action in derogation thereof.

(c)     Franchisor and Franchisee acknowledge an obligation to police the use of the Licensed Marks and trade dress of the Four Seasons System and agree to do so. Franchisee shall promptly notify Franchisor of any claim, demand or cause of action that Franchisor may have based upon or

- 7 -

arising from any unauthorized attempt by any person or legal entity to use the Licensed Marks or trade dress of the Four Seasons System, any colorable variation thereof, or any other mark, name or indicia in which Franchisor has or claims a proprietary interest. Franchisee shall assist Franchisor, upon its request and at Franchisor's expense, in taking such action, if any, as Franchisor may deem appropriate to halt such activities, but shall take no action nor incur any expenses on Franchisor's behalf without Franchisor's prior written approval. If Franchisor undertakes the defense or prosecution of any litigation relating to the Licensed Marks or trade dress of the Four Seasons System, Franchisee agrees to execute any and all documents and to do such acts and things as may, in the opinion of Franchisor's legal counsel, be reasonably necessary to carry out such defense or prosecution.

(d)    Franchisee further agrees and covenants to operate and advertise only under the name or names from time to time designated by Franchisor for use by similar Four Seasons System franchisees; to adopt and use the Licensed Marks solely in the manner prescribed by Franchisor; to refrain from using the Licensed Marks to perform any activity or to incur any obligation or indebtedness in such a manner as may, in any way, subject Franchisor to liability therefore; to observe all laws with respect to the registration of trade names and assumed or fictitious names, to include in any application therefore a statement that Franchisee's use of the Licensed Marks is limited by the terms of this Agreement, and to provide Franchisor with a copy of any such application and other registration document(s); to observe such requirements with respect to trademark and service mark registrations and copyright notices as Franchisor may, from time to time, require, including, without limitation, affixing "SM," "TM," or ® adjacent to all such Licensed Marks in any and all uses thereof; and, to utilize such other appropriate notice of ownership, registration and copyright as Franchisor may require. Franchisee shall utilize only such exterior and interior signage as meets Franchisor's specifications and which has been previously approved in writing by Franchisor.

(e)    Franchisor reserves the right, in its sole discretion, to designate one or more new, modified or replacement Licensed Marks for use by franchisees and to require the use by Franchisee of any such new, modified or replacement Licensed Marks in addition to or in lieu of any previously designated Licensed Marks. Franchisee shall not be entitled to any compensation as a result of the discontinuation of any of the Licensed Marks. Any expenses or costs associated with the use by Franchisee of any such new, modified or replacement Licensed Marks shall be the sole responsibility of Franchisee.

7.    STANDARDS OF OPERATION

Franchisor shall establish and Franchisee shall maintain standards of quality, appearance and operation for the Franchised Business. For the purpose of enhancing the public image and reputation of the Four Seasons System and of increasing the demand for the Four Seasons Product Line, the parties agree as follows:

(a)    Before commencing operation of the Franchised Business, Franchisee shall, at its expense, furnish to Franchisor, for its approval, the following:

(i)    All permits and certifications as may be required for the lawful operation of the Franchised Business, together with copies of any building inspection reports and certifications from all governmental authorities having jurisdiction over the Center and the Franchised Business that all necessary permits have been obtained and that all requirements for construction and operation have been met;

- 8 -

(ii)    A properly completed state "resale certificate" or other evidence which Franchisor may reasonably require to document Franchisee's compliance with state and/or municipal sales tax laws in the jurisdiction(s) where the Franchised Business is located or where sales of the Four Seasons Product Line are transacted; and

(iii)    A copy of the lease agreement, if the Premises are leased, which lease shall provide Franchisor notice of Franchisee's default of the lease.

(b)    Prior to the commencement of the Franchised Business, Franchisee is required to purchase from Franchisor Four Seasons Product Line displays, spare parts inventory and promotional materials having an aggregate wholesale value equal to not less than _____ *N/A* _____ Dollars ($ *N/A* ). The configuration and placement of any Four Seasons Product Line displays at the Premises shall be subject to Franchisor's prior approval. Franchisor agrees to provide Franchisee with the components of such product displays, and an inventory of spare parts and promotional materials at current wholesale prices then in effect for all similarly situated franchisees making allowance for volume discounts, freight and delivery charges.

(c)    Franchisee shall operate and maintain the Franchised Business pursuant to all Four Seasons System rules, regulations, policies and standards prescribed herein, in the Confidential Operating Manual or in other written materials provided by Franchisor to Franchisee which are by their terms mandatory. Without limiting the generality of the foregoing:

(i)    Franchisee agrees that it shall make no representations or warranties to prospective customers, purchasers or end-users of the Four Seasons Product Line regarding any tax consequences or tax treatment accorded to end-users except as specifically authorized by Franchisor in writing.

(ii)    Franchisee shall, without cost or expense to Franchisor provide service to end-users of the Four Seasons Product Line distributed by Franchisee consisting of installation, support, maintenance and repair. Franchisee shall perform all service, including in-warranty and out of warranty repairs in accordance with service procedures published by Franchisor from time to time in the Confidential Operating Manual and Franchisee agrees to maintain a qualified staff adequate to handle all such service requirements. In order to protect the reputation of the Four Seasons Product Line, Franchisee agrees that it shall only utilize installers, subcontractors, service technicians or employees who are qualified to service the Four Seasons Product Line and related components distributed by Franchisee. Franchisor reserves the right to withhold delivery of any portion or component of the Four Seasons Product Line in the event that Franchisor determines, in its sole discretion, that Franchisee is unable to provide adequate supervision and service of the Four Seasons Product Line. Franchisee shall be solely liable for the proper construction and installation of the Four Seasons Product Line and components thereof and for any custom fabrication or job-site alterations.

(iii)    Franchisee shall promptly respond to customer inquiries or complaints and shall take such other steps as may be required to insure positive customer relations. Franchisee agrees that if any customer complains to Franchisor about Franchisee's performance of service, Franchisor may conduct an investigation to determine the legitimacy of the customer's complaint and Franchisee's compliance with Franchisor's service procedures and standards. Franchisee agrees to take such corrective action as may be reasonably requested by Franchisor to remedy any such problem. In order to maintain and enhance the reputation of the Four Seasons System and the Four Seasons Product Line, in the event that Franchisor shall determine the existence of a legitimate consumer problem, Franchisor and Franchisee agree to use their best good faith efforts to diligently resolve any such

- 9 -

problems including through the use of other contractors or tradesmen. Franchisee will allow Franchisor's service representative to inspect Franchisee's service records at reasonable times to ensure compliance with the aforesaid standards and to acquire data for the purpose of improving service procedures and reliability. Franchisee acknowledges that its failure to adhere to the provisions of this subparagraph (c) shall constitute a material breach of this Agreement.

(d)      Franchisee's Center shall be open for the conduct of business on a consistent basis at least six (6) days each week (including Saturday) for not less than the minimum number of hours specified by Franchisor in the Confidential Operating Manual, as may be amended from time to time, unless otherwise specifically approved by Franchisor, and Franchisee shall at all times operate the Center diligently so as to maximize the revenues and profits therefrom.

(e)      Franchisee shall use only business stationery, business cards, marketing materials, advertising materials, printed materials and forms which have been approved in advance by Franchisor. Franchisee shall not employ any person to act as a representative of Franchisee in connection with local promotion of the Franchised Business in any public media without the prior written approval of Franchisor.

(f)      In all advertising displays and materials and at the Premises, Franchisee shall, in such form and manner as may be specified by Franchisor in the Confidential Operating Manual, notify the public that Franchisee is operating the Franchised Business as an independent franchisee of Franchisor and shall identify its business location in the manner specified by Franchisor in the Confidential Operating Manual.

(g)      Franchisee shall at all times actively promote and sell the Four Seasons Product Line at the Premises and will use its primary and best efforts to cultivate, develop and expand the market therefore within the Granted Territory consistent with Franchisor's evaluation of the potential of the Granted Territory taking into consideration such factors as the size of, population in and market potential of the Granted Territory; competition in the marketplace; the prior performance of Franchisee or other franchisees in other geographic areas; and such other financial and market factors as Franchisor may deem pertinent. Notwithstanding Franchisor's publication of suggested list prices for the Four Seasons Product Line, Franchisee shall not be obligated to observe such suggested prices and shall be free to respond to competitive pricing in the discharge of its obligation to actively promote and sell the Four Seasons Product Line. Without limiting the generality of the foregoing Franchisee shall be required to meet the minimum performance standards specified in Schedule C attached hereto throughout the term of this Agreement; provided, however, that in the event Franchisee elects to distribute the Four Seasons Product Line through one or more Dealers in an expanded territory, the minimum performance standards shall be increased based on the population of such expanded territory. Franchisee agrees that during the term hereof it shall not substantially reduce its efforts to market, promote and sell the Four Seasons Product Line.

(h)      Franchisee shall act as a marketing, service and installation agency for Franchisor pursuant to the terms of Four Seasons National Account Contracts in effect from time to time. Franchisor shall have the right reasonably to allocate marketing, sales and installation business under these contracts among any or all of its franchisees as Franchisor shall deem to be in the best interest of the Four Seasons System generally.

(i)      Upon Franchisee's acceptance of Franchisor's National Account and/or Government Account Programs in effect from time to time, Franchisee shall, at Franchisor's request, provide service for the account of Franchisor to National Account and/or Government Account customers with offices

- 10 -

or outlets in the Granted Territory in accordance with such Programs. Customers in the Government Account Program shall consist of all state and local government agencies and institutions. Franchisor shall have the right reasonably to allocate National Account and/or Government Account business among all of its franchisees as Franchisor shall deem to be in the best interest of the Four Seasons System generally.

(j)     In order to maintain the high quality of products and service provided under the Four Seasons System, Franchisee agrees that it shall not, without Franchisor's prior written consent, engage in any mail order or catalogue solicitation outside of the Granted Territory except in conjunction with programs made available by Franchisor to all other similarly situated franchisees of Franchisor. If Franchisee sells any Four Seasons products for use outside of the Granted Territory, Franchisee shall either agree with the end-user to provide the warranty service specified in Paragraph 7(c) hereof or, prior to shipment of any such products, take the following action:

(i)     Notify Franchisor of the name and address of the end-user;

(ii)     Request Franchisor to designate a franchisee in whose area such products are to be installed to install the product and to provide service to such end-user;

(iii)     Reimburse such franchisee at mutually agreed upon rates for installation and in-warranty service; and

(iv)     Obtain the agreement of the installing franchisee to service such products following the expiration of the warranty period on the same terms as such franchisee offers to its other customers.

(k)     Franchisee shall continuously offer to customers and maintain for demonstration purposes at the Center all components of the then-current Four Seasons Product Line as Franchisor may from time to time require, and only those which Franchisor may approve and not thereafter disapprove, as meeting its uniform quality standards and specifications. The Four Seasons Product Line is the subject of various patents and trade secrets which are integral to the quality, reliability and image associated with the Four Seasons System. Accordingly, Franchisee shall refrain from offering or selling any nonproprietary products and/or services from the Center without Franchisor's prior written consent. If Franchisee desires to offer and sell any nonproprietary products or services from the Center, Franchisee shall submit to Franchisor a written request for such approval in accordance with procedures prescribed from time to time by Franchisor in the Confidential Operating Manual. Franchisor reserves the right to prohibit or withdraw its approval for the sale of any nonproprietary products and/or services which, in Franchisor's sole judgment, are or become incompatible or inconsistent with the Four Seasons System and image, fail to meet Franchisor's standards of quality and reliability, or which may create a higher than normal risk of liability or customer dissatisfaction. If Franchisee elects to sell or distribute Non-Competing Products or requests Franchisor's authorization to sell or distribute Competing Products, Franchisee may, in Franchisor's sole discretion, be required to comply with any or all of the following additional requirements in order to prevent customer deception or confusion and to adequately separate the promotion, display and/or sale of such nonproprietary products from the Four Seasons Product Line:

(i)     Franchisee shall submit to Franchisor all preliminary plans and final plans and specifications delineating the Premises and noting the physical separation of display areas for the Four Seasons Product Line and any nonproprietary products permitted by Franchisor to be distributed at, from or through the Premises. There shall be no liability on the part of Franchisor to Franchisee or to any present or future owner of the Franchised Business or to any party in interest because Franchisor has approved the plans and specifications to assure compliance with its standards.

FS/FA-3.00(#685943)

(ii)    Any nonproprietary products shall be displayed only in a distinct area of the Premises, separated from any displays of Four Seasons Products by partition or threshold which serves to adequately notify Franchisee's customers of the separate product sources. Franchisee shall post a sign at all entrances to the nonproprietary product showroom in form satisfactory to Franchisor, notifying the public that such nonproprietary products are neither manufactured, sponsored nor warranted by Franchisor. No display of nonproprietary products shall be combined with or compromise the separate integrity of Four Seasons Product displays.

(iii)    Franchisee shall allocate approximately the following interior square footage at the Premises to display of the Four Seasons Product Line:

750 square feet for a "Level 3 franchise";

500 square feet for a "Level 2 franchise"; or

200 square feet for a "Level 1 franchise".

Franchisee's failure to comply with the minimum display requirements of this subparagraph (iii) and its failure to cure such default within thirty (30) days of receipt of written notice from Franchisor shall be deemed a material breach of this Agreement.

(iv)    Franchisee shall not commingle promotion of the Four Seasons Product Line, or use the Licensed Marks in conjunction with the promotion of any nonproprietary products or services in any form of advertising media without the prior written approval of Franchisor.

(v)    Franchisee shall utilize a separate trade name and phone listing in connection with the operation and promotion of any business promoting the sale of nonproprietary products as well as distinct stationery, invoices, business cards, purchase orders and customer contracts.

(vi)    To avoid confusion and minimize potential customer dissatisfaction in any case in which nonproprietary products are sold by Franchisee, Franchisee will clearly distinguish such nonproprietary products from the Four Seasons Product Line and explain to its customers prior to execution of any order the extent of any warranty given by the manufacturer of such nonproprietary products. Franchisee shall bear sole responsibility to assure that any and all such nonproprietary products comply and are installed in accordance with all applicable building, engineering and safety codes and ordinances. Franchisor may require that Franchisee execute purchase orders with all purchasers or end-users of nonproprietary products in form approved by Franchisor which disclaim any liability on behalf of Franchisor arising from the sale or installation of nonproprietary products by Franchisee. Franchisor assumes no liability, either express or implied, to Franchisee or any purchaser or end-user of such nonproprietary products, as a consequence of any such approval or disapproval of any nonproprietary product, service or installation provided by Franchisee.

(vii)    Franchisee shall provide to Franchisor, in such form as Franchisor may from time to time require, a listing of any nonproprietary products or services which are offered or sold by Franchisee at, from or through the Premises.

(l)    Any and all products or services sold by or through Franchisor to Franchisee shall be sold by Franchisee in accordance with the terms expressly set forth in the Confidential Operating Manual or otherwise in writing by Franchisor or by the manufacturer of such products or services. Any

- 12 -

contract or agreement between Franchisee and any purchaser or end-user, whether or not for the Four Seasons Product Line, shall contain a disclaimer of Franchisor's liability and shall specifically provide that any claim, controversy or dispute arising from the sale or lease of such products or services shall be governed by the laws of the State of New York and shall be resolved exclusively through the Commercial Arbitration Rules of the American Arbitration Association. Franchisor does not authorize Franchisee to create any obligation or liability in connection with the sale of the Four Seasons Product Line. The Four Seasons Product Line is to be sold strictly in accordance with such warranties as Franchisor may issue for each specific product. Warranty claims arising from, through, or out of Four Seasons Products sold by Franchisee are to be submitted by the purchaser or end-user only through Franchisee. Franchisor may, in its sole discretion, provide for returns and credits in connection with such warranty claims in the manner specified in the Confidential Operating Manual from time to time. Franchisee shall bear any costs of labor to inspect, remove and/or replace any defective part or replacement part, as the case may be, of the Four Seasons Product Line within the term of any applicable warranty.

EXCEPT AS EXCLUSIVELY SET FORTH IN WRITING, FRANCHISOR MAKES NO WARRANTIES, EITHER EXPRESS OR IMPLIED, WITH RESPECT TO THE FOUR SEASONS PRODUCT LINE, INCLUDING BUT NOT LIMITED TO THE IMPLIED WARRANTY OF TITLE AND THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

FRANCHISOR WILL NOT BE LIABLE FOR PERSONAL INJURY OR PROPERTY DAMAGE (UNLESS CAUSED SOLELY BY FRANCHISOR'S NEGLIGENCE) LOSS OF PROFIT, OR OTHER INCIDENTAL, CONSEQUENTIAL OR SPECIAL DAMAGES ARISING OUT OF THE USE OR INABILITY TO USE THE PRODUCTS OR FOR ANY DAMAGES (REGARDLESS OF THEIR NATURE) CAUSED BY THE FRANCHISEE'S FAILURE TO FULFILL ITS RESPONSIBILITIES AS SET FORTH HEREIN. IN NO EVENT SHALL FRANCHISOR'S LIABILITY HEREUNDER EXCEED THE STATED SELLING PRICE OF THE PRODUCTS TO FRANCHISEE. THIS WARRANTY SHALL BE VOID AND OF NO FORCE AND EFFECT WITH RESPECT TO ANY PRODUCT WHICH IS DAMAGED AS A RESULT OF (A) NEGLECT, ALTERATION OR ACCIDENT, (B) IMPROPER USE, INCLUDING FAILURE TO FOLLOW OPERATING AND MAINTENANCE PRESCRIBED IN FRANCHISOR'S CONFIDENTIAL OPERATING MANUAL, (C) REPAIR BY OTHER THAN SERVICE REPRESENTATIVES QUALIFIED BY FRANCHISOR AND ACTING IN ACCORDANCE WITH FOUR SEASONS' SERVICE BULLETINS, OR (D) USE OF PARTS WHICH DO NOT MEET FRANCHISOR'S SPECIFICATIONS.

 (m) Franchisee shall provide pre-delivery inspection and service for all Four Seasons products ordered by Franchisee. In those instances where Four Seasons products are "drop-shipped" to a job site, Franchisee shall be on hand to inspect all goods for damage and completeness and make every effort to rectify any problems.

 (n) Franchisee shall maintain a parts inventory adequate to provide prompt and efficient service at Franchisee's normally experienced usage rates, or as may be reasonably prescribed by Franchisor and, in addition, any equipment as may be reasonably required by Franchisor in order to

- 13 -

service the Four Seasons Product Line. Franchisee agrees to furnish each end-user of the Four Seasons Product Line with the printed form of warranty furnished by Franchisor.

(o) Franchisee agrees that the Franchised Business shall only be operated under the direct supervision of Franchisee or a general manager who has previously been approved in writing by Franchisor and not thereafter disapproved.

(p) Franchisee and/or such of its managerial personnel as designated by Franchisor shall complete, to Franchisor's reasonable satisfaction, any and all training programs as Franchisor may reasonably require. Franchisor may at its option require others of Franchisee's initial and subsequent management employees to attend and satisfactorily complete all or any part of such training programs. All expenses incurred in training, including, without limitation, cost of travel, room, board and wages of the person(s) receiving such training shall be borne by Franchisee.

(q) Franchisee hereby grants to Franchisor and its agents the right to enter upon the Premises at any reasonable time for the purpose of conducting inspections, and Franchisee agrees to render such assistance as may reasonably be requested and to take such steps as may be necessary immediately to correct any deficiencies detected during such an inspection upon the request of Franchisor or its agents.

(r) Franchisee hereby grants to Franchisor a purchase money security interest in any and all Four Seasons products, and any proceeds thereof (including, but not limited to all accounts receivable and the proceeds of any insurance covering such products), purchased by Franchisee from or through Franchisor. The security interest granted herein secures the payment to Franchisor of the purchase price of any Four Seasons products, all obligations of Franchisee to Franchisor relating to the purchase, and all costs, expenses, future advances and liabilities which may be made or incurred by Franchisor in the administration and collection of any such obligations. This Agreement shall constitute a security agreement, and upon request by Franchisor, Franchisee shall execute any additional instruments required to perfect this security interest including, without limitation, a standard Uniform Commercial Code ("UCC") financing statement. Franchisee authorizes Franchisor:

(i) To file a copy of this Agreement, a UCC financing statement and any other documents that may be necessary to perfect the security interest granted herein; and

(ii) To sign on behalf of Franchisee and to file in any jurisdiction, with or without signature of Franchisee, financing statements with respect to this security interest and security agreement.

(s) Franchisee agrees to install and utilize in connection with the Franchised Business facsimile transmission equipment compatible with specifications published by Franchisor in the Confidential Operating Manual and which is continuously accessible to Franchisor during prescribed hours of operation. Upon Franchisor's request, Franchisee agrees to install, update or replace any equipment (including computer equipment) and software designed to be used in connection with the operation of the Four Seasons Sunroom, and to utilize equipment and software of such kind and in such manner as specified by Franchisor from time to time. Without limiting the generality of the foregoing, Franchisee agrees that it shall install and utilize in connection with the Four Seasons Sunroom such hardware and software as Franchisor may require from time to time, which is compatible with and accessible to Franchisor's central accounting system through modem or other manual or electronic access. Franchisee shall establish and maintain Internet access and an electronic mail address and shall keep Franchisor informed of such address during the term of this Agreement.

FS/FA-3.00(#685943)

Franchisee shall not, without the prior written approval of Franchisor, create, establish, operate or otherwise utilize an Internet web page that advertises the services of the Four Seasons Sunroom, or the Four Seasons Product Line.

## 8. CONFIDENTIAL OPERATING MANUAL

(a)     To protect the reputation and goodwill of the businesses operating under the Four Seasons System and to maintain standards of operation under the Licensed Marks, Franchisee shall conduct the business operated under the Four Seasons System in accordance with various written instructions and confidential manuals (hereinafter and previously referred to as the "Confidential Operating Manual"), including such amendments thereto, as Franchisor may publish from time to time, all of which Franchisee acknowledges belong solely to Franchisor and shall be on loan from Franchisor during the term of this Agreement. When any provision in this Agreement requires that Franchisee comply with any standard, specification or requirement of Franchisor, unless otherwise indicated, such standard, specification or requirement shall be such as is set forth in this Agreement or as may, from time to time, be set forth by Franchisor in the Confidential Operating Manual.

(b)     Franchisee shall at all times use its best efforts to keep the Confidential Operating Manual and any other manuals, materials, goods and information created or used by Franchisor and designated for confidential use within the Four Seasons System and the information contained therein as confidential and shall limit access to employees and independent contractors of Franchisee on a need-to-know basis. Franchisee acknowledges that the unauthorized use or disclosure of Franchisor's confidential information will cause irreparable injury to Franchisor and, that damages are not an adequate remedy. Franchisee accordingly covenants that it shall not at any time, without Franchisor's prior written consent, disclose, use, permit the use thereof (except as may be required by applicable law or authorized by this Agreement), copy, duplicate, record, transfer, transmit or otherwise reproduce such information, in any form or by any means, in whole or in part, or otherwise make the same available to any unauthorized person or source. Any and all information, knowledge and know-how not generally known about the Four Seasons System and Franchisor's products, services, standards, procedures, techniques and such other information or material as Franchisor may designate as confidential shall be deemed confidential for purposes of this Agreement, except information which Franchisee can demonstrate legally came to its attention prior to disclosure by Franchisor, or which legally is or has become a part of the public domain by publication or communication by others.

(c)     Franchisee understands and acknowledges that Franchisor may, from time to time, revise the contents of the Confidential Operating Manual to implement new or different requirements for Four Seasons System franchised businesses, and Franchisee expressly agrees to comply with all such changed requirements which are by their terms mandatory; provided that such requirements shall also be applied in a reasonably nondiscriminatory manner to comparable businesses operated under the Four Seasons System by other franchisees. This implementation of such requirements may require the expenditure of reasonable sums of money by Franchisee.

(d)     Franchisee shall at all times insure that its copy of the Confidential Operating Manual is kept current and up to date and, in the event of any dispute as to the contents thereof, the terms and dates of the master copy thereof maintained by Franchisor at its principal place of business shall be controlling.

FS/FA-3.00(#685943)

9.    ADVERTISING AND MARKETING

Recognizing the value of standardized advertising and marketing programs to the furtherance of the goodwill and public image of the Four Seasons System, the parties agree as follows:

(a)    Franchisor agrees to contribute an amount equal to five percent (5%) of Franchisee's purchases of the Four Seasons Product Line through Franchisor or any affiliate of Franchisor (exclusive of products purchased for Dealer sales) to a Franchisee Advertising Account (the "Advertising Account"). Franchisee may draw upon the Advertising Account for reimbursement of approved advertising expenditures incurred by Franchisee in accordance with the following terms and conditions:

(i)    Within ten (10) days of the last day of each month, Franchisor will credit the Advertising Account in an amount equal to five percent (5%) of the net proceeds of any components of the Four Seasons Product Line purchased by Franchisee through Franchisor or any affiliate of Franchisor and paid for during the prior month;

(ii)    Franchisor agrees to send to Franchisee not later than the fifteenth day of each month a statement setting forth on a monthly and cumulative basis any amounts credited by Franchisor to the Advertising Account on Franchisee's behalf;

(iii)    Any credit accrued by Franchisee in the Advertising Account during any calendar year must be fully expended by Franchisee no later than March 1 of the following year, or Franchisee shall be deemed to have forfeited its right to any such accrued but unexpended amounts. Franchisee shall not be entitled to be reimbursed from the Advertising Account in an amount greater than One Hundred Thousand Dollars ($100,000) during any one calendar year;

(iv)    Prior to the publication or dissemination of any advertisement for which reimbursement is sought from the Advertising Account, Franchisee shall submit by certified mail a copy of any such advertising for Franchisor's prior approval. Any advertising not specifically disapproved by Franchisor within ten (10) days of its receipt by Franchisor shall be deemed approved. All such advertising shall be limited to the promotion of the Four Seasons Product Line and Franchisee agrees to use its best efforts to cooperate with Franchisor's recommendations by expending the Advertising Account on advertising subject matter displayed at such frequencies and in such media, in a consistent and efficient program of advertising as may from time to time be recommended by Franchisor in newsletters or in the Confidential Operating Manual;

(v)    Any amounts in the Advertising Account to which Franchisee may be entitled may, in Franchisor's sole discretion, be utilized to offset any past due account balance of Franchisee before any reimbursement is made by Franchisor to Franchisee for any approved advertising expenditures; and

(vi)    Upon the prior written request of Franchisee, and in lieu of crediting Franchisee's Advertising Account as provided in subparagraph (i) above, Franchisor may, in its sole discretion, elect to discount the wholesale price of Franchisee's purchase of any components of the Four Seasons Product Line in the additional amount of five percent (5%) of such purchases provided Franchisee:

(A)    is and has continuously been in good standing and has never received any notice of default pursuant to this or any other Franchise Agreement with Franchisor;

- 16 -

(B)    maintains a uniform advertising and marketing image promoting the Licensed Marks and the Four Seasons Product Line including, without limitation, the local advertising and marketing required pursuant to Paragraph 9(e) hereof; and

(C)    files the monthly reports required pursuant to Paragraph 10 hereof on a timely basis. Such discounts shall be subject to the aggregate annual limitations set forth in subparagraph (iii) above. Franchisor reserves the right to unilaterally discontinue such discounts without prior notice generally, or with respect only to Franchisee.

(b)    Within ten (10) days of the last day of each month, Franchisor agrees to contribute the additional amount of two and one-half percent (2-1/2%) of the net proceeds of purchases of the Four Seasons Product Line made by all Four Seasons franchisees from or through Franchisor or any affiliate of Franchisor during the prior month to the Four Seasons Advertising Fund. Franchisor or its designee shall exclusively maintain and administer the Four Seasons Advertising Fund ("Fund") for national and regional advertising, public relations and marketing programs and market research ("Advertising"), and shall direct all such Advertising with sole discretion over the concepts, materials and media used therein. Franchisee understands and acknowledges that the Fund is intended to maximize general public recognition and acceptance of the Licensed Marks for the benefit of the Four Seasons System as a whole and that Franchisor and its designee undertake no obligation in administering the Fund to insure that any particular franchisee benefits directly or pro rata from the Advertising. Franchisee agrees that the Fund may otherwise be used to meet any and all costs incident to such Advertising, including the cost of producing and distributing catalogs and mailings in response to national advertisements, costs of telephone and data processing equipment and personnel to process leads, and costs of other promotional activities such as national shows.

(c)    For purpose of calculating Franchisor's obligation to credit Franchisee's Advertising Account pursuant to Paragraph 9(a) or to contribute to the Fund pursuant to Paragraph 9(b) hereof, Franchisor may, from time to time, in its sole discretion exclude from application of either advertising contribution any component of the Four Seasons Product Line other than greenhouses and solariums which Franchisor may list in the Confidential Operating Manual or otherwise publish to Franchisee from time to time. The amount of any such credits or contributions shall be subject to verification and correction by Franchisor during the term hereof.

(d)    Franchisor may provide Franchisee, from time to time, with local advertising, marketing and customer training and educational plans and materials, including without limitation newspaper mats, radio commercial tapes, merchandising materials, sales aids, special promotions and similar advertising, marketing, training and educational materials, at a reasonable price, plus handling.

(e)    In addition to any expenditures from its Advertising Account, Franchisee, at its expense, shall:

(i)    Obtain at least the minimum size listings of the Center under listings for "Greenhouse Builders," "Patio and Sunroom Builders," and "Porch and Patio Enclosures" in the white and yellow pages of all local telephone directories within the Granted Territory. Listings in telephone directories which do not serve markets within the Granted Territory are prohibited unless approved in writing by Franchisor.

- 17 -

(ii)    Obtain and maintain advertising signs at the Center and in addition any special promotional materials of the kind and size, and at such location in the Center, as Franchisor may from time to time require for comparable Four Seasons System Centers.

(iii)    Utilize the current "Four Seasons Lead Management Program" to diligently follow up all leads generated through national and local advertising programs and use its best efforts to maximize the sale of the Four Seasons Product Line through such efforts.

(f)    Any advertising placed by Franchisee shall prominently feature the Licensed Marks and shall be compatible with advertising approved by Franchisor. Franchisee shall submit (through the mail, return receipt requested) to Franchisor for its prior approval (except with respect to prices to be charged), samples of all signage, marketing materials and advertising to be used by Franchisee that have not been prepared or previously approved by Franchisor or its designated agents. If written disapproval thereof is not received by Franchisee within seven (7) days from the date of receipt by Franchisor of such materials, Franchisor shall be deemed to have given the required approval.

(g)    Franchisor in its absolute discretion may transfer up to ten percent (10%) of the contributions received by the Fund into another fund known as the Four Seasons Special Fund ("Special Fund"). Expenditures from the Special Fund shall be in the absolute discretion of and may be used by Franchisor: (1) to subsidize Franchisor's expenses for exhibiting in industry trade shows; (2) to perform warranty, maintenance and repair work on products sold by Four Seasons System franchisees; or (3) for legal, accounting or other professional fees incurred by Franchisor in the defense of claims brought by any third party against Franchisor, whether alone or jointly with any franchisee, which arises from any incident, act or omission by any franchisee. Expenditures from the Special Fund shall be in the absolute discretion of Franchisor. No person, firm or company is intended to be a third party beneficiary of the Special Fund nor is there any intention to create any kind of insurance for the benefit of any party. The establishment of the Special Fund gives no rights to any person to bring a claim against the Special Fund. Franchisor shall be entitled to reimburse itself out of the Special Fund for reasonable accounting, bookkeeping, reporting, legal and administrative expenses incurred with respect to the Special Fund. Unexpended funds in the Special Fund may either be retained in the Special Fund or returned to the Fund in the absolute discretion of Franchisor.

## 10.    STATEMENTS AND RECORDS

(a)    Franchisee shall maintain original, full and complete records, accounts, books, data, licenses, contracts and product supplier invoices which shall accurately reflect all particulars relating to Franchisee's business and such statistical and other information or records as Franchisor may require and shall keep all such information for not less than three (3) years. Upon Franchisor's request, from time to time, Franchisee shall furnish Franchisor with copies of any or all product supply invoices reflecting purchases by the Franchised Business. In addition, upon the request of Franchisor, Franchisee shall compile and provide to Franchisor any statistical or financial information regarding the operation of the Franchised Business, the products or services sold by it, or data of a similar nature as Franchisor may reasonably request for purposes of evaluating or promoting the Franchised Business or the Four Seasons System in general. Franchisor and its designated agents shall have the right to examine and audit such records, accounts, books and data at all reasonable times to insure that Franchisee is complying with the terms of this Agreement. If such inspection discloses that the Gross Volume of Business in any period exceeded the amount reported by Franchisee as its Gross Volume of Business by an amount equal to one percent (1%) or more of the Gross Volume of Business originally reported to Franchisor, Franchisee shall bear the cost of such inspection and audit and shall pay any

- 18 -

such deficiency with interest from the date due at the lesser of eighteen percent (18%) of such overdue amount or the highest rate permitted by applicable law, immediately upon the request of Franchisor.

(b)    No later than the tenth (10th) day of each month, Franchisee shall deliver a monthly sales report and an unaudited profit and loss statement to Franchisor on forms prescribed by Franchisor, stating the fees due to Franchisor during the preceding month itemized by revenue producing activity as specified from time to time by Franchisor, the Gross Volume of Business at the Premises for the prior month, and such other information as Franchisor may require, all signed and certified as true and correct by an authorized agent of Franchisee.

(c)    No later than the twentieth (20th) day of each month, Franchisee shall deliver a New Bookings Report to Franchisor on forms prescribed by Franchisor, identifying Four Seasons Product and nonproprietary Products sold and installed by Franchisee during the prior month, and such other information as Franchisor may require, all signed and certified as true and correct by an authorized agent of Franchisee.

(d)    Franchisee shall furnish Franchisor with a copy of each of its reports and returns of sales, use and gross receipt taxes, which Franchisee shall certify as true and correct, by mailing such reports to Franchisor contemporaneously with the mailing of such reports and returns to the appropriate taxing authority.

(e)    Franchisee shall deliver semiannually to Franchisor, no later than thirty (30) days from the end of Franchisee's fiscal mid-term year and no later than forty-five (45) days from the close of Franchisee's fiscal year, an unaudited profit and loss statement and balance sheet covering Franchisee's business for the first six (6) months of each fiscal year and the final six (6) months of each fiscal year, respectively, all of which shall be in a format prescribed by Franchisor and certified by Franchisee as true and correct. In addition, Franchisee, as well as any guarantor(s) of this Agreement, shall, within thirty (30) days after request from Franchisor, deliver to Franchisor a financial statement, certified as correct and current, in a form which is satisfactory to Franchisor and which fairly represents the total assets and liabilities of Franchisee and any such guarantor(s).

## 11.    COVENANTS

(a)    During the term of this Agreement, Franchisee and any guarantor(s) hereof covenant, individually:

(i)    To use their best efforts in operating the Franchised Business, in maximizing sales of the Four Seasons Product Line in the Granted Territory, and in recommending, promoting and encouraging the use of the Four Seasons Product Line and all Four Seasons System Centers;

(ii)    Not to engage in any business, other than as a franchisee of the Four Seasons System, except as contemplated by this Agreement, within a twenty-five (25) mile radius of the Premises, which is the same as or similar to the Franchised Business or which sells any products similar to any component of the Four Seasons Product Line including any additions, modifications or enhancements to the Four Seasons Product Line introduced by Franchisor during the term hereof. The purpose of this subparagraph (ii) is to encourage Franchisee and any guarantor(s) hereof to use their best efforts to promote the Four Seasons System and the Four Seasons Product Line;

- 19 -

FS/FA-3.00(#685943)

(iii)    Not to offer or sell during the term of this Agreement any products or services which have not been approved by Franchisor for use or sale in Four Seasons System Centers; and

(iv)    Not to engage in any act or practice which is dishonest or misleading to prospective or current customers or clients of businesses operated under the Four Seasons System or which may impair the goodwill associated with the Licensed Marks.

(b)    In the event this Agreement expires or is terminated pursuant to Paragraph 13 hereof, Franchisee covenants, for a period of two (2) years after such expiration or termination, not to operate any business at or within a one (1) mile radius of the former Premises which offers or sells greenhouses, conservatories, patio-sunrooms or solariums.

(c)    During the term of this Agreement and thereafter, Franchisee covenants not to communicate directly or indirectly, divulge to or use for its benefit or the benefit of any other person or legal entity, any trade secrets which are proprietary to Franchisor or any information, knowledge or know-how deemed confidential under Paragraph 8 hereof, except as permitted by Franchisor. The protection granted hereunder shall be in addition to and not in lieu of all other protections for such trade secrets and confidential information as may otherwise be afforded in law or in equity. .

(d)    During the term of this Agreement and for one (1) year thereafter, Franchisee covenants not to directly or indirectly, through any means request, solicit or induce any employee of Franchisor or its affiliates to terminate employment with Franchisor or its affiliates and accept employment with Franchisee, nor to hire or employ any such employee as an employee of Franchisee.

(e)    The parties agree that each of the foregoing covenants shall be construed as independent of any other covenant or provision of this Agreement. Should any part of these restrictions be found to be unenforceable by virtue of its scope in terms of area, business activity prohibited or length of time, and should such part be capable of being made enforceable by reduction of any or all thereof, Franchisee and Franchisor agree that the same shall be enforced to the fullest extent permissible under the law. The running of any period of time specified in this Paragraph 11 shall be tolled and suspended for any period of time in which the Franchisee is found by a court of competent jurisdiction to have been in violation of this restrictive covenant. Franchisor may, unilaterally, at any time, in its sole discretion, revise any of the covenants in this Paragraph 11 so as to reduce the obligations of Franchisee hereunder. Franchisee further expressly agrees that the existence of any claim it may have against Franchisor whether or not arising from this Agreement, shall not constitute a defense to the enforcement by Franchisor of the covenants in this Paragraph 11.

## 12.    TRANSFER AND ASSIGNMENT OF AGREEMENT

(a)    This Agreement and all rights and duties hereunder may be freely assigned or transferred by Franchisor at its sole discretion to any person or legal entity which agrees to assume Franchisor's obligations hereunder, and shall be binding upon and inure to the benefit of Franchisor's successors and assigns including, without limitation, any entity which acquires all or a portion of the capital stock of Franchisor or any entity resulting from or participating in a merger, consolidation or reorganization in which Franchisor is involved, and to which Franchisor's rights and duties hereunder are assigned or transferred.

(b)    Franchisee understands and acknowledges that the rights and duties set forth in this Agreement are personal to Franchisee and that Franchisor has granted the Franchise in reliance on

- 20 -

Franchisee's business skill and financial capacity. It is important to Franchisor that Franchisee be known to Franchisor and meet Franchisor's then current standards and requirements. Accordingly, neither Franchisee nor any person possessing an interest or holding shares of stock of any kind or nature in Franchisee ("Shareholder") shall be permitted or have the power, without the prior written consent of Franchisor, to give away, sell, assign, pledge, lease, sublease, devise or otherwise transfer, either directly or by operation of law or in any other manner, this Agreement, any of Franchisee's rights or obligations hereunder, or any interest or shares of stock of any kind or nature in Franchisee (any such transaction being referred to hereinafter as a "Transfer"). In order to assure compliance by Franchisee with the transfer restrictions contained in this Paragraph 12, all share or stock certificates of Franchisee shall at all times contain a legend sufficient under applicable law to constitute notice of the restrictions on such stock contained in this Agreement and to allow such restrictions to be enforceable. Such legend shall appear in substantially the following form:

> "The sale, transfer, pledge or hypothecation of this stock is restricted pursuant to an option, the terms of which are contained in Paragraph 12 of a Franchise Agreement dated Apri 25,2001 between Four Seasons Marketing Corp. and the issuer of these shares."

Any Transfer which does not comply with the terms of this Paragraph 12 shall be null and void.

(c)    ...If Franchisee or any Shareholder desires to make a Transfer, such person or entity must comply with the following terms, conditions and procedures in order to effectuate a valid Transfer:

(i)    Franchisee shall first notify Franchisor in writing of the proposed Transfer and set forth a complete description of all terms of the proposed Transfer including the prospective transferee's name, address, financial qualifications and previous five years' business experience;

(ii)    Franchisor or its assignee may, within thirty (30) days after receipt of such notice, exercise the right to purchase the interest being offered by Franchisee or any Shareholder ("Option") by matching the monetary purchase price and payment schedule terms (without having to match any other or non-monetary terms) of the proposed Transfer; provided, however, Franchisor's Option shall not apply to transfers by gift, bequest or inheritance or to transfers to the immediate family of any person listed in Paragraph 4 of Schedule B hereof;

(iii)    If Franchisor or its assignee fails to exercise the Option to purchase the interest, Franchisor shall, within thirty (30) days after the Option has expired, notify Franchisee in writing of its approval or disapproval of the prospective transferee;

(iv)    If Franchisor approves the proposed transferee, Franchisee or the Shareholder may transfer the interest to the proposed transferee at a price and under terms and conditions which are not more favorable than the terms offered to Franchisor, but only after the proposed transferee has completed (to the satisfaction of Franchisor) the training then currently required of similarly situated Four Seasons System franchisees;

(v)    Prior to the consummation of any such Transfer, Franchisee shall pay all amounts due to Franchisor and cure all other breaches of this Agreement and any other agreement with Franchisor;

(vi)    Franchisee shall comply with all other applicable transfer requirements as designated in the Confidential Operating Manual or otherwise in writing;

- 21 -

FS/FA-3.00(#685943)

(vii)        Franchisor may require any transferee of any interest or shares of stock of any kind or nature in Franchisee or the Premises to guarantee the obligations of Franchisee under this Agreement or under any new franchise agreement entered into pursuant to subparagraph (ix) below.

Furthermore, in the case of any assignment of any rights under this Agreement, or in the case of any other Transfer which, when aggregated with all previous Transfers, may in the reasonable opinion of Franchisor result in transferring effective control over the ownership and/or operation of the Premises or Franchisee the following additional Transfer requirements of Franchisor must be met:

(viii)        The transferee must apply for a Four Seasons System franchise and must meet all of Franchisor's then current standards and requirements for becoming a Four Seasons System franchisee (which standards and requirements need not be in writing);

(ix)        The transferee (or in the case of a transfer of shares or interest in Franchisee, then Franchisee with an unconditional guaranty by the transferee in form reasonably satisfactory to Franchisor) shall execute the then current form of franchise agreement generally issued by Franchisor with respect to comparable Four Seasons System franchisees. Such agreement shall generally provide for a term equal to the remaining term of this Agreement and may include, without limitation, different fee structures, increased fees or both;

(x)        Franchisor may, as a condition of any Transfer, require the payment to it of a fee by Franchisee in order to reimburse Franchisor for any expenses which may be incurred in review, analysis, and preparation of any documentation relating to the Transfer, including legal and accounting fees; provided, however, that in no event shall such fee exceed One Thousand Dollars ($1,000);

(xi)        Franchisee and the prospective transferee shall request Franchisor to make an inspection of the Center. As a result of such inspection, Franchisor may prepare a "Punch List" setting forth the necessary repairs, maintenance or other upgrading of the Premises and the Center which will be necessary in order for Franchisor to approve of the Transfer; and

(xii)        The transferee shall assume and agree to honor any warranties and/or other contractual or legal commitments with respect to any Four Seasons products sold by Franchisee prior to the date of such transfer.

(d)        Notwithstanding any other provision in this Paragraph 12, if a surviving spouse, heir or estate of any deceased person owning stock or other interest in Franchisee (the "Survivor") desires to acquire or retain the interest of the decedent and continue to operate a business pursuant to the Four Seasons System, the Survivor may do so under the terms of this Agreement subject only to the execution and delivery to Franchisor of a written agreement to be bound by the terms hereof and any guaranty of this Agreement, and the satisfactory completion of the initial training provided by Franchisor pursuant to Paragraph 4(a) hereof. If the Survivor does not desire to acquire or retain such interest, then the Survivor shall have a reasonable period of time to make a Transfer to a transferee acceptable to Franchisor, subject to compliance with the procedures set forth in subparagraphs (b) and (c) of this Paragraph 12; provided, however, that the Survivor shall, throughout such period, fulfill all duties of Franchisee under this Agreement.

(e)        Franchisor's consent to a Transfer hereunder shall not constitute a waiver of any claims Franchisor may have against Franchisee or the transferring party or Franchisor's right to demand exact compliance with any provision of this Agreement.

- 22 -

FS/FA-3.00(#685943)

## 13.    DEFAULT AND TERMINATION

(a)    Franchisor may not terminate this Agreement prior to the expiration of its term except for "good cause," which shall mean the occurrence of any event of default described below. Upon the occurrence of any event of default, Franchisor may, at its option, and without waiving its rights hereunder or any other rights available at law or in equity, including its rights to damages, terminate this Agreement and all of Franchisee's rights hereunder effective immediately upon the date Franchisor gives written notice of termination, upon such other date as may be set forth in such notice of termination, or in those instances enumerated below, automatically upon the occurrence of, or the lapse of the specified period following, an event of default. The occurrence of any one or more of the following events shall constitute an event of default and grounds for termination of this Agreement by Franchisor:

(i)    Automatically, if Franchisee becomes insolvent or makes a general assignment for the benefit of creditors, or if a petition in bankruptcy is filed by Franchisee, or such a petition is filed against and consented to by Franchisee, or if a bill in equity or other proceeding for the appointment of a receiver of Franchisee or other custodian for Franchisee's business or assets is filed and consented to by Franchisee, or if a receiver or other custodian (permanent or temporary) of Franchisee's assets or property, or any part thereof, is appointed.

(ii)    If Franchisee fails to pay any financial obligation pursuant to this Agreement within thirty (30) days of the date on which Franchisor gives notice of such delinquency or immediately upon written notice if such payment has not been made within sixty (60) days after the date on which it is required to be paid, or immediately upon written notice if Franchisee is determined to have underreported its Gross Volume of Business during any month by one percent (1%) or more of the actual Gross Volume of Business during such month on two or more occasions during the term of this Agreement, whether or not Franchisee subsequently rectifies such deficiency.

(iii)    If Franchisee fails to perform or breaches any covenant, obligation, term, condition, warranty or certification herein and fails to cure such noncompliance within thirty (30) days after Franchisor gives written Notice to Cure.

(iv)    If Franchisee fails to open the Center and commence business within six (6) months of the Effective Date of this Agreement.

(v)    If Franchisee makes, or has made, any materially false statement or report to Franchisor in connection with this Agreement or application therefore.

(vi)    If Franchisee operates the Franchised Business in a manner contrary to or inconsistent with the Licensed Marks or as specified by Franchisor in the Confidential Operating Manual, and Franchisee fails to cure such deficiency within thirty (30) days after Franchisor gives a written Notice to Cure.

(vii)    If there is any violation of any transfer and assignment provision contained in Paragraph 12 of this Agreement.

(viii)    If Franchisee receives from Franchisor four (4) or more notices to cure defaults or violations of this Agreement in the same calendar year.

- 23 -

(ix)     If Franchisee abandons or ceases to operate all or any part of the Franchised Business conducted under this Agreement or defaults under any mortgage, deed of trust or lease with any third party covering the Center, and such party treats such act or omission as a default, and Franchisee fails to cure such default to the satisfaction of such third party within any applicable cure period granted Franchisee by such party.

(x)      If Franchisee or any person owning an interest in the Franchise is convicted of a felony, a crime of moral turpitude, or any other crime or offense relating to the operation of the Franchised Business.

(xi)     If Franchisee shall fail to carry or allow to lapse any insurance coverage required pursuant to Paragraph 15 hereof or as may be required from time to time in the Confidential Operating Manual.

(xii)    If Franchisee or any guarantor(s) hereof default in any other agreement with Franchisor and such default is not cured in accordance with the terms of such other agreement.

(xiii)   If Franchisee fails, for a period of thirty (30) days after notification of noncompliance, to comply with any law or regulation applicable to the operation of the Franchised Business.

(xiv)    If Franchisee fails to meet the minimum performance standards specified in Schedule C for two or more successive calendar quarters or fails to meet the minimum display requirements contained in Paragraph 7(k)(iii) hereof and fails to cure such non-compliance within thirty (30) days after Franchisor gives written notice to cure.

(b)      Upon the occurrence of one or more of the events of default enumerated in Paragraph 13(a), Franchisor, in addition to any other rights and remedies to which it may be entitled, shall have all rights and remedies of a secured party under the UCC as enacted in the state where the Granted Territory is located, including but not limited to, the right to enter the Premises to remove and repossess any products and goods in which Franchisor has been granted a security interest, without notice to Franchisee. Franchisee hereby waives and releases Franchisor from any and all claims in connection therewith and arising therefrom. At Franchisor's request following an event of default, Franchisee shall assemble and make available to Franchisor all products and goods in which Franchisor has been granted a security interest, at a place to be designated by Franchisor which is reasonably convenient to both parties.

(c)      Franchisee may not terminate this Agreement prior to the expiration of its term except through legal process resulting from Franchisor's material breach of this Agreement or otherwise with Franchisor's consent. In the event that Franchisee shall claim that Franchisor has failed to meet any obligation under this Agreement, Franchisee shall provide Franchisor with written notice of such claim, within ninety (90) days of its occurrence, specifically enumerating all alleged deficiencies and providing Franchisor with an opportunity to cure, which shall in no event be less than thirty (30) days from the date of receipt of such notice by Franchisor from Franchisee. Failure to give such notice shall constitute a waiver of any such alleged default.

(d)      Notwithstanding anything contained in this Agreement to the contrary, neither party shall be in default hereunder by reason of its delay in performance of, or failure to perform, any of its obligations hereunder, if such delay or failure is caused by:

- 24 -

(i)         strikes or other labor disturbance;

(ii)        acts of God, or the public enemy, riots or other civil disturbances, fire, or flood;

(iii)       interference by civil or military authorities;

(iv)        compliance with governmental laws, rules or regulations which were not in effect and could not be reasonably anticipated as of the date of this Agreement;

(v)         delays in transportation, failure of suppliers, or inability to secure necessary governmental priorities for materials; or

(vi)        any other fault beyond its control or without its fault or negligence.  In any such event, the time required for performance of such obligation shall be extended for an additional period equal to the period of time caused by such unavoidable delay.

## 14.    POST TERM OBLIGATIONS

(a)         Upon the expiration or termination of this Agreement, Franchisee shall immediately:

(i)         Cease to be a franchisee of Franchisor and cease to operate the former Franchised Business under the Four Seasons System.  Franchisee shall not thereafter, directly or indirectly, represent to the public that the former Franchised Business is or was operated or in any way connected with the Four Seasons System or hold itself out as a present or former franchisee of Franchisor;

(ii)        Pay all sums owing to Franchisor.  Upon termination for any default by Franchisee, such sums shall include all actual and consequential damages, costs and expenses incurred by Franchisor as a result of the default;

(iii)       Return to Franchisor the Confidential Operating Manual and all trade secrets and confidential materials and other property owned by Franchisor to Franchisor  and all copies thereof; Franchisee shall retain no copy or record of any of the foregoing; provided Franchisee may retain its copy of this Agreement, any correspondence between the parties, and any other document which Franchisee reasonably needs for compliance with any applicable provision of law;

(iv)        Upon Franchisor's request, provide Franchisor a complete list of Franchisee's employees, clients, customers, their respective addresses and any outstanding obligations Franchisee may have to any third parties;

(v)         Take such action as may be required by Franchisor to transfer and assign to Franchisor or its designee all telephone numbers, white and yellow page telephone references and advertisements, and all trade and similar name registrations and business licenses, and to cancel any interest which Franchisee may have in the same;

(vi)        Cease to use in advertising, or in any manner whatsoever, any methods, procedures or techniques associated with the Four Seasons System in which Franchisor has a proprietary right, title or interest; the Licensed Marks; and any other marks and indicia of operation

- 25 -

associated with the Four Seasons System and remove all trade dress and other indications of operation under the Four Seasons System from the Center; and

(vii)        Agree and undertake to provide to all end-users of the Four Seasons Product Line service, maintenance and repair of any products ordered through Franchisee hereunder for at least seven (7) years after the delivery and installation of each such product. Termination or cancellation of this Agreement shall not be construed to relieve Franchisee of such obligation, or from damages to Franchisor caused by Franchisee's failure to maintain any component of the Four Seasons Product Line sold or installed by Franchisee, unless Franchisor provides directly or by arrangements with third persons (including a potential successor to Franchisee) for such services.

## 15.    INSURANCE

(a)        Franchisee shall, at its expense and no later than upon commencement of the business contemplated by this Agreement, procure and maintain in full force and effect throughout the term of this Agreement the types of insurance enumerated in the Confidential Operating Manual which shall be in such amounts as may from time to time be required by Franchisor and which shall designate Franchisor as an additional named insured, including the following:

(i)        Employer's liability and workers' compensation insurance as prescribed by law;

(ii)        Comprehensive general liability insurance covering the operation of the Franchised Business; and

(iii)        Products liability and completed operation insurance.

(b)        Franchisee shall make timely delivery of certificates of all required insurance to Franchisor, each of which shall contain a statement by the insurer that the policy will not be canceled or materially altered without at least thirty (30) days' prior written notice to Franchisor.

(c)        The procurement and maintenance of such insurance shall not relieve Franchisee of any liability to Franchisor under any indemnity requirement of this Agreement.

## 16.    TAXES, PERMITS, AND INDEBTEDNESS

(a)        Franchisee shall promptly pay when due any and all federal, state and local taxes including without limitation unemployment and sales taxes, levied or assessed with respect to any services or products furnished, used or licensed pursuant to this Agreement and all accounts or other indebtedness of every kind incurred by Franchisee in the operation of the Franchised Business.

(b)        Franchisee shall comply with all federal, state and local laws, rules and regulations and timely obtain any and all permits, certificates and licenses for the full and proper conduct of the Franchised Business.

(c)        Franchisee hereby expressly covenants and agrees to accept full and sole responsibility for any and all debts and obligations incurred in the operation of the Franchised Business.

## 17.    INDEMNIFICATION AND INDEPENDENT CONTRACTOR

(a)    Franchisee agrees to protect, defend, indemnify, and hold Franchisor, its parent or any affiliate corporation, and their respective directors, officers and shareholders, jointly and severally, harmless from and against all claims, actions, proceedings, damages, costs, expenses and other losses and liabilities, consequently, directly or indirectly incurred (including without limitation attorneys' and accountants' fees) as a result of, arising out of, or connected with the operation of the Franchised Business, for which Franchisor is neither wholly nor contributorily responsible, including, without limitation:

(i)    any liability arising out of Franchisee's sale or installation of, or alteration or modification to any components of the Four Seasons Product Line which have been made from customized extrusions, and which modifications or alterations have not been previously approved by Franchisor;

(ii)    any liability arising out of Franchisee's sale or installation of any nonproprietary product(s) or service, whether or not permitted by Franchisor to be displayed and/or sold at, from or through the Premises.

Franchisee shall not be liable under these indemnifications for any portion of damages for which Franchisor is found by a court of law to be responsible.

(b)    In all dealings with third parties including, without limitation, employees, suppliers, clients and customers, Franchisee shall disclose in an appropriate manner acceptable to Franchisor that it is an independent entity licensed by Franchisor. Nothing in this Agreement is intended by the parties hereto to create a fiduciary relationship between them nor to constitute Franchisee an agent, legal representative, subsidiary, joint venturer, partner, employee or servant of Franchisor for any purpose whatsoever. It is understood and agreed that Franchisee is an independent contractor and is in no way authorized to make any contract, warranty or representation or to create any obligation on behalf of Franchisor.

## 18.    WRITTEN APPROVALS, WAIVERS, AND AMENDMENT

(a)    Whenever this Agreement requires Franchisor's prior approval, Franchisee shall make a timely written request. Unless a different time period is specified in this Agreement, Franchisor shall respond with its approval or disapproval within fifteen (15) days. In addition, Franchisor's approval shall not be unreasonably withheld.

(b)    No failure of Franchisor to exercise any power reserved to it by this Agreement and no custom or practice of the parties at variance with the terms hereof shall constitute a waiver of Franchisor's right to demand exact compliance with any of the terms herein. A waiver or approval by Franchisor of any particular default by Franchisee or acceptance by Franchisor of any payments due hereunder shall not be considered a waiver or approval by Franchisor of any preceding or subsequent breach by Franchisee of any term, covenant or condition of this Agreement.

(c)    No warranty or representation is made by Franchisor that all Four Seasons System franchise agreements heretofore or hereafter issued by Franchisor do or will contain terms substantially similar to those contained in this Agreement. Further, Franchisee recognizes and agrees that Franchisor may, in its reasonable business judgment, due to local business conditions or otherwise, waive or

- 27 -

modify comparable provisions of other franchise agreements heretofore or hereafter granted to other Four Seasons System franchisees in a nonuniform manner, subject, however, to those provisions of this Agreement which require Franchisor to act toward its franchisees on a reasonably nondiscriminatory basis.

(d)     Except as otherwise provided in Paragraph 11(e) hereof, no amendment, change or variance from this Agreement shall be binding upon either Franchisor or Franchisee except by mutual written agreement. If an amendment of this Agreement is executed at Franchisee's request, any legal fees or costs of preparation in connection therewith shall be paid by Franchisee.

## 19.    ENFORCEMENT

(a)     To ensure compliance with this Agreement and to provide consultation with Franchisee, Franchisee agrees that Franchisor and its designated agent(s) shall, upon reasonable prior notice to Franchisee, be permitted full and complete access during business hours to inspect the Premises and all records thereof including, but not limited to, records relating to Franchisee's customers, clients, suppliers, employees and agents. Franchisee shall cooperate fully with Franchisor and its designated agents requesting such access.

(b)     Franchisor or its designee shall be entitled to apply for, without bond, declarations, temporary and permanent injunctions, and orders of specific performance, in order to enforce the provisions of this Agreement relating to Franchisee's use of the Licensed Marks, the obligations of Franchisee upon termination or expiration of this Agreement, and assignment of the Franchise and ownership interests in Franchisee or to prohibit any act or omission by Franchisee or its employees that constitutes a violation of any applicable law or regulation, is dishonest or misleading to prospective or current customers or clients of businesses operated under the Four Seasons System, constitutes a danger to other franchisees, employees, customers, clients or the public, or may impair the goodwill associated with the Licensed Marks.

(c)     If Franchisor secures any declaration, injunction or order of specific performance pursuant to Paragraph 19(b) hereof, if any provision of this Agreement is enforced at any time by Franchisor or if any amounts due from Franchisee to Franchisor are, at any time, collected by or through an attorney at law or collection agency, Franchisee shall be liable to Franchisor for all costs and expenses of enforcement and collection including, but not limited to, court costs and reasonable attorneys' fees.

## 20.    NOTICES

Any notice required to be given hereunder shall be in writing and shall be either mailed by certified mail, return receipt requested or delivered by a recognized courier service, receipt acknowledged. Notices to Franchisee shall be addressed to it at the address listed in Paragraph 1(a) of this Agreement. Notices to Franchisor shall be addressed to it at the address listed in Paragraph 1(a) of this Agreement, Attention: President. Any notice complying with the provisions hereof shall be deemed to be given three (3) days after mailing, or on the date of receipt, whichever is earlier. Each party shall have the right to designate any other address for such notices by giving notice thereof in the foregoing manner, and in such event all notices to be mailed after receipt of such notice shall be sent to such other address.

- 28 -

FS/FA-3.00(#685943)

## 21.    GOVERNING LAW

(a)    This Agreement is accepted by Franchisor in the State of New York and the terms and conditions thereof shall be governed by, enforced under and construed in accordance with the laws thereof.

(b)    The parties hereto agree that it is in their best interest to resolve disputes between them in an orderly fashion and in a consistent manner.  Therefore, the parties hereby agree as follows:

(i)    Any controversy or claim arising out of or relating to this Agreement, or any breach thereof, including, without limitation, any claim that the Agreement, or any part of the Agreement, is invalid, illegal or otherwise voidable or void, or the enforcement of any right or obligation which by its nature survives the expiration or termination of the Agreement, shall be submitted to arbitration before and in accordance with the Commercial Rules of Arbitration of the American Arbitration Association and judgment upon the award may be entered in any court having jurisdiction thereof; provided, however, that this clause shall not be construed to limit Franchisor from bringing any action in any court of competent jurisdiction for injunctive or other provisional relief as Franchisor deems to be necessary or appropriate to protect its trademarks, trade names, service marks, logotypes, insignia, trade dress and designs, or to enjoin or restrain Franchisee from otherwise causing immediate and irreparable harm to Franchisor.

(ii)    Any award rendered in connection with an arbitration pursuant to this Paragraph shall be final and binding and judgment upon such an award may be entered and enforced in any court of competent jurisdiction.

(iii)    Any arbitration under this Paragraph shall be conducted by a single arbitrator selected jointly by the parties.  If within thirty (30) days after a demand for arbitration is made, the parties are unable to agree on a single arbitrator, the arbitrator shall be selected by each party from a list obtained from the American Arbitration Association by a process of striking the name of one arbitrator alternately until one name remains.  Franchisor shall begin the process of striking names in all circumstances.  If for some reason the arbitrator whose name is left is unavailable to arbitrate the dispute, the arbitrator shall be the last potential arbitrator whose name was stricken.  If this alternate arbitrator is similarly unavailable, the arbitrator shall be selected by moving up the list of stricken arbitrators from the last to the first until an available arbitrator is found.

(iv)    Such arbitration shall take place in New York, New York.

This arbitration provision shall be deemed to be self-executing, and in the event that either party fails to appear at any properly noticed arbitration proceeding, an award may be entered against such party.

## 22.    SEVERABILITY AND CONSTRUCTION

(a)    Should any provision of this Agreement be for any reason held invalid, illegal or unenforceable by a court of competent jurisdiction, such provision shall be deemed restricted in application to the extent required to render it valid; and the remainder of this Agreement shall in no way be affected and shall remain valid and enforceable for all purposes, both parties hereto declaring that they would have executed this Agreement without inclusion of such provision.  In the event such total or partial invalidity or unenforceability of any provision of this Agreement exists only with respect

- 29 -

to the laws of a particular jurisdiction, this subparagraph (a) shall operate upon such provision only to the extent that the laws of such jurisdiction are applicable to such provision. Each party agrees to execute and deliver to the other any further documents which may be reasonably required to effectuate fully the provisions hereof. Franchisee understands and acknowledges that Franchisor shall have the right, in its sole discretion, on a temporary or permanent basis, to reduce the scope of any covenant or provision of this Agreement binding upon Franchisee, or any portion hereof, without Franchisee's consent, effective immediately upon receipt by Franchisee of written notice thereof; and Franchisee agrees that it will comply forthwith with any covenant as so modified, which shall be fully enforceable.

(b)    This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original, but such counterparts together shall constitute one and the same instrument.

(c)    The headings and captions contained herein are for the purposes of convenience and reference only and are not to be construed as a part of this Agreement. All terms and words used herein shall be construed to include the number and gender as the context of this Agreement may require. The parties agree that each section of this Agreement shall be construed independently of any other section or provision of this Agreement.

## 23. ACKNOWLEDGMENTS

Franchisee hereby acknowledges the following:

(a)    FRANCHISEE HAS CONDUCTED AN INDEPENDENT INVESTIGATION OF THE BUSINESS CONTEMPLATED BY THIS AGREEMENT AND UNDERSTANDS AND ACKNOWLEDGES THAT THE BUSINESS CONTEMPLATED BY THIS AGREEMENT INVOLVES BUSINESS RISKS MAKING THE SUCCESS OF THE VENTURE LARGELY DEPENDENT UPON THE BUSINESS ABILITIES AND PARTICIPATION OF FRANCHISEE AND ITS EFFORTS AS AN INDEPENDENT BUSINESS OPERATOR. FRANCHISOR EXPRESSLY DISCLAIMS THE MAKING OF, AND FRANCHISEE ACKNOWLEDGES THAT IT HAS NOT RECEIVED OR RELIED UPON ANY WARRANTY OR GUARANTEE, EXPRESS OR IMPLIED, AS TO THE POTENTIAL VOLUME, PROFITS OR SUCCESS OF THE BUSINESS VENTURE CONTEMPLATED BY THIS AGREEMENT EXCEPT AS SET FORTH IN ANY FRANCHISE OFFERING CIRCULAR PROVIDED TO FRANCHISEE, OR AS TO THE SUITABILITY OF THE PREMISES FOR THE CENTER AS A SUCCESSFUL LOCATION FOR THE CENTER.

(b)    FRANCHISEE HAS NO KNOWLEDGE OF ANY REPRESENTATIONS BY FRANCHISOR OR ITS OFFICERS, DIRECTORS, SHAREHOLDERS, EMPLOYEES, AGENTS OR SERVANTS, ABOUT THE BUSINESS CONTEMPLATED BY THIS AGREEMENT THAT ARE CONTRARY TO THE TERMS OF THIS AGREEMENT OR THE DOCUMENTS INCORPORATED HEREIN. FRANCHISEE REPRESENTS, AS AN INDUCEMENT TO FRANCHISOR'S ENTRY INTO THIS AGREEMENT, THAT IT HAS MADE NO MISREPRESENTATIONS IN OBTAINING THIS AGREEMENT.

(c)    FRANCHISEE ACKNOWLEDGES THAT FRANCHISOR'S APPROVAL OF FRANCHISEE'S PREMISES DOES NOT CONSTITUTE RECOMMENDATION OR ENDORSEMENT OF THE LOCATION OF THE CENTER, NOR ANY ASSURANCE BY FRANCHISOR THAT THE OPERATION OF A FOUR SEASONS SYSTEM CENTER AT THE PREMISES WILL BE SUCCESSFUL OR PROFITABLE.

(d)    FRANCHISEE ACKNOWLEDGES THAT FRANCHISOR OR ITS AGENT HAS PROVIDED FRANCHISEE WITH A FRANCHISE OFFERING CIRCULAR NOT LATER THAN THE EARLIER OF THE

FS/FA-3.00(#685943)

FIRST PERSONAL MEETING HELD TO DISCUSS THE SALE OF A FRANCHISE, TEN (10) BUSINESS DAYS BEFORE THE EXECUTION OF THIS AGREEMENT, OR TEN (10) BUSINESS DAYS BEFORE ANY PAYMENT OF ANY CONSIDERATION. FRANCHISEE FURTHER ACKNOWLEDGES THAT FRANCHISEE HAS READ SUCH FRANCHISE OFFERING CIRCULAR AND UNDERSTANDS ITS CONTENTS.

(e)     FRANCHISEE ACKNOWLEDGES THAT FRANCHISOR HAS PROVIDED FRANCHISEE WITH A COPY OF THIS AGREEMENT AND ALL RELATED DOCUMENTS, FULLY COMPLETED, FOR AT LEAST FIVE (5) BUSINESS DAYS PRIOR TO FRANCHISEE'S EXECUTION HEREOF.

(f)  FRANCHISEE, TOGETHER WITH ITS ADVISERS, HAS SUFFICIENT KNOWLEDGE AND EXPERIENCE IN FINANCIAL AND BUSINESS MATTERS TO MAKE AN INFORMED INVESTMENT DECISION WITH RESPECT TO THE FRANCHISE.

(g) FRANCHISEE IS AWARE OF THE FACT THAT OTHER PRESENT OR FUTURE FRANCHISEES OF FRANCHISOR MAY OPERATE UNDER DIFFERENT FORMS OF AGREEMENT(S), AND CONSEQUENTLY THAT FRANCHISOR'S OBLIGATIONS AND RIGHTS WITH RESPECT TO ITS VARIOUS FRANCHISEES MAY DIFFER MATERIALLY IN CERTAIN CIRCUMSTANCES.

(h)     FRANCHISEE ACKNOWLEDGES THAT THIS INSTRUMENT CONSTITUTES THE ENTIRE AGREEMENT OF THE PARTIES.  THIS AGREEMENT TERMINATES AND SUPERSEDES ANY PRIOR AGREEMENT BETWEEN THE PARTIES CONCERNING THE SAME SUBJECT MATTER.

(i)     FRANCHISEE ACKNOWLEDGES THAT IT IS NOT, NOR IS IT INTENDED TO BE, A THIRD PARTY BENEFICIARY OF THIS AGREEMENT OR ANY OTHER AGREEMENT OR CONTRACTUAL RELATIONSHIP TO WHICH FRANCHISOR IS A PARTY.

(j)     PRIOR TO THE EXECUTION HEREOF, FRANCHISEE HAS BEEN PROVIDED SUCH TECHNICAL PRODUCT INFORMATION AS FRANCHISEE HAS REQUESTED IN ORDER TO EVALUATE THE SUITABILITY OF THE FOUR SEASONS PRODUCT LINE AND ITS COMPONENTS FOR USE IN THE GRANTED TERRITORY, INCLUDING THE EXTENT TO WHICH SUCH PRODUCTS COMPLY WITH APPLICABLE BUILDING CODES OR OTHER REQUIREMENTS WHICH MAY BE IMPOSED UPON THE PRODUCTS SOLD BY FRANCHISOR AND INSTALLED BY FRANCHISEE.  FRANCHISEE HEREBY ACKNOWLEDGES THAT FRANCHISOR HAS MADE NO REPRESENTATIONS THAT ANY OR ALL COMPONENTS OF THE FOUR SEASONS PRODUCT LINE MEET OR EXCEED SUCH LOCAL BUILDING CODES APPLICABLE TO THE OPERATION OF THE FRANCHISED BUSINESS IN THE GRANTED TERRITORY.

[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

- 31 -

FS/FA-3.00(#685943)

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement under seal on the date first written above.

FRANCHISOR:

FOUR SEASONS MARKETING CORP.

By: _Chris Egenti, Pres._

Title: _____

Attest: _Anthony Russo_

Title: _VP Business Development_

(Affix Corporate Seal)

FRANCHISEE:

_GLASS STRUCTURES, INC._

By: _____

Title: _V.P._

Attest: _____

Title: _Pres._

(Affix Corporate Seal)

- 32 -

## GUARANTY OF FRANCHISEE'S UNDERTAKINGS

In consideration of, and as an inducement to, the execution of the foregoing Franchise Agreement ("Agreement") dated the 25 day of April ,20 01 , by Four Seasons Marketing Corp. ("Franchisor"), each of the undersigned hereby guarantees unto Four Seasons Marketing Corp., and Four Seasons Solar Products Corp., their affiliates, successors and assigns that GLASS STRUCTURES, INC. ("Franchisee") will perform during the term of this Agreement each and every covenant, payment, agreement and undertaking on the part of Franchisee contained and set forth in such Agreement.

Franchisor, its affiliates, successors and assigns, may from time to time, after notice to the Franchisee, if any, required under the Franchise Agreement (a) resort to the undersigned for payment of any of the financial obligations for which Franchisee is in default, whether or not it or its affiliates, successors and assigns have resorted to any property securing any of such obligations or proceeded against any other of the undersigned or any party primarily or secondarily liable on any of such obligations, (b) release or compromise any obligation of any of the undersigned hereunder or any obligation of any party or parties primarily or secondarily liable on any obligation, and (c) extend, renew or credit any obligation for any period (whether or not longer than the original period); alter, amend or exchange any obligation; or give any other form of indulgence, whether under the Agreement or not.

The undersigned agrees to comply with and abide by the restrictive covenants and non-disclosure provisions contained in Paragraph 11 of the Agreement to the same extent as and for the same period of time as Franchisee is required to comply with and abide by such covenants and provisions. These obligations of the undersigned shall survive any expiration or termination of the Franchise Agreement or this Guaranty.

The undersigned further waives presentment, demand, notice of dishonor, protest, nonpayment and all other notices whatsoever, including without limitation: notice of acceptance hereof; notice of all contracts and commitments; notice of the existence or creation of any liabilities under the foregoing Agreement and of the amount and terms thereof; and notice of all defaults, disputes or controversies between Franchisee and Franchisor resulting from such Agreement or otherwise, and the settlement, compromise or adjustment thereof.

The undersigned agrees to pay all expenses paid or incurred by Franchisor, its affiliates, successors and assigns in attempting to enforce the foregoing Agreement and this Guaranty against Franchisee and against the undersigned and in attempting to collect any amounts due thereunder and hereunder, including reasonable attorneys' fees if such enforcement or collection is by or through an attorney-at-law. Any waiver, extension of time or other indulgence granted from time to time by Franchisor or its affiliates, successors or assigns, with respect to the foregoing Agreement, shall in no way modify or amend this Guaranty, which shall be continuing, absolute, unconditional and irrevocable.

If more than one person has executed this Guaranty, the term "the undersigned," as used herein shall refer to each such person, and the liability of each of the undersigned hereunder shall be joint and several and primary as sureties.

FS/FA-3.00(#685943)

IN WITNESS WHEREOF, each of the undersigned has executed this Guaranty under seal effective as of the date of the foregoing Agreement.

_____        _____ (SEAL)
Witness                                    Guarantor

_____        _____ (SEAL)
Witness                                    Guarantor

Subscribed and sworn to before me this

_27_ day of _March_ _____ ,20 _00_

_____

Notary Public _____

County of _Champaign_____

My Commission Expires:

_4 - 6 - 04_____

OFFICIAL SEAL
TRACY BALLINGER
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 4/06/04

FS/FA-3.00(#685943)

FRANCHISE AGREEMENT DATED April 25, 2001
BETWEEN FOUR SEASONS MARKETING CORP. AND
_____ Glass Structures, Inc.

SCHEDULE A

Franchisor owns or has the right to license the following registered service marks:

FOUR SEASONS LOGO, Reg. No. 1,236,354
FOUR SEASONS (DESIGN AND REMODELING CENTERS),
   Reg. No. 1,392,366
FOUR SEASONS, Reg. No. 1,372,107
FOUR SEASONS GREENHOUSES, Reg. No. 1,401,197
POW-R-VENT, Reg. No. 1,414,129
SYSTEM 4, Reg. No. 1,379,179
CURV-ALONG, Reg. No. 1,312,351
REMODEL SEARCH, Reg. No. 1,505,065
TUNNEL OF HEAT, Reg. No. 1,538,172
FOUR SEASONS AND LOGO, Reg. No. 1,585,675
FOUR SEASONS DESIGN AND REMODELING CENTERS and design,
   Reg. No. 1,665,860
SUN SMART, Reg. No. 1,687,148

In addition (and without limitation), Franchisor may from time to time authorize any one or more of the following marks and names in connection with the Four Seasons System:

Outdoor Living . . . Indoors
Georgian Extension
Mit-R-Lock
Four Seasons Skylights
We Recycle the Sun
Interlocking Panels
Outdoorable
Texcoat
Weatherlock
Sunsmart Plus
Sunsmart Max
Steel Classic
Kleencoat
A Sunroom for every Budget

FS/FA-3.00(#685943)

SCHEDULE B

1.    Legal Description of Premises:

2.    Name(s) and address(es) of holder(s) of record fee title to Premises:

3.    If Franchisee is not holder of record fee title:

    (a)    Interest of Franchisee in Premises, whether leasehold or other written contract of tenancy leasehold

    (b)    Name and address of Franchisee's landlord or person through whom Franchisee occupies Premises

    (c)    Term of lease or other written contract of tenancy (attach copy of lease or of appropriate documents)

FS/FA-3.00(#685943)

4. <u>Acknowledgment Regarding Controlling Persons</u>. Franchisee hereby acknowledges that Franchisee is a(n):

    _____ individual
    _____ partnership
    _____ joint venture
    _____ corporation
    _____ other business form_____
    (check one)                    (describe)

Franchisee hereby warrants and represents that the following persons own, either legally or beneficially, voting control of Franchisee:

| NAME | TYPE OF OWNERSHIP (LEGAL OR BENEFICIAL) | PERCENTAGE OF INTEREST OWNED |
|------|------------------------------------------|------------------------------|
|      |                                          |                              |

5. Attach certified copy of Articles of Incorporation, by-laws and all corporate documents authorizing Franchisee to enter into this Agreement, including references to transfer restrictions shown on stock certificates.

\

FS/FA-3.00(#685943)

6.    Franchisee is granted a

    [  ] Level 3 Franchise
    [✗] Level 2 Franchise
    [  ] Level 1 Franchise

comprised of the following listed zip codes/postal districts (the "Granted Territory"):

## A

| ZIP CODE | LOCATION | POPULATION |
|----------|----------|------------|
| 61815 | BONDVILLE | 356 |
| 61820 | CHAMPAIGN | 35,085 |
| 61801 | URBANA | 47,404 |
| 61874 | SAVOY | 3,151 |
|  |  |  |
|  | TOTAL STIPULATED POPULATION | 85,996 |

# SCHEDULE C

## MINIMUM PERFORMANCE STANDARDS

At all times after the first full calendar quarter following the Effective Date, and thereafter during the term hereof, Franchisee shall be required to purchase through Franchisor or any affiliate of Franchisor during each calendar quarter, Four Seasons Products having an aggregate wholesale value equal to not less than an amount calculated by multiplying the population of the Granted Territory stipulated in Paragraph 6 of Schedule B times Fifteen Cents ($0.15).

SATELLITE TERRITORY

SPECIAL STIPULATION TO
FOUR SEASONS FRANCHISE AGREEMENT
DATED  4/28/01
BY AND BETWEEN
FOUR SEASONS MARKETING CORP.
AND
GLASS STRUCTURES, INC
(the "Franchise Agreement")

This Special Stipulation to Franchise Agreement ("Special Stipulation") is made and entered into as of the 28 day of _APRIL_ ,20 01 by and between Four Seasons Marketing Corp., a Nevada corporation with its principal place of business at 5005 Veterans Memorial Highway, Holbrook, New York 11741 ("Franchisor") and GLASS STRUCTURES, INC with a principal place of business at 505 EAST CHESTNUT CHAMPAIGN, IL  61826 ("Franchisee".

This Special Stipulation is intended to be a modification of and amendment to the Franchise Agreement. Defined terms shall have the same meaning in this Special Stipulation as in the Franchise Agreement. To the extent of any conflict between the following and the printed provisions of the Franchise Agreement, these Special Stipulations shall control.

Whereas, Franchisee desires to obtain the supplemental right to operate a business utilizing the Four Seasons System and the Licensed Marks from within the additional territory more particularly described in Paragraph 4 below (the "Satellite Territory"); and

Whereas, Franchisor is willing to grant Franchisee such supplemental rights subject to Franchisee's compliance with the following terms, covenants and conditions.

Now, therefore, in consideration of the mutual covenants and conditions hereinafter set forth, the parties hereto agree as follows:

1.    Good Standing. Franchisee hereby acknowledges and agrees that Franchisor, as of the date hereof, is in full compliance with all of its obligations under the Franchise Agreement. Except as set forth in this Special Stipulation, the Franchise Agreement remains in full force and effect.

2.    Term. This Special Stipulation shall take effect upon the date first set forth above and shall remain in effect during the term of the Franchise Agreement unless terminated by either party pursuant to Paragraph 6 hereof.

3.    Grant of Satellite Territory. Subject to the reservation of rights contained in Paragraph 2 of the Franchise Agreement, Franchisor hereby grants to Franchisee the supplemental right to operate the Franchised Business both in the Granted Territory and the Satellite Territory pursuant to the Four Seasons System and in accordance with the Franchise Agreement and Franchisor's Confidential Operating Manual. Unless otherwise specifically authorized by Franchisor in writing, Franchisee shall have no right to construct, open or operate a Center in the Satellite Territory. Provided that Franchisee is in good standing

SCHEDULE D-2
Page 1

PLAINTIFF'S
EXHIBIT
2

*pursuant to the terms of this Special Stipulation, Franchisor will grant no other party the right to operate a Four Seasons System Franchised Business from within the Satellite Territory during the term hereof.*

4.     *Description of Satellite Territory.  The Satellite Territory shall be comprised of the following listed zip codes/postal districts (the "Satellite Territory"):*

| Location | Zip Code Population |
|---|---|

TERRITORY C

ATTACHED

| Total Stipulated Population of Satellite Territory | 229,499 |
|---|---|

5.     *Incremental Performance Standards.  At all times after the first full month following the date first set forth above, and thereafter throughout the term of this Special Stipulation, Franchisee shall be required to purchase from or through Franchisor or an affiliate of Franchisor on a monthly basis for distribution in the Satellite Territory, Four Seasons Products having an aggregate wholesale value equal to not less than an amount calculated by multiplying the Total Stipulated Population of the Satellite Territory set forth in Paragraph 4 above, times Five cents ($.05).*

6.     *Termination of Satellite Territory Rights.  Franchisor may terminate this Special Stipulation and Franchisee's rights hereunder to operate from within the Satellite Territory effective immediately upon the date Franchisor gives written notice of termination upon the occurrence of any event of default described below:*

*FS/FA-3.00(#685943)*

(a)     If Franchisee fails to achieve the Incremental Performance Standards specified in Paragraph 5 hereof during any month; or

(b)     If Franchisee commits any event of default specified in Paragraph 13 of the Franchise Agreement and fails to cure such default in accordance with the terms thereof.

7.     _Grant of Satellite Business Rights._ Upon the request of Franchisor, Franchisee may obtain the supplemental right to offer the Four Seasons Product Line either from premises other than the Center which are owned or operated by a third party retailer, or in conjunction with the direct marketing of Four Seasons Products by or through a third party retailer (the "Satellite Business"). Except as otherwise provided herein, the Satellite Business and Franchisee's rights hereunder shall be governed by and subject to the terms of the Franchise Agreement and Franchisor's Confidential Operating Manual. If Franchisee is granted the right to operate a Satellite Business, such Satellite Business shall be conducted only from those premises listed in Paragraph 1 of Exhibit A and/or pursuant to a lease, license agreement or other contract with the third party retailer ("Retailer") designated in Paragraph 2 of Exhibit A.

8.     _Approval of Satellite Business by Franchisor._ Prior to execution of any lease, license agreement or other contract with Retailer, Franchisee shall, at its expense, furnish to Franchisor, for its approval, the following (if applicable):

(a)     A proposed site plan for the operation of the Satellite Business and specifications for any display fixtures, leasehold improvements or similar structures proposed to be utilized by Franchisee in connection with the Satellite Business. Franchisee agrees to install display fixtures of the kind and size as may be required by Franchisor.

(b)     A copy of the proposed lease, license agreement or other contracts to be executed between Franchisee and Retailer, which must be approved by Franchisor;

(c)     If the Satellite Business will be operated from or through premises located outside of Franchisee's Granted Territory:

(i)     the right of Franchisor to act as the prime lessee/party-in-interest under the lease, license agreement or other contract with Retailer and to sub-lease or assign such interest to Franchisee. In such event Franchisor may "mark-up" the lease payment or license fee in order to compensate Franchisor for the liability and expenses associated with such arrangement, or

(ii)     a "Collateral Assignment" and a "Consent and Agreement of Retailer" in substantially the form attached hereto as Exhibit B, executed by Franchisee and the Retailer, providing Franchisor notice of Franchisee's default of the lease, license agreement or other contract, a right to cure such default and the right to assume Franchisee's interest thereunder with the right to sublease or assign such rights to another Four Seasons System franchisee in the event of any default by Franchisee under the Franchise Agreement or the lease, license agreement or other contract(s) with Retailer. If Franchisor exercises its rights under the Collateral Assignment, Franchisor shall have the option to acquire all fixtures, equipment and other leasehold improvements utilized by Franchisee in connection with the Satellite Business at fair market value.

FS/FA-3.00(#685943)

9.     _Continuing Fees on Satellite Business_. Franchisee agrees that the term "Gross Volume of Business" as used in the Franchise Agreement shall also be deemed to include the aggregate gross amount of all revenues derived from the operation of any Satellite Business. Franchisee shall maintain full, accurate and complete records of the Satellite Business. If any lease, license agreement or contract between Franchisee and Retailer provides that Franchisee shall provide periodic reports of sales, income, gross receipts or other financial and operating data to Retailer, Franchisee shall also contemporaneously provide complete copies of any such reports to Franchisor.

10.     _Additional Obligations of Franchisee_. Upon the request of Franchisor, Franchisee shall (if applicable):

(a)     Maintain in stock and display in connection with the Satellite Business such amounts of all standard advertising and marketing materials and referral cards promoting the Four Seasons Product Line as Franchisor may require from time to time, and shall use only marketing, advertising and printed materials which have been approved in advance, in writing, by Franchisor;

(b)     Clean and maintain the appearance of any display fixtures at the Satellite Business as may be required by Retailer or by Franchisor from time to time in the Confidential Operating Manual;

(c)     Upon the request of Retailer, "man" the Satellite Business on weekends or at special sales or promotional events.

11.     _Termination of Satellite Business Rights_. Franchisor may terminate any rights of Franchisee to operate a Satellite Business effective immediately upon the date Franchisor gives written notice of termination upon the occurrence of any event of default described below:

(a)     If Franchisee defaults in any lease, license agreement or other contract with Retailer affecting Franchisee's right to operate the Satellite Business and such default is not cured in accordance with the terms thereof;

(b)     If Franchisee commits any event of default specified in Paragraph 13 of the Franchise Agreement and fails to cure such default in accordance with the terms thereof.

12.     _Post-Termination Covenants_.

(a)     Upon the termination, expiration or nonrenewal of Franchisee's rights to operate any Satellite Business outside of the Granted Territory:

(i)     Franchisee hereby collaterally assigns to Franchisor any interest of Franchisee in and to any lease, license agreement or other contract with Retailer and grants Franchisor an irrevocable power of attorney coupled with an interest for the purpose of executing such assignments if Franchisee fails or refuses to do so. In any such event, Franchisor may operate the Satellite Business itself or assign such rights to another Four Seasons franchisee.

(ii)     Franchisor may, at its option, terminate the exclusive rights of Franchisee to operate from within the Satellite Territory.

(b)     Upon the termination, expiration or nonrenewal of Franchisee's rights to operate the Satellite Business, Franchisee agrees for a period of one year thereafter not to engage as an owner, operator, licensee or in any managerial capacity, in any remodeling or home improvement business with Retailer at, from or associated with the former Satellite Business identified in Exhibit A hereto.

FS/FA-3.00 (#685943)

IN WITNESS WHEREOF, Franchisor and Franchisee have duly executed this Special Stipulation under seal on the date first written above.

FRANCHISOR

Four Seasons Marketing Corp.

By: _____

Title: _____

Attest: _____

Title: _____

(Affix Corporate Seal)


FRANCHISEE

GLASS STRUCTURES, INC.

By: _____

Title: _____

Attest: _____

Title: _____

(Affix Corporate Seal)


Guarantor _____


Guarantor _____

FS/FA-3.00 (#685943)

6.    Franchisee is granted a

[   ] Level 3 Franchise

[   ] Level 2 Franchise

[   ] Level 1 Franchise

comprised of the following listed zip codes/postal districts (the "Granted Territory"):

## C

| ZIP CODE | LOCATION | POPULATION |
|---|---|---|
| 61516 | BENSON | 967 |
| 61522 | N/L | |
| 61535 | N/L | |
| 61545 | LOWPOINT | 1308 |
| 61548 | METAMORA | 11006 |
| 61550 | MORTON | 16351 |
| 61561 | ROANOKE | 2996 |
| 61568 | TREMONT | 4792 |
| 61570 | WASHBURN | 1967 |
| 61571 | WASHINGTON | 20398 |
| 61701 | BLOOMINGTON | 38499 |
| 61721 | ARMINGTON | 1176 |
| 61723 | ATLANTA | 1939 |
| 61725 | CARLOCK | 1153 |
| 61727 | CLINTON | 10048 |
| 61729 | CONGERVILLE | 902 |
| 61730 | COOKSVILLE | 505 |
| 61732 | DANVERS | 2056 |
| 61733 | DEER CREEK | 2481 |
| 61734 | DELAVAN | 2424 |
| 61736 | DOWNS | 1121 |
| 61737 | ELLSWORTH | 707 |
| 61738 | EL PASO | 3803 |
| 61740 | FLANAGAN | 1441 |
| 61743 | GRAYMONT | 180 |
| 61744 | GRIDLEY | 2355 |
| 61745 | HEYWORTH | 3257 |
| 61747 | HOPEDALE | 1429 |
| 61748 | HUDSON | 2065 |
| 61749 | KENNEY | 817 |
| 61751 | N/L | |
| 61752 | LEROY | 3659 |
| 61753 | LEXINGTON | 3349 |
| 61754 | MCLEAN | 1584 |
| 61755 | MACKINAW | 3038 |
| 61759 | MINIER | 1567 |
| 61760 | MINONK | 2908 |
| 61761 | NORMAL | 47376 |
| 61771 | SECOR | 1067 |

| 61772 | SHIRLEY | 377 |
|---|---|---|
| 61774 | STANFORD | 1098 |
| 61777 | WAPELLA | 1033 |
| 61778 | WAYNESVILLE | 770 |
| 62512 | BEASON | 458 |
| 62518 | CHESTNUT | 417 |
| 62623 | N/L | |
| 62635 | EMDEN | 1096 |
| 62643 | HARTSBURG | 577 |
| 62656 | LINCOLN | 19782 |
| 62666 | MIDDLETOWN | 564 |
| 62671 | NEW HOLLAND | 636 |
| | | |
| | | |
| | TOTAL STIPULATED POPULATION | 229,499 |

E-FILED
Monday, 10 September, 2007  01:32:48 PM
Clerk, U.S. District Court, ILCD

SATELLITE TERRITORY

SPECIAL STIPULATION TO
FOUR SEASONS FRANCHISE AGREEMENT
DATED  4/25/01
BY AND BETWEEN
FOUR SEASONS MARKETING CORP.
AND
GLASS STRUCTURES, INC.
(the "Franchise Agreement")

This Special Stipulation to Franchise Agreement ("Special Stipulation") is made and entered into as of the __25__ day of ___APRIL___, 20_01_ by and between Four Seasons Marketing Corp., a Nevada corporation with its principal place of business at 5005 Veterans Memorial Highway, Holbrook, New York 11741 ("Franchisor") and ___GLASS STRUCTURES, INC.___ with a principal place of business at ___505 EAST CHESTNUT CHAMPAIGN, IL. 61826___ ("Franchisee".

This Special Stipulation is intended to be a modification of and amendment to the Franchise Agreement. Defined terms shall have the same meaning in this Special Stipulation as in the Franchise Agreement. To the extent of any conflict between the following and the printed provisions of the Franchise Agreement, these Special Stipulations shall control.

Whereas, Franchisee desires to obtain the supplemental right to operate a business utilizing the Four Seasons System and the Licensed Marks from within the additional territory more particularly described in Paragraph 4 below (the "Satellite Territory"); and

Whereas, Franchisor is willing to grant Franchisee such supplemental rights subject to Franchisee's compliance with the following terms, covenants and conditions.

Now, therefore, in consideration of the mutual covenants and conditions hereinafter set forth, the parties hereto agree as follows:

1.    _Good Standing._ Franchisee hereby acknowledges and agrees that Franchisor, as of the date hereof, is in full compliance with all of its obligations under the Franchise Agreement. Except as set forth in this Special Stipulation, the Franchise Agreement remains in full force and effect.

2.    _Term._ This Special Stipulation shall take effect upon the date first set forth above and shall remain in effect during the term of the Franchise Agreement unless terminated by either party pursuant to Paragraph 6 hereof.

3.    _Grant of Satellite Territory._ Subject to the reservation of rights contained in Paragraph 2 of the Franchise Agreement, Franchisor hereby grants to Franchisee the supplemental right to operate the Franchised Business both in the Granted Territory and the Satellite Territory pursuant to the Four Seasons System and in accordance with the Franchise Agreement and Franchisor's Confidential Operating Manual. Unless otherwise specifically authorized by Franchisor in writing, Franchisee shall have no right to construct, open or operate a Center in the Satellite Territory. Provided that Franchisee is in good standing

SCHEDULE D-2
Page 1

PLAINTIFF'S
EXHIBIT
3

pursuant to the terms of this Special Stipulation, Franchisor will grant no other party the right to operate a Four Seasons System Franchised Business from within the Satellite Territory during the term hereof.

4. _Description of Satellite Territory_. The Satellite Territory shall be comprised of the following listed zip codes/postal districts (the "Satellite Territory"):

Location                                                    Zip Code Population

TERRITORY "E"

ATTACHED

Total Stipulated Population
of Satellite Territory                        _183,116_

5. _Incremental Performance Standards_. At all times after the first full month following the date first set forth above, and thereafter throughout the term of this Special Stipulation, Franchisee shall be required to purchase from or through Franchisor or an affiliate of Franchisor on a monthly basis for distribution in the Satellite Territory, Four Seasons Products having an aggregate wholesale value equal to not less than an amount calculated by multiplying the Total Stipulated Population of the Satellite Territory set forth in Paragraph 4 above times Five cents ($.05).

6. _Termination of Satellite Territory Rights_. Franchisor may terminate this Special Stipulation and Franchisee's rights hereunder to operate from within the Satellite Territory effective immediately upon the date Franchisor gives written notice of termination upon the occurrence of any event of default described below:

FS/FA-3.00(#685943)

   (a) *If Franchisee fails to achieve the Incremental Performance Standards specified in Paragraph 5 hereof during any month; or*

   (b) *If Franchisee commits any event of default specified in Paragraph 13 of the Franchise Agreement and fails to cure such default in accordance with the terms thereof.*

   7. <u>*Grant of Satellite Business Rights.*</u> *Upon the request of Franchisor, Franchisee may obtain the supplemental right to offer the Four Seasons Product Line either from premises other than the Center which are owned or operated by a third party retailer, or in conjunction with the direct marketing of Four Seasons Products by or through a third party retailer (the "Satellite Business"). Except as otherwise provided herein, the Satellite Business and Franchisee's rights hereunder shall be governed by and subject to the terms of the Franchise Agreement and Franchisor's Confidential Operating Manual. If Franchisee is granted the right to operate a Satellite Business, such Satellite Business shall be conducted only from those premises listed in Paragraph 1 of Exhibit A and/or pursuant to a lease, license agreement or other contract with the third party retailer ("Retailer") designated in Paragraph 2 of Exhibit A.*

   8. <u>*Approval of Satellite Business by Franchisor.*</u> *Prior to execution of any lease, license agreement or other contract with Retailer, Franchisee shall, at its expense, furnish to Franchisor, for its approval, the following (if applicable):*

   (a) *A proposed site plan for the operation of the Satellite Business and specifications for any display fixtures, leasehold improvements or similar structures proposed to be utilized by Franchisee in connection with the Satellite Business. Franchisee agrees to install display fixtures of the kind and size as may be required by Franchisor.*

   (b) *A copy of the proposed lease, license agreement or other contracts to be executed between Franchisee and Retailer, which must be approved by Franchisor;*

   (c) *If the Satellite Business will be operated from or through premises located outside of Franchisee's Granted Territory:*

    (i) *the right of Franchisor to act as the prime lessee/party-in-interest under the lease, license agreement or other contract with Retailer and to sub-lease or assign such interest to Franchisee. In such event Franchisor may "mark-up" the lease payment or license fee in order to compensate Franchisor for the liability and expenses associated with such arrangement, or*

    (ii) *a "Collateral Assignment" and a "Consent and Agreement of Retailer" in substantially the form attached hereto as Exhibit B, executed by Franchisee and the Retailer, providing Franchisor notice of Franchisee's default of the lease, license agreement or other contract, a right to cure such default and the right to assume Franchisee's interest thereunder with the right to sublease or assign such rights to another Four Seasons System franchise in the event of any default by Franchisee under the Franchise Agreement or the lease, license agreement or other contract(s) with Retailer. If Franchisor exercises its rights under the Collateral Assignment, Franchisor shall have the option to acquire all fixtures, equipment and other leasehold improvements utilized by Franchisee in connection with the Satellite Business at fair market value.*

*SCHEDULE D-2*
*Page 3*

*FS/FA-3.00(#685943)*

9.      _Continuing Fees on Satellite Business_.  Franchisee agrees that the term "Gross Volume of Business" as used in the Franchise Agreement shall also be deemed to include the aggregate gross amount of all revenues derived from the operation of any Satellite Business.  Franchisee shall maintain full, accurate and complete records of the Satellite Business.  If any lease, license agreement or contract between Franchisee and Retailer provides that Franchisee shall provide periodic reports of sales, income, gross receipts or other financial and operating data to Retailer, Franchisee shall also contemporaneously provide complete copies of any such reports to Franchisor.

10.     _Additional Obligations of Franchisee_.  Upon the request of Franchisor, Franchisee shall (if applicable):

(a)     Maintain in stock and display in connection with the Satellite Business such amounts of all standard advertising and marketing materials and referral cards promoting the Four Seasons Product Line as Franchisor may require from time to time, and shall use only marketing, advertising and printed materials which have been approved in advance, in writing, by Franchisor;

(b)     Clean and maintain the appearance of any display fixtures at the Satellite Business as may be required by Retailer or by Franchisor from time to time in the Confidential Operating Manual;

(c)     Upon the request of Retailer, "man" the Satellite Business on weekends or at special sales or promotional events.

11.     _Termination of Satellite Business Rights_.  Franchisor may terminate any rights of Franchisee to operate a Satellite Business effective immediately upon the date Franchisor gives written notice of termination upon the occurrence of any event of default described below:

(a)     If Franchisee defaults in any lease, license agreement or other contract with Retailer affecting Franchisee's right to operate the Satellite Business and such default is not cured in accordance with the terms thereof;

(b)     If Franchisee commits any event of default specified in Paragraph 13 of the Franchise Agreement and fails to cure such default in accordance with the terms thereof.

12.     _Post-Termination Covenants_.

(a)     Upon the termination, expiration or nonrenewal of Franchisee's rights to operate any Satellite Business outside of the Granted Territory:

(i)     Franchisee hereby collaterally assigns to Franchisor any interest of Franchisee in and to any lease, license agreement or other contract with Retailer and grants Franchisor an irrevocable power of attorney coupled with an interest for the purpose of executing such assignments if Franchisee fails or refuses to do so.  In any such event, Franchisor may operate the Satellite Business itself or assign such rights to another Four Seasons franchisee.

(ii)    Franchisor may, at its option, terminate the exclusive rights of Franchisee to operate from within the Satellite Territory.

(b)     Upon the termination, expiration or nonrenewal of Franchisee's rights to operate the Satellite Business, Franchisee agrees for a period of one year thereafter not to engage as an owner, operator, licensee or in any managerial capacity, in any remodeling or home improvement business with Retailer at, from or associated with the former Satellite Business identified in Exhibit A hereto.

FS/FA-3.00(#685943)

*IN WITNESS WHEREOF, Franchisor and Franchisee have duly executed this Special Stipulation under seal on the date first written above.*

FRANCHISOR

*Four Seasons Marketing Corp.*

By: _[signature]_

Title: _____

Attest: _[signature]_

Title: _[handwritten] VP Bus Development_

(Affix Corporate Seal)

FRANCHISEE

*[handwritten] GLASS STRUCTURES, INC*

By: _[signature]_

Title: _[handwritten] V.P._

Attest: _[signature]_

Title: _[handwritten] Pres._

(Affix Corporate Seal)

_[signature]_

Guarantor

_[signature]_

Guarantor

SCHEDULE D-2
Page 5



6.    Franchisee is granted a

[  ] Level 3 Franchise

[  ] Level 2 Franchise

[  ] Level 1 Franchise

comprised of the following listed zip codes/postal districts (the "Granted Territory"):

## E

| ZIP CODE | LOCATION | POPULATION |
|---|---|---|
| 62513 | BLUE MOUND | 1487 |
| 62515 | BUFFALO | 848 |
| 62520 | DAWSON | 579 |
| 62519 | N/L | |
| 62530 | DIVERNON | 1557 |
| 62531 | EDINBURG | 1874 |
| 62533 | FARMERSVILLE | 985 |
| 62536 | GLENARM | 817 |
| 62538 | HARVEL | 377 |
| 62539 | ILLIOPOLIS | 1423 |
| 62541 | N/L | |
| 62540 | N/L | |
| 62545 | MECHANICSBURG | 2329 |
| 62546 | MORRISONVILLE | 1475 |
| 62548 | MT. PULASKI | 2472 |
| 62547 | MT. AUBURN | 972 |
| 62555 | OWANECO | 517 |
| 62556 | PALMER | 738 |
| 62558 | PAWNEE | 2998 |
| 62561 | RIVERTON | 4337 |
| 62563 | ROCHESTER | 9545 |
| 62567 | STONINGTON | 1216 |
| 62568 | TAYLOR | 16943 |
| 62572 | WAGGONER | 552 |
| 62570 | N/L | |
| 62613 | ATHENS | 2823 |
| 62615 | AUBURN | 4149 |
| 62625 | CANTRALL | 2024 |
| 62629 | CHATAM | 5290 |
| 62634 | ELKHART | 882 |
| 62637 | N/L | |
| 62684 | SHERMAN | 2323 |
| 62687 | N/L | |
| 62693 | WILLIAMSVILLE | 2566 |
| 62701 | SPRINGFIELD | 1488 |
| 62702 | SPRINGFIELD | 43865 |
| 62704 | SPRINGFIELD | 45004 |
| 62707 | SPRINGFIELD | 18661 |
| | **TOTAL STIPULATED POPULATION** | **183,116** |

SATELLITE TERRITORY

SPECIAL STIPULATION TO
FOUR SEASONS FRANCHISE AGREEMENT
DATED  4/25/01

BY AND BETWEEN

FOUR SEASONS MARKETING CORP.

AND

GLASS STRUCTURES, INC.

(the "Franchise Agreement")

This Special Stipulation to Franchise Agreement ("Special Stipulation") is made and entered into as of the __23__ day of __APRIL__, 20 _01_ by and between Four Seasons Marketing Corp., a Nevada corporation with its principal place of business at 5005 Veterans Memorial Highway, Holbrook, New York 11741 ("Franchisor") and __GLASS STRUCTURES, INC.__ with a principal place of business at __505 EAST CHESTNUT  CHAMPAIGN, IL. 61826__ ("Franchisee".

This Special Stipulation is intended to be a modification of and amendment to the Franchise Agreement. Defined terms shall have the same meaning in this Special Stipulation as in the Franchise Agreement. To the extent of any conflict between the following and the printed provisions of the Franchise Agreement, these Special Stipulations shall control.

Whereas, Franchisee desires to obtain the supplemental right to operate a business utilizing the Four Seasons System and the Licensed Marks from within the additional territory more particularly described in Paragraph 4 below (the "Satellite Territory"); and

Whereas, Franchisor is willing to grant Franchisee such supplemental rights subject to Franchisee's compliance with the following terms, covenants and conditions.

Now, therefore, in consideration of the mutual covenants and conditions hereinafter set forth, the parties hereto agree as follows:

1.    _Good Standing_. Franchisee hereby acknowledges and agrees that Franchisor, as of the date hereof, is in full compliance with all of its obligations under the Franchise Agreement. Except as set forth in this Special Stipulation, the Franchise Agreement remains in full force and effect.

2.    _Term_. This Special Stipulation shall take effect upon the date first set forth above and shall remain in effect during the term of the Franchise Agreement unless terminated by either party pursuant to Paragraph 6 hereof.

3.    _Grant of Satellite Territory_. Subject to the reservation of rights contained in Paragraph 2 of the Franchise Agreement, Franchisor hereby grants to Franchisee the supplemental right to operate the Franchised Business both in the Granted Territory and the Satellite Territory pursuant to the Four Seasons System and in accordance with the Franchise Agreement and Franchisor's Confidential Operating Manual. Unless otherwise specifically authorized by Franchisor in writing, Franchisee shall have no right to construct, open or operate a Center in the Satellite Territory. Provided that Franchisee is in good standing

SCHEDULE D-2
Page 1

PLAINTIFF'S
EXHIBIT
4

*pursuant to the terms of this Special Stipulation, Franchisor will grant no other party the right to operate a Four Seasons System Franchised Business from within the Satellite Territory during the term hereof.*

4.    *Description of Satellite Territory. The Satellite Territory shall be comprised of the following listed zip codes/postal districts (the "Satellite Territory"):*

*Location*                                                *Zip Code Population*

TERRITORY "F"

(ATTACHED)

*Total Stipulated Population*
*of Satellite Territory*                    267,605

5.    *Incremental Performance Standards. At all times after the first full month following the date first set forth above, and thereafter throughout the term of this Special Stipulation, Franchisee shall be required to purchase from or through Franchisor or an affiliate of Franchisor on a monthly basis for distribution in the Satellite Territory, Four Seasons Products having an aggregate wholesale value equal to not less than an amount calculated by multiplying the Total Stipulated Population of the Satellite Territory set forth in Paragraph 4 above, times Five cents ($.05).*

6.    *Termination of Satellite Territory Rights. Franchisor may terminate this Special Stipulation and Franchisee's rights hereunder to operate from within the Satellite Territory effective immediately upon the date Franchisor gives written notice of termination upon the occurrence of any event of default described below:*

FS/FA-3.00(#685943)

(a)     If Franchisee fails to achieve the Incremental Performance Standards specified in Paragraph 5 hereof during any month; or

(b)     If Franchisee commits any event of default specified in Paragraph 13 of the Franchise Agreement and fails to cure such default in accordance with the terms thereof.

7.     _Grant of Satellite Business Rights._ Upon the request of Franchisor, Franchisee may obtain the supplemental right to offer the Four Seasons Product Line either from premises other than the Center which are owned or operated by a third party retailer, or in conjunction with the direct marketing of Four Seasons Products by or through a third party retailer (the "Satellite Business"). Except as otherwise provided herein, the Satellite Business and Franchisee's rights hereunder shall be governed by and subject to the terms of the Franchise Agreement and Franchisor's Confidential Operating Manual. If Franchisee is granted the right to operate a Satellite Business, such Satellite Business shall be conducted only from those premises listed in Paragraph 1 of Exhibit A and/or pursuant to a lease, license agreement or other contract with the third party retailer ("Retailer") designated in Paragraph 2 of Exhibit A.

8.     _Approval of Satellite Business by Franchisor._ Prior to execution of any lease, license agreement or other contract with Retailer, Franchisee shall, at its expense, furnish to Franchisor, for its approval, the following (if applicable):

(a)     A proposed site plan for the operation of the Satellite Business and specifications for any display fixtures, leasehold improvements or similar structures proposed to be utilized by Franchisee in connection with the Satellite Business. Franchisee agrees to install display fixtures of the kind and size as may be required by Franchisor.

(b)     A copy of the proposed lease, license agreement or other contracts to be executed between Franchisee and Retailer, which must be approved by Franchisor;

(c)     If the Satellite Business will be operated from or through premises located outside of Franchisee's Granted Territory:

(i)     the right of Franchisor to act as the prime lessee/party-in-interest under the lease, license agreement or other contract with Retailer and to sub-lease or assign such interest to Franchisee. In such event Franchisor may "mark-up" the lease payment or license fee in order to compensate Franchisor for the liability and expenses associated with such arrangement, or

(ii)     a "Collateral Assignment" and a "Consent and Agreement of Retailer" in substantially the form attached hereto as Exhibit B, executed by Franchisee and the Retailer, providing Franchisor notice of Franchisee's default of the lease, license agreement or other contract, a right to cure such default and the right to assume Franchisee's interest thereunder with the right to sublease or assign such rights to another Four Seasons System franchisee in the event of any default by Franchisee under the Franchise Agreement or the lease, license agreement or other contract(s) with Retailer. If Franchisor exercises its rights under the Collateral Assignment, Franchisor shall have the option to acquire all fixtures, equipment and other leasehold improvements utilized by Franchisee in connection with the Satellite Business at fair market value.

FS/FA-3.00(#685943)

9.    _Continuing Fees on Satellite Business._ Franchisee agrees that the term "Gross Volume of Business" as used in the Franchise Agreement shall also be deemed to include the aggregate gross amount of all revenues derived from the operation of any Satellite Business. Franchisee shall maintain full, accurate and complete records of the Satellite Business. If any lease, license agreement or contract between Franchisee and Retailer provides that Franchisee shall provide periodic reports of sales, income, gross receipts or other financial and operating data to Retailer, Franchisee shall also contemporaneously provide complete copies of any such reports to Franchisor.

10.    _Additional Obligations of Franchisee._ Upon the request of Franchisor, Franchisee shall (if applicable):

(a)    Maintain in stock and display in connection with the Satellite Business such amounts of all standard advertising and marketing materials and referral cards promoting the Four Seasons Product Line as Franchisor may require from time to time, and shall use only marketing, advertising and printed materials which have been approved in advance, in writing, by Franchisor;

(b)    Clean and maintain the appearance of any display fixtures at the Satellite Business as may be required by Retailer or by Franchisor from time to time in the Confidential Operating Manual;

(c)    Upon the request of Retailer, "man" the Satellite Business on weekends or at special sales or promotional events.

11.    _Termination of Satellite Business Rights._ Franchisor may terminate any rights of Franchisee to operate a Satellite Business effective immediately upon the date Franchisor gives written notice of termination upon the occurrence of any event of default described below:

(a)    If Franchisee defaults in any lease, license agreement or other contract with Retailer affecting Franchisee's right to operate the Satellite Business and such default is not cured in accordance with the terms thereof;

(b)    If Franchisee commits any event of default specified in Paragraph 13 of the Franchise Agreement and fails to cure such default in accordance with the terms thereof.

12.    _Post-Termination Covenants._

(a)    Upon the termination, expiration or nonrenewal of Franchisee's rights to operate any Satellite Business outside of the Granted Territory:

(i)    Franchisee hereby collaterally assigns to Franchisor any interest of Franchisee in and to any lease, license agreement or other contract with Retailer and grants Franchisor an irrevocable power of attorney coupled with an interest for the purpose of executing such assignments if Franchisee fails or refuses to do so. In any such event, Franchisor may operate the Satellite Business itself or assign such rights to another Four Seasons franchisee.

(ii)    Franchisor may, at its option, terminate the exclusive rights of Franchisee to operate from within the Satellite Territory.

(b)    Upon the termination, expiration or nonrenewal of Franchisee's rights to operate the Satellite Business, Franchisee agrees for a period of one year thereafter not to engage as an owner, operator, licensee or in any managerial capacity, in any remodeling or home improvement business with Retailer at, from or associated with the former Satellite Business identified in Exhibit A hereto.

IN WITNESS WHEREOF, Franchisor and Franchisee have duly executed this Special Stipulation under seal on the date first written above.

FRANCHISOR

Four Seasons Marketing Corp.

By: _____

Title: _____

Attest: _____

Title: _____

(Affix Corporate Seal)

FRANCHISEE

_____

By: _____

Title: _____

Attest: _____

Title: _____

(Affix Corporate Seal)

_____
Guarantor

_____
Guarantor

SCHEDULE D-2
Page 5

FS/FA-3.00(#685943)

6.    Franchisee is granted a

[  ] Level 3 Franchise

[  ] Level 2 Franchise

[  ] Level 1 Franchise

comprised of the following listed zip codes/postal districts (the "Granted Territory"):

## F

| ZIP CODE | LOCATION | POPULATION |
|---|---|---|
| 61810 | ALLERTON | 393 |
| 61813 | BEMET | 1946 |
| 61818 | CERRO GORDO | 2094 |
| 61816 | BROAD LANDS | 496 |
| 61830 | CISCO | 758 |
| 61841 | FAIRMOUNT | 1272 |
| 61849 | HOMER | 1677 |
| 61850 | INDIANOLA | 693 |
| 61851 | IVESDALE | 607 |
| 61852 | LONGVILLE | 566 |
| 61855 | MILMINE | 152 |
| 61856 | MONTICELLO | 5533 |
| 61863 | PESOTUM | 789 |
| 61864 | PHILO | 1403 |
| 61870 | RIDGE FARM | 2061 |
| 61872 | SADORUS | 1042 |
| 61876 | SIDELL | 686 |
| 61877 | SIDNEY | 1567 |
| 61880 | TOLONO | 2892 |
| 61910 | ARCOLA | 3057 |
| 61911 | ARTHUR | 5047 |
| 61912 | ASHMORE | 1450 |
| 61913 | ATWOOD | 2528 |
| 61914 | BETHANY | 1938 |
| 61917 | BROCTON | 698 |
| 61920 | CHARLESTON | 23050 |
| 61923 | N/L | |
| 61924 | CHRISMAN | 2139 |
| 61925 | DALTON CITY | 706 |
| 61928 | GAYS | 690 |
| 61929 | HAMMOND | 804 |
| 61930 | HINOLSBORO | 816 |
| 61931 | HUMBOLDT | 858 |
| 61932 | HUME | 553 |
| 61933 | KANSAS | 1058 |
| 61936 | N/L | |
| 61938 | MATTOON | 23155 |
| 61940 | METCALF | 518 |
| 61941 | N/L | |
| 61942 | NEWMAN | 1593 |
| 61943 | OAKLAND | 1407 |
| 61444 | PARIS | 11852 |

| | | |
|---|---|---|
| 61937 | LOVINGTON | 1987 |
| 61949 | N/L | |
| 61951 | SULLIVAN | 6888 |
| 61953 | TUSCOLA | 5084 |
| 61955 | N/L | |
| 61956 | VILLA GROVE | 3332 |
| 61957 | WINDSOR | 2028 |
| 62501 | ARGENTA | 1447 |
| 62510 | ASSUMPTION | 1918 |
| 62521 | DECATUR | 39465 |
| 62622 | DECATUR | 19131 |
| 62523 | DECATUR | 841 |
| 62532 | N/L | |
| 62534 | FINDLAY | 1385 |
| 62535 | N/L | |
| 32526 | DECATUR | 39805 |
| 62537 | N/L | |
| 62543 | LATHAM | 855 |
| 62544 | MACON | 1742 |
| 62549 | MT. ZION | 5768 |
| 62550 | MOWEAQUA | 3071 |
| 62551 | NIANTIC | 848 |
| 62552 | OAKLEY | 797 |
| 62554 | OREANA | 1567 |
| 62565 | SHELBYVILLE | 7479 |
| 62573 | WARRENSBURG | 1775 |
| 62574 | N/L | |
| 62440 | LERNA | 1342 |
| 62441 | MARSHALL | 8054 |
| 62465 | STRASBURG | 746 |
| 62474 | WESTFIELD | 1606 |
| | | |
| | TOTAL STIPULATED POPULATION | 267,605 |

SATELLITE TERRITORY

SPECIAL STIPULATION TO
FOUR SEASONS FRANCHISE AGREEMENT
DATED 4/28/01
BY AND BETWEEN
FOUR SEASONS MARKETING CORP.
AND
GLASS STRUCTURES, INC.
(the "Franchise Agreement")

This Special Stipulation to Franchise Agreement ("Special Stipulation") is made and entered into as of the 28 day of APRIL , 20 01 by and between Four Seasons Marketing Corp., a Nevada corporation with its principal place of business at 5005 Veterans Memorial Highway, Holbrook, New York 11741 ("Franchisor") and GLASS STRUCTURES, INC. with a principal place of business at 505 EAST CHESTNUT CHAMPAIGN, IL 61826 ("Franchisee".

This Special Stipulation is intended to be a modification of and amendment to the Franchise Agreement. Defined terms shall have the same meaning in this Special Stipulation as in the Franchise Agreement. To the extent of any conflict between the following and the printed provisions of the Franchise Agreement, these Special Stipulations shall control.

Whereas, Franchisee desires to obtain the supplemental right to operate a business utilizing the Four Seasons System and the Licensed Marks from within the additional territory more particularly described in Paragraph 4 below (the "Satellite Territory"); and

Whereas, Franchisor is willing to grant Franchisee such supplemental rights subject to Franchisee's compliance with the following terms, covenants and conditions.

Now, therefore, in consideration of the mutual covenants and conditions hereinafter set forth, the parties hereto agree as follows:

1.      Good Standing. Franchisee hereby acknowledges and agrees that Franchisor, as of the date hereof, is in full compliance with all of its obligations under the Franchise Agreement. Except as set forth in this Special Stipulation, the Franchise Agreement remains in full force and effect.

2.      Term. This Special Stipulation shall take effect upon the date first set forth above and shall remain in effect during the term of the Franchise Agreement unless terminated by either party pursuant to Paragraph 6 hereof.

3.      Grant of Satellite Territory. Subject to the reservation of rights contained in Paragraph 2 of the Franchise Agreement, Franchisor hereby grants to Franchisee the supplemental right to operate the Franchised Business both in the Granted Territory and the Satellite Territory pursuant to the Four Seasons System and in accordance with the Franchise Agreement and Franchisor's Confidential Operating Manual. Unless otherwise specifically authorized by Franchisor in writing, Franchisee shall have no right to construct, open or operate a Center in the Satellite Territory. Provided that Franchisee is in good standing

SCHEDULE D-2
Page 1

PLAINTIFF'S
EXHIBIT
5

*pursuant to the terms of this Special Stipulation, Franchisor will grant no other party the right to operate a Four Seasons System Franchised Business from within the Satellite Territory during the term hereof.*

       4.    *Description of Satellite Territory.* *The Satellite Territory shall be comprised of the following listed zip codes/postal districts (the "Satellite Territory"):*

*Location*

*Zip Code Population*

TERRITORY "G"

(ATTACHED)

*Total Stipulated Population*
*of Satellite Territory*

2109,031

       5.    *Incremental Performance Standards.* *At all times after the first full month following the date first set forth above, and thereafter throughout the term of this Special Stipulation, Franchisee shall be required to purchase from or through Franchisor or an affiliate of Franchisor on a monthly basis for distribution in the Satellite Territory, Four Seasons Products having an aggregate wholesale value equal to not less than an amount calculated by multiplying the Total Stipulated Population of the Satellite Territory set forth in Paragraph 4 above times Five cents ($.05).*

       6.    *Termination of Satellite Territory Rights.* *Franchisor may terminate this Special Stipulation and Franchisee's rights hereunder to operate from within the Satellite Territory effective immediately upon the date Franchisor gives written notice of termination upon the occurrence of any event of default described below:*

*FS/FA-3.00(#685943)*

(a)    If Franchisee fails to achieve the Incremental Performance Standards specified in Paragraph 5 hereof during any month; or

(b)    If Franchisee commits any event of default specified in Paragraph 13 of the Franchise Agreement and fails to cure such default in accordance with the terms thereof.

7.    _Grant of Satellite Business Rights._ Upon the request of Franchisor, Franchisee may obtain the supplemental right to offer the Four Seasons Product Line either from premises other than the Center which are owned or operated by a third party retailer, or in conjunction with the direct marketing of Four Seasons Products by or through a third party retailer (the "Satellite Business"). Except as otherwise provided herein, the Satellite Business and Franchisee's rights hereunder shall be governed by and subject to the terms of the Franchise Agreement and Franchisor's Confidential Operating Manual. If Franchisee is granted the right to operate a Satellite Business, such Satellite Business shall be conducted only from those premises listed in Paragraph 1 of Exhibit A and/or pursuant to a lease, license agreement or other contract with the third party retailer ("Retailer") designated in Paragraph 2 of Exhibit A.

8.    _Approval of Satellite Business by Franchisor._ Prior to execution of any lease, license agreement or other contract with Retailer, Franchisee shall, at its expense, furnish to Franchisor, for its approval, the following (if applicable):

(a)    A proposed site plan for the operation of the Satellite Business and specifications for any display fixtures, leasehold improvements or similar structures proposed to be utilized by Franchisee in connection with the Satellite Business. Franchisee agrees to install display fixtures of the kind and size as may be required by Franchisor.

(b)    A copy of the proposed lease, license agreement or other contracts to be executed between Franchisee and Retailer, which must be approved by Franchisor;

(c)    If the Satellite Business will be operated from or through premises located outside of Franchisee's Granted Territory:

(i)    the right of Franchisor to act as the prime lessee/party-in-interest under the lease, license agreement or other contract with Retailer and to sub-lease or assign such interest to Franchisee. In such event Franchisor may "mark-up" the lease payment or license fee in order to compensate Franchisor for the liability and expenses associated with such arrangement, or

(ii)    a "Collateral Assignment" and a "Consent and Agreement of Retailer" in substantially the form attached hereto as Exhibit B, executed by Franchisee and the Retailer, providing Franchisor notice of Franchisee's default of the lease, license agreement or other contract, a right to cure such default and the right to assume Franchisee's interest thereunder with the right to sublease or assign such rights to another Four Seasons System franchise in the event of any default by Franchisee under the Franchise Agreement or the lease, license agreement or other contract(s) with Retailer. If Franchisor exercises its rights under the Collateral Assignment, Franchisor shall have the option to acquire all fixtures, equipment and other leasehold improvements utilized by Franchisee in connection with the Satellite Business at fair market value.

9.  *Continuing Fees on Satellite Business.* Franchisee agrees that the term "Gross Volume of Business" as used in the Franchise Agreement shall also be deemed to include the aggregate gross amount of all revenues derived from the operation of any Satellite Business. Franchisee shall maintain full, accurate and complete records of the Satellite Business. If any lease, license agreement or contract between Franchisee and Retailer provides that Franchisee shall provide periodic reports of sales, income, gross receipts or other financial and operating data to Retailer, Franchisee shall also contemporaneously provide complete copies of any such reports to Franchisor.

10. *Additional Obligations of Franchisee.* Upon the request of Franchisor, Franchisee shall (if applicable):

(a)  Maintain in stock and display in connection with the Satellite Business such amounts of all standard advertising and marketing materials and referral cards promoting the Four Seasons Product Line as Franchisor may require from time to time, and shall use only marketing, advertising and printed materials which have been approved in advance, in writing, by Franchisor;

(b)  Clean and maintain the appearance of any display fixtures at the Satellite Business as may be required by Retailer or by Franchisor from time to time in the Confidential Operating Manual;

(c)  Upon the request of Retailer, "man" the Satellite Business on weekends or at special sales or promotional events.

11. *Termination of Satellite Business Rights.* Franchisor may terminate any rights of Franchisee to operate a Satellite Business effective immediately upon the date Franchisor gives written notice of termination upon the occurrence of any event of default described below:

(a)  If Franchisee defaults in any lease, license agreement or other contract with Retailer affecting Franchisee's right to operate the Satellite Business and such default is not cured in accordance with the terms thereof;

(b)  If Franchisee commits any event of default specified in Paragraph 13 of the Franchise Agreement and fails to cure such default in accordance with the terms thereof.

12. *Post-Termination Covenants.*

(a)  Upon the termination, expiration or nonrenewal of Franchisee's rights to operate any Satellite Business outside of the Granted Territory:

(i)  Franchisee hereby collaterally assigns to Franchisor any interest of Franchisee in and to any lease, license agreement or other contract with Retailer and grants Franchisor an irrevocable power of attorney coupled with an interest for the purpose of executing such assignments if Franchisee fails or refuses to do so. In any such event, Franchisor may operate the Satellite Business itself or assign such rights to another Four Seasons franchisee.

(ii)  Franchisor may, at its option, terminate the exclusive rights of Franchisee to operate from within the Satellite Territory.

(b)  Upon the termination, expiration or nonrenewal of Franchisee's rights to operate the Satellite Business, Franchisee agrees for a period of one year thereafter not to engage as an owner, operator, licensee or in any managerial capacity, in any remodeling or home improvement business with Retailer at, from or associated with the former Satellite Business identified in Exhibit A hereto.

FS/FA-3.00(#685943)

*IN WITNESS WHEREOF, Franchisor and Franchisee have duly executed this Special Stipulation under seal on the date first written above.*

FRANCHISOR

*Four Seasons Marketing Corp.*

By: _____

Title: _____

Attest: _____

Title: _____

(Affix Corporate Seal)

FRANCHISEE

GLASS STRUCTURES, INC.

By: _____

Title: _____

Attest: _____

Title: _____

(Affix Corporate Seal)

_____
Guarantor

_____
Guarantor

FS/FA-3.00 (#685943)

6.    Franchisee is granted a

[   ] Level 3 Franchise

[   ] Level 2 Franchise

[   ] Level 1 Franchise

comprised of the following listed zip codes/postal districts (the "Granted Territory"):

## G

| ZIP CODE | LOCATION | POPULATION |
|----------|----------|------------|
| 61517 | BRIMFORD | 1,242 |
| 61520 | CANTON | 15,743 |
| 61525 | DUNLAP | 5,725 |
| 61526 | EDELSTEIN | 1,803 |
| 61528 | EDWARDS | 3,191 |
| 61529 | ELMWOOD | 2,764 |
| 61531 | FARMINGTON | 3,494 |
| 61533 | GLASFORD | 2,726 |
| 61536 | HANNA CITY | 3,370 |
| 61547 | MAPLETON | 2,711 |
| 61552 | N/L | |
| 61553 | N/L | |
| 61554 | PEKIN | 48,093 |
| 61559 | PRINCEVILLE | 3,402 |
| 61562 | N/L | |
| 61569 | TRIVOLI | 1,347 |
| 61572 | YATES CITY | 1,401 |
| 61603 | PEORIA | 2,1133 |
| 61604 | PEORIA | 35,617 |
| 61607 | PEORIA | 11,108 |
| 61611 | E. PEORIA | 30,987 |
| 61614 | PEORIA | 37,502 |
| 61615 | PEORIA | 15,672 |
| | TOTAL STIPULATED POPULATION | 249,031 |

FOUR SEASONS
Design & Remodeling Centers

Four Seas... arketing Corp.

## FAX TRANSMITTAL SHEET

TO: JIM

FROM: Dominick

DATE: 12/9/92

TIME: 11:15

DESTINATION  FAX NO.:  217-351-8205

NO. OF PAGES (including transmittal sheet): 2

Special Instructions: GRANTed territory, champaign
96,000 X .60 = 58,000 Annual wholesale pur...
Area A = 242,871 X .40 = 97,148
...ea B = 231,377 X .40 = 92,550
Area ... = 285,641 X .40 = 114,256
Area D = 208,771 X .40 = 83,508
total = 445,46?

IF YOU ... T RECEIV... AL  OF THE PAGES INDICATED OR IF ...
IS NOT ...  PLEAS...

PHO... ... EXT.

PLAINTIFF'S
EXHIBIT
6

✱ Not: addit... ...epublish... on a monthly bais...

E-FILED
Monday, 10 September, 2007 01:33:57 PM
ENTERED JUN 7 1993
Clerk, U.S. District Court, ILCD



**FOUR SEASONS SUNROOMS** ®

SOLAR GREENHOUSES • SUNROOMS • PATIO ROOMS
SOLARIUMS • WINDOWS • DOORS • SKYLIGHTS

*Outdoor Living...Indoors*™

FOUR SEASONS MARKETING CORP.

5005 Veterans Memorial Highway, Holbrook, New York 11741
Tel (516) 563-4000 • Fax (516) 563-4010 • Telex 971324

May 18, 1993

Jim Scott
Sunstructure Design, Inc.
107 South Walnut
Champaign, IL 61820

RE: <u>Satellite Territory Agreements</u>

Dear Jim:

Enclosed are four (4) executed Satellite Agreements for your file.

Your new Minimum Purchase Requirements for these territories are as follows:

| Territory | Population | Monthly Purchase | 12 Months | Annual Total |
|-----------|------------|------------------|-----------|--------------|
| A | 242,871 X | .0335 X | 12 = | $97,634.00 |
| B | 235,871 X | .0335 X | 12 = | $94,811.00 |
| C | 285,641 X | .0335 X | 12 = | $114,828.00 |
| D | 208,771 X | .0335 X | 12 = | $83,926.00 |

$391,199.00

Original "Granted Territory                    57,782.00

$448,981.00

Should you have any questions please feel free to contact me.

Very truly yours,

Tony Russo,
Vice President of Franchise

cc: Bruce Connally

PLAINTIFF'S
EXHIBIT
7

E-FILED
Monday, 10 September, 2007 01:34:30 PM
Clerk, U.S. District Court, ILCD



Made in America for Over 30 Years

**FOUR SEASONS SUNROOMS**

Four Seasons Marketing Corp.

RECEIVED

JUN 2 9 2007

RECEIVED JUN 2 8 2007

June 25, 2007

Joseph O'Bryan
Glass Structures, Inc.
PO Box 11146
Champaign, IL 61826

Re:    Default and Termination Notices for Satellite territories

Dear Joe:

As requested enclosed are copies of the letters and Satellite Territory Agreements we mailed to you previously. Also enclosed are copies of the Certified letters we mailed which Jim Scott or you never picked up.

Should you have any questions regarding this matter please contact us.

Very truly yours,

*Tony Russo*

Tony Russo

PLAINTIFF'S
EXHIBIT
8

       

5005 Veterans Memorial Highway • Holbrook, NY 11741 • Telephone (631) 563-4000 • Facsimile (631) 563-4010





UNITED STATES POSTAGE
PITNEY BOWES
02 1M
0004224584
MAILED FROM ZIP CODE 11741
$ 00.410
MAY 17 2007

RECEIVED

00 05/01/07

517     1

RETURN TO SENDER
ATTEMPTED - NOT KNOWN
UNABLE TO FORWARD

BC: 117414507799     *0602-03669-17-36

NIXIE

Mr. James D. Scott
Glass Structures, Inc.
505 East C
Champaig

Four Seasons Marketing Corp.
5005 Veterans Memorial Highway
Holbrook, NY 11741

Telephone (631) 563-4000
Fax (631) 563-4010
www.FourSeasonsSunrooms.com

More Reasons for Four Seasons

CERTIFIED MAIL

7004 2510 0006 9858 5958





UNITED STATES POSTAGE
PITNEY BOWES
02 1M
0004224584
MAILED FROM ZIP CODE 11741
$ 05.210
MAY 17 2007

RETURNED TO SENDER

ATTEMPTED, NOT KNOWN

Mr. James D. Scott
Glass Structures, Inc.
505 East Chestnut
Champaign, Illinois 61826

Four Seasons Marketing Corp.
5005 Veterans Memorial Highway
Holbrook, NY 11741

Telephone (631) 563-4000
Fax (631) 563-4010
www.FourSeasonsSunrooms.com

More Reasons for Four Seasons




Made in America for Over 30 Years

**FOUR SEASONS SUNROOMS**

Four Seasons Marketing Corp.

More Reasons for Four Seasons

June 18, 2007

### CERTIFIED MAIL RETURN RECEIPT REQUESTED AND REGULAR MAIL

Mr. James D. Scott
Glass Structures, Inc.
505 East Chestnut
Champaign, IL 61826

**RE:   *Termination of the Special Stipulation to Franchise Agreement Dated April 25, 2001 for Satellite Territories C, D,E, F, G, and H and Material Provision for Special Stipulation to Franchise Agreement dated September 3, 2002 for Satellite Territory designated as Sectionals 420, 636, 637, 638 and 639***

Dear Mr. Scott:

I am Director of Franchise Compliance to Four Seasons Marketing Corp. ("Four Seasons") and it is my obligation to notify you that you are in default of your obligations to Four Seasons under the referenced Franchise Agreement.

The termination results from your failure to comply the terms and conditions under Paragraph 5 of the Special Stipulation to Franchise Agreement. Each Special Stipulation to Franchise Agreement referenced above contains an identical Paragraph 5, which is provided below for your convenience:

*"At all times after the first full month following the date first set forth above, and hereafter throughout the term of this Special Stipulation, Franchisee shall be required to purchase from or through Franchisor or an affiliate of Franchisor on a monthly basis for distribution in the Satellite Territory, Four Seasons Products having an aggregate wholesale value equal to not less than an amount calculated by multiplying the Total Stipulated Population of the Satellite Territory set forth in Paragraph 4 above times Five cents ($.05)"*

Franchisor hereby terminates the above referenced Special Stipulations to Franchise Agreement.

In order to ensure that you have received a copy of this letter, we have also sent a copy by regular mail.

Very truly yours,
**Four Seasons Marketing Corp**

Tony Russo
Director of Franchise Compliance

CC:    Cliff Nonnenmacher
Randall Firmin










- 1 -



Made in America for Over 30 Years

Four Seasons Marketing Corp.

## CERTIFIED MAIL/RETURN RECEIPT REQUESTED AND REGULAR MAIL

May 17, 2007

Mr. James D. Scott
Glass Structures, Inc.
505 East Chestnut
Champaign, Illinois 61826

*Re:*   *NOTICE TO CURE - Default of Material Provision of Special Stipulation to Franchise Agreements Dated April 25, 2001 for Satellite Territories C, D, E, F, F, G and H and Material Provision for Special Stipulation to Franchise Agreement Dated September 3, 2002 for Satellite Territory designated as Sectionals 420, 636, 637, 638 and 639*

Dear Mr. Scott:

I am the Director of Franchise Compliance to Four Seasons Marketing Corp ("Four Seasons") and it is my obligation to notify you that you are in default of your obligations to Four Seasons under the above referenced Special Stipulation to Franchise Agreements.

The default results from your failure to comply with Paragraph 5 of the Special Stipulation to Franchise Agreements. Each Special Stipulation to Franchise Agreement referenced above contains an identical Paragraph 5, which is provided below for your convenience:

> *"At all times after the first full month following the date first set forth above, and hereafter throughout the term of this Special Stipulation, Franchisee shall be required to purchase from or through Franchisor or an affiliate of Franchisor on a monthly basis for distribution in the Satellite Territory, Four Seasons Products having an aggregate wholesale value equal to not less than an amount calculated by multiplying the Total Stipulated Population of the Satellite Territory set forth in Paragraph 4 above times Five cents ($.05)"*

Accordingly, we hereby provide you with written notice of said default for each Special Stipulation to Franchise Agreement referenced above. You have thirty (30) days from the date of this notice to cure such defaults. Failure to cure the aforementioned defaults within thirty (30) days shall constitute good cause grounds for terminating the corresponding Special Stipulation to Franchise Agreement and any rights granted under that Special Stipulation to Franchise Agreement. If you continue to sell the Four Seasons Product Line within a Satellite Territory

       

your receipt of this letter, we strongly urge that any deposits or other monies received from end users/consumers be segregated and applied only against performance of those contracts. You are advised that in the event of a termination of a Special Stipulation to Franchise Agreement, your obligations to comply with the post-termination provisions imposed by that Special Stipulation to Franchise Agreement and/or by law shall remain in full force and effect. Four Seasons will insist upon strict performance of such obligations and may take action to recover damages incurred by it as a result of your early termination of that Special Stipulation to Franchise Agreement.

In order to ensure that you have received a copy of this letter, we have also sent a copy by regular mail.

Very truly yours,
**FOUR SEASONS MARKETING CORP**

Tony Russo
Sr. Director of New Business


Cc:    Cliff Nonnenmacher
       Randall Firmin

E-FILED
Monday, 10 September, 2007 01:35:05 PM
Clerk, U.S. District Court, ILCD

## IN THE CIRCUIT COURT FOR THE SIXTH JUDICIAL CIRCUIT
## CHAMPAIGN COUNTY, ILLINOIS

FILED
SIXTH JUDICIAL CIRCUIT

AUG 0 1 2007

_Linda S. Frank_
CLERK OF THE CIRCUIT COURT
CHAMPAIGN COUNTY ILLINOIS

| | |
|---|---|
| SUN STRUCTURE DESIGNS, INC.     ) | |
|       ) | |
|     Plaintiff,     ) | |
|       ) | |
| v.     ) | Case No.:  07-CH- **240** |
|       ) | |
| FOUR SEASONS MARKETING CORP.     ) | |
|       ) | |
|     Defendant.     ) | |
|       ) | |

## MOTION FOR PRELIMINARY INJUNCTION

COMES NOW the Plaintiff, SUN STRUCTURES DESIGNS, INC., by and through its

attorneys, MEYER CAPEL, a Professional Corporation, and for its Motion for Preliminary

Injunction states as follows:

1.      The Plaintiff, SUN STRUCTURE DESIGNS, INC. ("Sun Structure") is a

corporation doing business in the state of Illinois with its primary location in Bondville,

Champaign County, Illinois.

2.      Defendant, FOUR SEASONS MARKETING CORP. ("Four Seasons") is a

corporation doing business in the state of Illinois and properly registered pursuant to the Illinois

Franchise Disclosure Act of 1987 to engage in the sale of franchises within Illinois.

3.      At some point, prior to renewing its contractual relationship with Four Seasons,

Sun Structure contemplated changing its name to Glass Structures, Inc. and informed Four

Seasons of the same.

4.      As a result of Sun Structures contemplating a change in its name, Four Seasons

altered its record keeping system for franchisees to reflect that Glass Structures, Inc. had

replaced Sun Structure as a franchisee in Four Seasons corporate records.  However, Sun

Structure's name change never occurred; the parties hereto understand and have operated as if Sun Structure and Glass Structure, Inc. are one in the same.

5.   In 1991, Four Seasons granted a franchise to Glass Structures, Inc., an Illinois Corporation for the sale of Four Seasons Sunrooms in and around central Illinois which had a term of ten years. The exact territory granted in the franchise agreement was delineated by zip codes referenced in the franchise agreement dated March 15, 1991 and several 'Satellite Territory Special Stipulations to Four Seasons Franchise Agreement Dated March 15, 1991, by and between Four Seasons Marketing Corp. and Glass Structures, Inc.'

6.   After its expiration, the original franchise agreement between the parties was renewed on April 25, 2001. A copy of the current Franchise Agreement dated on April 25, 2001 (hereinafter, the "Franchise Agreement") is attached hereto and incorporated herein as Exhibit 1.

7.   At the time of the renewal of the franchise agreement, the parties also renewed the 'Satellite Territory Special Stipulations to Four Seasons Franchise Agreement Dated April 25, 2001, by and between Four Seasons Marketing Corp. and Glass Structures, Inc.' which are now at issue in this case. Said satellite territory agreements (hereinafter, the "Satellite Agreements") are attached hereto and incorporated herein as Exhibits 2 through 5.

8.   At the time of the renewal of the Franchise Agreement and the Satellite Agreements and in the documents themselves, Four Seasons referred to Sun Structures as Glass Structures, Inc.

9.   Paragraph 5 of each Satellite Agreements contains identical language which states:

> "At all times after the first full month following the date
> first set forth above, and thereafter throughout the term of this
> Special Stipulation, Franchisee shall be required to purchase from
> or through Franchisor or an affiliate of Franchisor on a monthly

2

basis for distribution in the Satellite Territory, Four Seasons
Products having an aggregate wholesale value equal to not less
than an amount calculated by multiplying the Total Stipulated
Population of the Satellite Territory set forth in Paragraph 4 above
times Five cents ($.05)."

10.    The total population listed in Exhibits 1 through 5 herein and subject to the

minimum order amounts referred to in Paragraph 5 of the Satellite Agreements (hereinafter,

"Minimum Payments") is 1,254,618.

11.    Four Seasons indicated early in the franchise relationship with Sun Structure, in a

December 9, 1992 facsimile and May 18, 1993 letter, both of which are attached hereto as

Exhibits 6 and 7 respectively, that the Minimum Payments would be paid and computed annually

which is the practice followed by the parties since that time.

12.    The total population covered by the Franchise Agreements and the Satellite

Agreements is 1,254,618.

13.    The total yearly fee due from Sun Structure and payable to Four Seasons based

upon a population of 1,254,618 is $752,770.80 per year.

14.    In 2006, Sun Structure ordered a total of Eight Hundred Eighty Eight Thousand

Six Hundred Seventeen and 00/100 Dollars($888,617.00) worth of products from Four Seasons

in full satisfaction of the Minimum Payments requirement of the Franchise Agreement and

Satellite Agreements.

15.    Due to the seasonal nature of the sale of sunrooms, it would be commercially

unreasonable to expect orders to satisfy the Minimum Payments requirements on a monthly basis

during the winter months in central Illinois.

16.    Neither the Satellite Agreements nor the Franchise Agreement contain statements

as to the due date of the Minimum Payments.

17.    Neither the Satellite Agreements nor the Franchise Agreements contain language which prohibit carrying-over previous excess orders in order to satisfy future Minimum Payments due.

18.    On May 17, 2007, Four Seasons' Senior Director of New Business and Director of Franchise Compliance, Tony Russo, (hereinafter, "Russo") sent a Notice to Cure letter (hereinafter, "Notice Letter") to Jim Scott at Glass Structures, Inc. 505 East Chestnut Champaign, Illinois 61826 which referred to a default on the Minimum Payments by Sun Structure.

19.    On or before May 17, 2007, Russo and Four Seasons knew that Sun Structure had two addresses to receive mail. The first was 505 East Chestnut Bondville, Illinois 61815 and the second was P.O. Box 11146 Champaign, Illinois 61826.

20.    On or before May 17, 2007, Russo and Four Seasons knew that Jim Scott was no longer involved in the day-to-day operations of Sun Structure and had moved to Arizona.

21.    On or before May 17, 2007, Russo and Four Seasons knew that Joseph O'Bryan was the President of Sun Structure and ran its day-to-day operations.

22.    The Notice Letter was returned "Attempted, not Known" to Four Seasons by the United States Postal Service.

23.    The Franchise Agreement paragraph 13(a)(ii) requires Four Seasons to give a 30-day notice to cure any delayed financial obligation before the Franchise Agreement can be terminated.

24.    The Notice Letter was intended to satisfy Franchise Agreement Paragraph 13(a)(ii), but did not because it was not received by Sun Structure and was sent to the wrong address.

4

25.    On June 18, 2007, Russo sent a letter attempting to terminate (hereinafter, "Termination Letter") the Satellite Agreements to the same address listed in paragraph 15 herein.

26.    The Franchise Agreement paragraph 13(a) allows for a termination of the Satellite Agreements immediately upon proper notice by Four Seasons to Sun Structure.

27.    The Termination Letter was intended to satisfy Franchise Agreement Paragraph 13(a), but did not because it was not received by Sun Structures after the 30-day cure period had expired.

28.    On June 25, 2007, Russo sent a letter which included the Notice Letter and Termination Letter as enclosures to Mr. O'Bryan which was the first time Mr. O'Bryan and Sun Structure had been sent either the Notice Letter or the Termination Letter to the correct address. Attached hereto and incorporate herein as Exhibit 8.

29.    Sun Structure did not receive the Notice Letter until June 28, 2007.

30.    Sun Structure did not receive the Termination Letter until June 28, 2007.

31.    Four Seasons failed to give proper notice pursuant to the Franchise Agreement and Satellite Agreements.

32.    Four Seasons breached the Franchise Agreement and Satellite Agreements by improperly terminating the same.

33.    The Illinois Franchise Disclosure Act of 1987 (hereinafter, the "Act") states: "It shall be a violation of this Act for a franchisor to terminate a franchise of a franchised business located in this State prior to the expiration of its term except for 'good cause'..." 815 ILCS 705/19(a).

34.    The Act defines 'Good Cause' as follows: "[Good cause] shall include, but not be limited to, the failure of the franchisee to comply with any lawful provisions of the franchise or

other agreement and to cure such default after being given notice thereof and a reasonable

opportunity to cure such default, which in no event need be more than 30 days." 815 ILCS

705/19(b).

35.    Four Seasons did not provide Sun Structure with the 30-day notice required by the

Act.

36.    Sun Structure received the Notice Letter and Termination Letter on the same day

and were given no opportunity to dispute or cure the alleged default.

37.    Four Seasons improperly terminated the Satellite Agreements in violation of the

Illinois Franchise Disclosure Act, 815 ILCS 705/19.

38.    On July 10, 2007, Russo informed Mr. O'Bryan that Peoria Siding and Window

Company, Inc. (hereinafter, "Peoria Siding") had been granted a "dealership" by Four Seasons

for a large portion of the territory formerly granted to Sun Structure pursuant to the Satellite

Agreements.

39.    On July 18, 2007, Sun Structure sent a letter to Four Seasons outlining Four

Seasons' breach of the Franchise Agreement and Satellite Agreements and pointing out Four

Seasons' violation of the Act.  Said letter was intended to provide Four Seasons with proper

notice pursuant to paragraph 13(c) of the Franchise Agreement.  This letter also informed Four

Seasons' of its violation of 815 ILCS 705/19.  The July 18, 2007 letter is attached hereto and

incorporated herein as Exhibit 9.

40.    Further, Sun Structure is not in breach of the agreements as claimed by the

Defendant in the May 17, 2007 correspondence.

41.    Sun Structure has a duty to mitigate future damages in any claims related to Four Seasons' breach of contract and violation of the Act and has engaged in that duty by filing this claim.

42.    Sun Structure will be financially injured by Peoria Siding's relationship with Four Seasons and Peoria Siding's ability to conduct operations in and around central Illinois in an area that is exclusively granted to Sun Structure.

43.    Sun Structure has clearly ascertainable contractual rights pursuant to the Franchise Agreement and Satellite Agreements which are in need of protection from Four Seasons' allowance of a "dealership" to Peoria Siding in an area that is exclusively granted to Sun Structure.

44.    Sun Structure has clearly ascertainable contractual rights pursuant to the Franchise Agreement and Satellite Agreements which are in need of protection from Four Seasons' consideration of additional dealers or franchisees in the territory covered by the Satellite Agreements attached hereto as Exhibits 2 through 5.

45.    Four Seasons' current action in improperly terminating the Satellite Agreements for its own economic advantage interferes with Sun Structure's rights set out previously herein.

46.    In the absence of an injunction, Sun Structure would suffer irreparable harm since Four Seasons would be allowed to grant "dealerships" and franchises in a territory covered by the Satellite Agreements and given exclusively to Sun Structure.

47.    Sun Structure is unable to calculate the extent of its damages at this time due to Four Seasons' actions since those damages will result in future lost profits, as well as damages to Sun Structure's reputation and good will built up throughout its business activity over the last 16

years, not to mention the continued erosion of Sun Structure's customer base in areas where Peoria Siding is located.

48.    Sun Structure has no adequate remedy at law.

49.    Sun Structure is likely to succeed on the merits of its breach of contract claim.

50.    Sun Structure is likely to succeed on the merits of its claim based upon the Illinois Franchise Disclosure Act of 1987.

51.    The aforementioned facts in conjunction with the possible damages and potential liability placed on Sun Structure by Four Seasons demonstrates that on balance Sun Structure would suffer more without the entry of an injunction than Four Season would suffer with the entry of an injunction.

WHEREFORE, the Plaintiff, SUN STRUCTURE DESIGN, INC., an Illinois Corporation, respectfully prays this Honorable Court enter an order against the Defendant, FOUR SEASONS MARKETING CORP. as follows:

A. Preliminarily restraining the Defendant from granting a franchise or dealership to any parties for the territory listed in the Satellite Territory Special Stipulation to Four Seasons Franchise Agreement Dated April 25, 2001 by and between Four Seasons Marketing Corp. and Glass Structures, Inc. attached hereto as Exhibits 2 through 5.

B. Preliminarily restraining the Defendant from engaging in any business with Peoria Siding and Window Company, Inc. or any other company, entity or person in the territory listed in the Satellite Territory Special Stipulation to Four Seasons Franchise Agreement Dated April 25, 2001 by and between Four Seasons Marketing Corp. and Glass Structures, Inc. attached hereto as Exhibits 2 through 5.

8

C.  For such further relief as this Court deems equitable and just.

Respectfully submitted,

SUN STRUCTURE DESIGN, INC.,
an Illinois Corporation, Plaintiff

By:  Meyer Capel, A Professional Corporation

Lorna K. Geiler

Steven A. Amjad

LORNA K. GEILER
STEVEN A. AMJAD
Meyer Capel, *A Professional Corporation*
306 West Church Street
Champaign, IL  61820
Phone:        (217) 352-1800
Fax:          (217) 352-1083

R:\SAA\Sun Structure\Four Seasons\Motion for Preliminary Injunction.doc
7/30/2007 1:58 PM

E-FILED
Monday, 10 September, 2007  01:35:39 PM
Clerk, U.S. District Court, ILCD

FOUR SEASONS® SUNROOMS CENTER
FRANCHISE AGREEMENT

EXHIBIT A

Copyright 1990

FS/FA-3.00(#685943)

PLAINTIFF'S
EXHIBIT

# FOUR SEASONS® SUNROOMS CENTER

## FRANCHISE AGREEMENT

## TABLE OF CONTENTS

| Paragraph | Heading | Page |
|---|---|---|
| 1. | Parties and Recitals | 1 |
| 2. | Grant of Franchise | 2 |
| 3. | Term | 3 |
| 4. | Operating Assistance | 3 |
| 5. | Fees | 6 |
| 6. | Licensed Marks | 7 |
| 7. | Standards of Operations | 8 |
| 8. | Confidential Operating Manual | 15 |
| 9. | Advertising and Marketing | 16 |
| 10. | Statements and Records | 18 |
| 11. | Covenants | 19 |
| 12. | Transfer and Assignment of Agreement | 20 |
| 13. | Default and Termination | 23 |
| 14. | Post Term Obligations | 25 |
| 15. | Insurance | 26 |
| 16. | Taxes, Permits, and Indebtedness | 26 |
| 17. | Indemnification and Independent Contractor | 27 |
| 18. | Written Approvals, Waivers, and Amendment | 27 |
| 19. | Enforcement | 28 |
| 20. | Notices | 28 |
| 21. | Governing Law | 29 |
| 22. | Severability and Construction | 29 |
| 23. | Acknowledgments | 30 |

Guaranty

Schedule A - Licensed Marks

Schedule B - Premises, Ownership and Granted Territory

Schedule C - Minimum Performance Standards

*Schedule D-1 - Satellite Business Special Stipulation*

*Schedule D-2 - Satellite Territory Special Stipulation*

Rider A - Rider to Franchise Agreement (if applicable)

## 1.    PARTIES AND RECITALS

(a)    This Franchise Agreement ("Agreement") is made as of ᕼᑭᑎ ᑕᔕ , 2○)| by and between Four Seasons Marketing Corp.; a Nevada corporation with its principal place of business at 5005 Veterans Memorial Highway, Holbrook, New York 11741 ("Franchisor"), and ____ GLASS STRUCTURES, INC. ("Franchisee") with a place of business at 505 EAST CHESTNUT, CHAMPAIGN, IL, 61826 .

(b)    In connection with those words/marks more fully set forth on Schedule "A", which is attached hereto and made a part hereof by reference (the "Licensed Marks"), Franchisor has developed a proprietary plan and system (the "Four Seasons System") relating to the operation of outlets under the name and mark, "Four Seasons Sunrooms," which are authorized to distribute, install, service and maintain various glass-faced structures and component parts thereof which are used as greenhouses, conservatories, patio-sunrooms, room-additions, solariums, and related functions (specifically excluding modular homes) as well as other building and remodeling products and/or services as may now or hereafter be manufactured, designed, developed or authorized for use by Franchisor (collectively the "Four Seasons Product Line") which are manufactured according to standards, specifications and designs prescribed by Franchisor and well known for their high quality and reliability. The Four Seasons System includes site selection guidelines, store layout, equipment and product selection, patented and proprietary products distributed under the Licensed Marks, purchasing and inventory guidelines, accounting methods, merchandising, advertising, installation, maintenance, sales and promotional techniques, construction design, Solarcad (a computer assisted solarium design, drafting and estimating program) planning services and general contracting, personnel training and other matters relating to the efficient operation and supervision of those outlets operated under the Four Seasons System (the "Center(s)"), and the maintenance of quality standards.

(c)    To prevent customer confusion or deception, maximize promotion of the Licensed Marks, limit warranty claims, and reinforce consumer acceptance of the Four Seasons Product Line, this Agreement restricts the sale by Franchisee of any product(s) or service(s), either in whole or in part, which, in Franchisor's sole judgment, are the same-as or similar to any element or component of the Four Seasons Product Line then currently manufactured or distributed by Franchisor or its affiliates ("Competing Product(s)"). Subject to Franchisor's prior approval and Franchisee's compliance with the terms and conditions of Paragraph 7(k) hereof, Franchisee may sell and distribute product(s) and service(s) which, in Franchisor's sole judgment, are not the same as or similar to any element or component of the Four Seasons Product Line then currently manufactured or distributed by Franchisor or its affiliates (Non-Competing Product(s)"). The terms "Competing Product(s)" and "Non-Competing Product(s)" may sometimes hereinafter be collectively referred to as "nonproprietary products." Franchisee desires, upon the terms and conditions set forth herein, to obtain a license to operate a business which will utilize the Licensed Marks and the Four Seasons System (the "Franchised Business"). Franchisee acknowledges that it is essential to the maintenance of the high standards of authorized Four Seasons System franchisees, and to the preservation of the integrity of the Licensed Marks and goodwill of Franchisor, that each franchisee in the Four Seasons System maintain and adhere to certain standards, procedures and policies described herein.

(d)    Franchisor is willing, upon the terms and conditions set forth herein, to license Franchisee to operate a business which will utilize the Licensed Marks and the Four Seasons System.

(e)    The parties intend that this Agreement be implemented in a fair and reasonable manner and all provisions hereof shall be interpreted accordingly.

- 1 -

FS/FA-3.00(#685943)

## 2.    GRANT OF FRANCHISE

(a)    Subject to all of the terms and conditions herein, Franchisor licenses to Franchisee the exclusive right to operate a business utilizing the Four Seasons System and the Licensed Marks, in connection with the sale of the Four Seasons Product Line from within the territory more particularly described on Schedule "B" (the "Granted Territory"), which is attached hereto and made a part hereof by reference; provided, however, Franchisor shall retain the right to sell the Four Seasons Product Line within the Granted Territory to national accounts which shall be defined as interstate restaurants, hotels and other similar multi-state businesses purchasing the Four Seasons Product Line as end-users and as interstate retailers purchasing the Four Seasons Product Line as re-sellers. Franchisor reserves the right:

(i)    To redefine such national accounts in writing or in the Confidential Operating Manual (as hereinafter defined) or otherwise to include a reasonably similar group of businesses;

(ii)    To allocate any business related to the installation and maintenance of national accounts among, or to establish commissions based on sales to retailers for, Four Seasons System franchisees, as Franchisor in its sole discretion shall determine;

(iii)    To market products other than greenhouses, conservatories, patio-sunrooms or solarium type structures within the Granted Territory under a different brand name or mark through other distribution methods; and

(iv)    To use the Licensed Marks and other aspects of the Four Seasons System in conjunction with activities not contemplated by Franchisor as being conducted solely through Four Seasons Sunrooms; and to offer, distribute, use and/or sell the Four Seasons Product Line through facilities other than Four Seasons Sunrooms, within the Granted Territory of outside the Granted Territory including, but not limited to: (i) the Internet, and (ii) other concepts currently in existence or as may be developed in the future, for example through advancements in technology.

Franchisor reserves the right, in its sole and absolute discretion, to make modifications, improvements or changes to the Four Seasons Product Line at any time during the term hereof to introduce new products or to discontinue the sale or distribution of existing products, without incurring any liability whatsoever to Franchisee or others as a result of any Product Line discontinuation. If Franchisee is offering any product with Franchisor's prior approval which is deemed by Franchisor to be similar to any such addition, modification or enhancement to the Four Seasons Product Line, Franchisee shall have a reasonable period of time (but in no event more than six (6) months) following any such Four Seasons Product introduction to deplete its existing inventory of such nonproprietary product(s). The rights herein granted are sometimes referred to in this Agreement as the "Franchise".

(b)    Within thirty (30) days of the date on which this Agreement is executed by all parties, Franchisee shall use its best efforts to select a site location for the Franchised Business within the Granted Territory and, subject to Franchisor's prior approval, Franchisee agrees to execute a lease at such site and to commence business operations as a Franchised Business within ninety (90) days of the execution of the lease agreement. Franchisee hereby grants Franchisor an irrevocable power of attorney to amend this Agreement to include the legal description of the Premises in Paragraph 1 of Schedule B. Franchisee acknowledges and agrees that this is a site license only for the operation of one (1) Center at the site specified in Schedule "B" (the "Premises"), and that Franchisor may itself

- 2 -

operate or license to others the right to operate businesses utilizing the Four Seasons System and the Licensed Marks at any location not within the Granted Territory.

(c)     Provided that Franchisee is not in default under this Agreement or any other agreement with Franchisor or its affiliate, and has complied with all provisions of such agreements during the Initial Term, Franchisee may distribute the Four Seasons Product Line through dealers, approved by Franchisor and not thereafter disapproved ("Dealers"), within the Granted Territory and, if approved in writing by the Franchisor, outside of the Granted Territory, upon such terms and conditions as may be determined solely by Franchisor.

3.     TERM

(a)     This Agreement shall take effect upon its execution by all parties hereto (the "Effective Date") and, unless previously terminated pursuant to Paragraph 13 hereof, its term shall extend for ten (10) years from the Effective Date (the "Initial Term").

(b)     If Franchisee is not in default under this Agreement and has complied with all of its provisions during the Initial Term, including the timely payment of all fees, Franchisee may, at its option, without the payment of any further initial or renewal fee, renew the Franchise upon the expiration of the Initial Term for an additional term of ten (10) years, in accordance with Franchisor's then current terms and conditions for granting renewal franchises, which may include: (i) execution of a new and modified agreement with a different fee structure, and (ii) a requirement that Franchisee refurbish or relocate the Premises within the Granted Territory to conform to then current standards for Four Seasons System Centers. Franchisee shall exercise its option to renew the Franchise by giving Franchisor written notice of Franchisee's election to renew not less than six (6) nor more than twelve (12) months prior to the expiration of the Initial Term.

4.     OPERATING ASSISTANCE

(a)     Prior to Franchisee's commencement of business, Franchisor shall provide Franchisee with such of the following and on the same basis as will from time to time be made available to similarly situated franchisees of Franchisor:

(i)     Information with respect to size and location of the Center, preliminary plans, layouts, and standards and specifications for all product displays, fixtures, furnishings, signs, leasehold improvements, equipment and other related facilities for use in typical or similar Centers;

(ii)     Such information as may be available to Franchisor concerning possible sources of signs, equipment, fixtures, furnishings, leasehold improvements and other products and services available in connection with the operation of the Center;

(iii)     A minimum of five (5) days of training in the operation of the Franchised Business for the manager and assistant manager of the Center. Such training shall include business, marketing and installation training which must be completed before the opening of the Center. All such training will be conducted exclusively by Franchisor or its designee either at Franchisor's headquarters in Holbrook, New York or at other sites to be designated by Franchisor; provided, however, Franchisee shall pay all costs and living expenses during and in connection with such training;

- 3 -

FS/FA-3.00(#685943)

(iv)    Up to one (1) additional day of training at Franchisee's Center during its grand opening or within six (6) months thereafter. In addition, Franchisor agrees to furnish training at such locations as Franchisor shall designate for Franchisee's representatives in the use, installation and service of any new or modified elements of the Four Seasons Product Line introduced during the term of this Agreement. Enrollment in such training program shall be limited to a reasonable number of persons who are employed by Franchisee and who are qualified to receive such training. Franchisor shall pay only for the reasonable cost of materials and instruction during such training period and Franchisee shall be solely responsible for all expenses of travel, lodging and board during such training period;

(v)    One (1) set of the Confidential Operating Manual(s) (as hereinafter defined) which may be amended from time to time by Franchisor in accordance with Paragraph 8 hereof;

(vi)    Pre-opening operating materials, at no cost to Franchisee, including promotional materials, an illuminated sign, and stationery, of such value as Franchisor may determine in its sole discretion.

(vii)    Initial advertising materials, at no cost to Franchisee, including advertising copy, direct mail materials and television commercials of such value as Franchisor may determine in its sole discretion.

(viii)    Such equipment and supplies as may be designated by Franchisor in the Confidential Operating Manual to be used in connection with the commencement of the Franchised Business at wholesale prices then in effect for all similarly situated franchises, making allowances for varying volume discounts and costs of shipping and delivery.

(b)    Franchisor shall continue its efforts to maintain standards of quality, appearance and service at all Centers, thereby enhancing the public image and reputation of the Four Seasons System and the demand for the Four Seasons Product Line and services associated therewith, and to that end Franchisor may provide Franchisee with the following:

(i)    Continuing training for such periods and at such locations as may be designated by Franchisor;

(ii)    Periodic assistance in local advertising and marketing in such manner, form and frequency as Franchisor, in its sole discretion, may deem appropriate;

(iii)    Periodic individual or group counseling in the operation of the Center rendered in person, by seminar, or by newsletters or bulletins made available from time to time to all Four Seasons System franchisees, as Franchisor, in its sole discretion, may deem appropriate;

(iv)    Advice concerning Center operations, new techniques or operating methods disclosed by reports submitted to or inspections made by Franchisor as Franchisor, in its sole discretion, may deem appropriate;

(v)    Assistance as Franchisor, in its sole discretion, may deem reasonably required, including advice and guidance with respect to new and improved methods of operation or business procedures developed by Franchisor, use of the Confidential Operating Manual, management materials, promotional materials, advertising formats and the Licensed Marks;

- 4 -

FS/FA-3.00(#685943)

(vi)    Enhancements to the Four Seasons Product Line including additional or different building and remodeling products and services as Franchisor, in its sole discretion, may deem appropriate;

(vii)    The opportunity to participate, on the same basis as other franchisees, in group purchasing programs for products, supplies, insurance and equipment which Franchisor may, from time to time, use, develop, sponsor or provide and upon such terms and conditions as may be determined solely by Franchisor. Franchisor may, from time to time, delegate to its affiliate, Four Seasons Solar Products Corp., or other designees of Franchisor, its responsibility to supply Franchisee the Four Seasons Product Line. In such event, Franchisee agrees that its obligation to make payments to any such affiliate or designee of Franchisor may at Franchisor's option be governed by and secured in accordance with the terms of this Agreement. Franchisor agrees to sell the Four Seasons Product Line to Franchisee at the prevailing gross price or prices then charged by Franchisor to other franchisees, making allowances for varying volume discounts and costs of shipping and delivery. Franchisor will use reasonable efforts to ship Four Seasons products to meet Franchisee's requested delivery dates provided, however, that Franchisor may, in its sole discretion, allocate distribution in the event that Franchisor is subject to production or shipping delays for any component parts of the Four Seasons Product Line. Shipments of the Four Seasons Product Line shall be F.O.B. Franchisor's or its designated supplier's manufacturing facility or warehouse. All risks of loss or damage to the products shall cease upon delivery to the carrier selected by Franchisor or designated by Franchisee in its order. Franchisor may, in its sole discretion, limit availability of any component of the Four Seasons Product Line to certain geographic areas or set minimum purchase levels for certain components of the Four Seasons Product Line.

Franchisee's orders for all Four Seasons products shall be submitted by formal purchase order in form and substance acceptable to Franchisor. Franchisor may, in its sole discretion, accept telephone orders. A purchase order shall not be deemed binding on Franchisor unless and until Franchisor accepts the same by sending written confirmation thereof to Franchisee, or in lieu of such confirmation, by shipping any products covered by the order. Franchisor may direct Franchisee to purchase various components of the Four Seasons Product Line from third-party sources which may set terms of sale according to their own standards, or such third-party sources may refuse or terminate business with Franchisee according to their own terms.

Franchisee shall be required to pay for products in accordance with the applicable terms of any invoice therefore, without any setoff or counterclaim, except for the amount of any written credit memorandum which has been issued by Franchisor to Franchisee prior to the due date of the outstanding invoice. Franchisor reserves the right to change such terms at any time. Without limiting any other rights Franchisor may have hereunder, if Franchisee's account is not current, or if, in Franchisor's sole discretion, Franchisee's credit standing deteriorates after the Effective Date, Franchisor may discontinue shipments or require advance payments on all shipments. Payment for all Four Seasons Products is due in accordance with the terms of sale set forth by Franchisor and in no event shall payment be withheld due to damaged, missing or defective parts in any shipment. In the event of any such problem, Franchisee shall notify Franchisor in writing within ten (10) days of such delivery and Franchisor shall use its best efforts to rectify such problem or credit Franchisee's account for any such damaged components. Franchisor assumes no liability for goods damaged in transit. Franchisee or a representative must be available to accept goods at their final destination, to thoroughly inspect goods for damage and/or completeness and to file any freight claims necessary. Franchisee waives any and all claims against Franchisor for actual, incidental and consequential damages arising from delays in the shipment or delivery of any products, incomplete deliveries, missing parts or other claims arising from Franchisor's defective delivery of products ordered by Franchisee; provided,

- 5 -

however, that such waiver shall be unenforceable to the extent that it violates the provisions of Articles 687.4 and 687.5 of the New York State Franchise Regulations.

(viii)    Periodic inspections of the Premises and all other Four Seasons System Centers and of the products and services they offer including inspections by Franchisor or its designee of actual Four Seasons Product Line installations.

(c)    Upon request of Franchisee, Franchisor shall make available to Franchisee during the term of this Agreement a current list of spare parts for the Four Seasons Product Line. Franchisor agrees to make available to Franchisee for a period of seven (7) years from the date of discontinuance of any component of the Four Seasons Product Line or for a period of seven (7) years from the date of the termination of this Agreement, whichever shall first occur, spare parts for any component of the Four Seasons Product Line; provided, however, that Franchisor may discontinue the stocking of any such spare parts provided that Franchisor has first given Franchisee three (3) months advanced written notice of its intent to discontinue such stocking and providing Franchisee with the opportunity to purchase a number of parts sufficient to meet its anticipated needs.

5.    FEES

(a)    In consideration of the execution of this Agreement, Franchisee agrees to pay Franchisor an initial franchise fee in the amount of _____ _N_/_H_ _____ Thousand Dollars ($ _N_/_H_ _____ ) which shall be paid in full by the Effective Date. Upon execution of this Agreement by all parties, the initial franchise fee is non-refundable.

(b)    At all times after the commencement of operation of the Franchised Business, Franchisee shall pay to Franchisor the following continuing franchise fees:

(i)    There shall be no continuing franchise fee imposed upon any revenues derived by Franchisee from the sale, installation or servicing of the Four Seasons Product Line or any component thereof manufactured and sold to Franchisee by Franchisor or its affiliates or foundation work related thereto.

(ii)    Provided that, in Franchisor's sole judgment, Franchisee adequately separates the promotion, display and sale of Non-Competing Product(s) in the manner required pursuant to Paragraph 7(k) hereof, there shall be no continuing franchise fee imposed upon any revenues derived by Franchisee from the sale or service of any Non-Competing Product(s).

(iii)    If Franchisee is determined by Franchisor, in its sole judgment, not to have adequately separated the promotion, display and sale of Non-Competing Products in the manner required pursuant to Paragraph 7(k) hereof, Franchisee shall pay to Franchisor a continuing franchise fee equal to two and one-half percent (2-1/2%) of the Gross Volume of Business (as hereinafter defined) derived by Franchisee from the sale and/or service of all Non-Competing Products at, from or through the Center.

(iv)    Subject to Franchisee's compliance with the provisions of Paragraph 7(k) hereof, Franchisor may, in its sole discretion, approve the sale of Competing Product(s) which it determines are compatible and consistent with the Four Seasons System and image and which meet Franchisor's standards of quality and reliability. If Franchisee is determined by Franchisor to have sold any Competing Product(s) at, from or through the Premises or which in Franchisor's sole judgment, may

- 6 -

FS/FA-3.00(#685943)

be associated with the operation of the Franchised Business, Franchisee shall pay to Franchisor a continuing franchise fee equal to fifteen percent (15%) of the Gross Volume of Business derived by Franchisee from the sale and/or service of all Competing Product(s). Franchisor's acceptance of any such fees shall not be considered a waiver or approval by Franchisor of any such sales which have not been previously approved by Franchisor in writing.

(c)    Unless otherwise provided, all fees and other amounts due to Franchisor hereunder shall be paid in the manner designated by Franchisor in the Confidential Operating Manual, and such payments shall be accompanied by a statement setting forth in reasonable detail the basis for the computation, as required under Paragraph 10 of this Agreement.

(d)    If any fee or any other amount due under this Agreement is not paid within five (5) days after such amount is due, Franchisee shall pay a service charge equal to the lesser of the daily equivalent of eighteen percent (18%) of such overdue amount per year or the highest rate then permitted by applicable law for each day such amount is past due.

(e)    The term "Gross Volume of Business," as used in this Agreement, shall mean the aggregate gross amount of all revenues, excepting those revenues specifically excluded in Paragraph 5(b)(i) and (ii) above, (less the price of any products previously sold by and returned to Franchisee) from whatever source derived (whether in the form of cash, credit, agreements to pay or other consideration), excluding only sales or other tax receipts, the collection of which is required by law which arise from or are derived by Franchisee or by any other person from business conducted or which originated in, on, from, or through the Premises, whether such business is conducted in compliance with or in violation of the terms of this Agreement.

## 6.  LICENSED MARKS

(a)    Franchisee expressly acknowledges that Franchisor is the sole and exclusive licensor of the Licensed Marks and agrees not to represent in any manner that Franchisee has acquired any ownership rights in the Licensed Marks. Franchisee agrees not to use any of the Licensed Marks, any formatives thereof including the individual words "Four" and/or "Season(s)", or any other marks, names or indicia which are or may be confusingly similar in its own corporate or business name except as authorized by Franchisor. Franchisee further acknowledges and agrees that any and all goodwill associated with the System and identified by the Licensed Marks shall inure directly and exclusively to the benefit of Franchisor and that, upon the expiration or termination of this Agreement for any reason, no monetary amount shall be assigned as attributable to any goodwill associated with Franchisee's use of the Licensed Marks.

(b)    Franchisee understands and agrees that any use of the Licensed Marks other than as expressly authorized by this Agreement, without Franchisor's prior written consent, is an infringement of Franchisor's rights therein and that the right to use the Licensed Marks granted herein does not extend beyond the termination or expiration of this Agreement. Franchisee expressly covenants that, during the term of this Agreement and thereafter, Franchisee shall not, directly or indirectly, commit any act of infringement or contest or aid others in contesting the validity of Franchisor's right to use the Licensed Marks or take any other action in derogation thereof.

(c)    Franchisor and Franchisee acknowledge an obligation to police the use of the Licensed Marks and trade dress of the Four Seasons System and agree to do so. Franchisee shall promptly notify Franchisor of any claim, demand or cause of action that Franchisor may have based upon or

- 7 -

arising from any unauthorized attempt by any person or legal entity to use the Licensed Marks or trade dress of the Four Seasons System, any colorable variation thereof, or any other mark, name or indicia in which Franchisor has or claims a proprietary interest. Franchisee shall assist Franchisor, upon its request and at Franchisor's expense, in taking such action, if any, as Franchisor may deem appropriate to halt such activities, but shall take no action nor incur any expenses on Franchisor's behalf without Franchisor's prior written approval. If Franchisor undertakes the defense or prosecution of any litigation relating to the Licensed Marks or trade dress of the Four Seasons System, Franchisee agrees to execute any and all documents and to do such acts and things as may, in the opinion of Franchisor's legal counsel, be reasonably necessary to carry out such defense or prosecution.

(d)    Franchisee further agrees and covenants to operate and advertise only under the name or names from time to time designated by Franchisor for use by similar Four Seasons System franchisees; to adopt and use the Licensed Marks solely in the manner prescribed by Franchisor; to refrain from using the Licensed Marks to perform any activity or to incur any obligation or indebtedness in such a manner as may, in any way, subject Franchisor to liability therefore; to observe all laws with respect to the registration of trade names and assumed or fictitious names, to include in any application therefore a statement that Franchisee's use of the Licensed Marks is limited by the terms of this Agreement, and to provide Franchisor with a copy of any such application and other registration document(s); to observe such requirements with respect to trademark and service mark registrations and copyright notices as Franchisor may, from time to time, require, including, without limitation, affixing "SM," "TM," or ® adjacent to all such Licensed Marks in any and all uses thereof; and, to utilize such other appropriate notice of ownership, registration and copyright as Franchisor may require. Franchisee shall utilize only such exterior and interior signage as meets Franchisor's specifications and which has been previously approved in writing by Franchisor.

(e)    Franchisor reserves the right, in its sole discretion, to designate one or more new, modified or replacement Licensed Marks for use by franchisees and to require the use by Franchisee of any such new, modified or replacement Licensed Marks in addition to or in lieu of any previously designated Licensed Marks. Franchisee shall not be entitled to any compensation as a result of the discontinuation of any of the Licensed Marks. Any expenses or costs associated with the use by Franchisee of any such new, modified or replacement Licensed Marks shall be the sole responsibility of Franchisee.

## 7.    STANDARDS OF OPERATION

Franchisor shall establish and Franchisee shall maintain standards of quality, appearance and operation for the Franchised Business. For the purpose of enhancing the public image and reputation of the Four Seasons System and of increasing the demand for the Four Seasons Product Line, the parties agree as follows:

(a)    Before commencing operation of the Franchised Business, Franchisee shall, at its expense, furnish to Franchisor, for its approval, the following:

(i)    All permits and certifications as may be required for the lawful operation of the Franchised Business, together with copies of any building inspection reports and certifications from all governmental authorities having jurisdiction over the Center and the Franchised Business that all necessary permits have been obtained and that all requirements for construction and operation have been met;

- 8 -

(ii)    A properly completed state "resale certificate" or other evidence which Franchisor may reasonably require to document Franchisee's compliance with state and/or municipal sales tax laws in the jurisdiction(s) where the Franchised Business is located or where sales of the Four Seasons Product Line are transacted; and

(iii)    A copy of the lease agreement, if the Premises are leased, which lease shall provide Franchisor notice of Franchisee's default of the lease.

(b)    Prior to the commencement of the Franchised Business, Franchisee is required to purchase from Franchisor Four Seasons Product Line displays, spare parts inventory and promotional materials having an aggregate wholesale value equal to not less than _____ $N/A$ _____ Dollars ($ $N/A$ ). The configuration and placement of any Four Seasons Product Line displays at the Premises shall be subject to Franchisor's prior approval. Franchisor agrees to provide Franchisee with the components of such product displays, and an inventory of spare parts and promotional materials at current wholesale prices then in effect for all similarly situated franchisees making allowance for volume discounts, freight and delivery charges.

(c)    Franchisee shall operate and maintain the Franchised Business pursuant to all Four Seasons System rules, regulations, policies and standards prescribed herein, in the Confidential Operating Manual or in other written materials provided by Franchisor to Franchisee which are by their terms mandatory. Without limiting the generality of the foregoing:

(i)    Franchisee agrees that it shall make no representations or warranties to prospective customers, purchasers or end-users of the Four Seasons Product Line regarding any tax consequences or tax treatment accorded to end-users except as specifically authorized by Franchisor in writing.

(ii)    Franchisee shall, without cost or expense to Franchisor provide service to end-users of the Four Seasons Product Line distributed by Franchisee consisting of installation, support, maintenance and repair. Franchisee shall perform all service, including in-warranty and out of warranty repairs in accordance with service procedures published by Franchisor from time to time in the Confidential Operating Manual and Franchisee agrees to maintain a qualified staff adequate to handle all such service requirements. In order to protect the reputation of the Four Seasons Product Line, Franchisee agrees that it shall only utilize installers, subcontractors, service technicians or employees who are qualified to service the Four Seasons Product Line and related components distributed by Franchisee. Franchisor reserves the right to withhold delivery of any portion or component of the Four Seasons Product Line in the event that Franchisor determines, in its sole discretion, that Franchisee is unable to provide adequate supervision and service of the Four Seasons Product Line. Franchisee shall be solely liable for the proper construction and installation of the Four Seasons Product Line and components thereof and for any custom fabrication or job-site alterations.

(iii)    Franchisee shall promptly respond to customer inquiries or complaints and shall take such other steps as may be required to insure positive customer relations. Franchisee agrees that if any customer complains to Franchisor about Franchisee's performance of service, Franchisor may conduct an investigation to determine the legitimacy of the customer's complaint and Franchisee's compliance with Franchisor's service procedures and standards. Franchisee agrees to take such corrective action as may be reasonably requested by Franchisor to remedy any such problem. In order to maintain and enhance the reputation of the Four Seasons System and the Four Seasons Product Line, in the event that Franchisor shall determine the existence of a legitimate consumer problem, Franchisor and Franchisee agree to use their best good faith efforts to diligently resolve any such

- 9 -

problems including through the use of other contractors or tradesmen. Franchisee will allow Franchisor's service representative to inspect Franchisee's service records at reasonable times to ensure compliance with the aforesaid standards and to acquire data for the purpose of improving service procedures and reliability. Franchisee acknowledges that its failure to adhere to the provisions of this subparagraph (c) shall constitute a material breach of this Agreement.

(d)     Franchisee's Center shall be open for the conduct of business on a consistent basis at least six (6) days each week (including Saturday) for not less than the minimum number of hours specified by Franchisor in the Confidential Operating Manual, as may be amended from time to time, unless otherwise specifically approved by Franchisor, and Franchisee shall at all times operate the Center diligently so as to maximize the revenues and profits therefrom.

(e)     Franchisee shall use only business stationery, business cards, marketing materials, advertising materials, printed materials and forms which have been approved in advance by Franchisor. Franchisee shall not employ any person to act as a representative of Franchisee in connection with local promotion of the Franchised Business in any public media without the prior written approval of Franchisor.

(f)     In all advertising displays and materials and at the Premises, Franchisee shall, in such form and manner as may be specified by Franchisor in the Confidential Operating Manual, notify the public that Franchisee is operating the Franchised Business as an independent franchisee of Franchisor and shall identify its business location in the manner specified by Franchisor in the Confidential Operating Manual.

(g)     Franchisee shall at all times actively promote and sell the Four Seasons Product Line at the Premises and will use its primary and best efforts to cultivate, develop and expand the market therefore within the Granted Territory consistent with Franchisor's evaluation of the potential of the Granted Territory taking into consideration such factors as the size of, population in and market potential of the Granted Territory; competition in the marketplace; the prior performance of Franchisee or other franchisees in other geographic areas; and such other financial and market factors as Franchisor may deem pertinent. Notwithstanding Franchisor's publication of suggested list prices for the Four Seasons Product Line, Franchisee shall not be obligated to observe such suggested prices and shall be free to respond to competitive pricing in the discharge of its obligation to actively promote and sell the Four Seasons Product Line. Without limiting the generality of the foregoing Franchisee shall be required to meet the minimum performance standards specified in Schedule C attached hereto throughout the term of this Agreement; provided, however, that in the event Franchisee elects to distribute the Four Seasons Product Line through one or more Dealers in an expanded territory, the minimum performance standards shall be increased based on the population of such expanded territory. Franchisee agrees that during the term hereof it shall not substantially reduce its efforts to market, promote and sell the Four Seasons Product Line.

(h)     Franchisee shall act as a marketing, service and installation agency for Franchisor pursuant to the terms of Four Seasons National Account Contracts in effect from time to time. Franchisor shall have the right reasonably to allocate marketing, sales and installation business under these contracts among any or all of its franchisees as Franchisor shall deem to be in the best interest of the Four Seasons System generally.

(i)     Upon Franchisee's acceptance of Franchisor's National Account and/or Government Account Programs in effect from time to time, Franchisee shall, at Franchisor's request, provide service for the account of Franchisor to National Account and/or Government Account customers with offices

- 10 -

FS/FA-3.00(#685943)

or outlets in the Granted Territory in accordance with such Programs. Customers in the Government Account Program shall consist of all state and local government agencies and institutions. Franchisor shall have the right reasonably to allocate National Account and/or Government Account business among all of its franchisees as Franchisor shall deem to be in the best interest of the Four Seasons System generally.

(j)    In order to maintain the high quality of products and service provided under the Four Seasons System, Franchisee agrees that it shall not, without Franchisor's prior written consent, engage in any mail order or catalogue solicitation outside of the Granted Territory except in conjunction with programs made available by Franchisor to all other similarly situated franchisees of Franchisor. If Franchisee sells any Four Seasons products for use outside of the Granted Territory, Franchisee shall either agree with the end-user to provide the warranty service specified in Paragraph 7(c) hereof or, prior to shipment of any such products, take the following action:

(i)    Notify Franchisor of the name and address of the end-user;

(ii)    Request Franchisor to designate a franchisee in whose area such products are to be installed to install the product and to provide service to such end-user;

(iii)    Reimburse such franchisee at mutually agreed upon rates for installation and in-warranty service; and

(iv)    Obtain the agreement of the installing franchisee to service such products following the expiration of the warranty period on the same terms as such franchisee offers to its other customers.

(k)    Franchisee shall continuously offer to customers and maintain for demonstration purposes at the Center all components of the then-current Four Seasons Product Line as Franchisor may from time to time require, and only those which Franchisor may approve and not thereafter disapprove, as meeting its uniform quality standards and specifications. The Four Seasons Product Line is the subject of various patents and trade secrets which are integral to the quality, reliability and image associated with the Four Seasons System. Accordingly, Franchisee shall refrain from offering or selling any nonproprietary products and/or services from the Center without Franchisor's prior written consent. If Franchisee desires to offer and sell any nonproprietary products or services from the Center, Franchisee shall submit to Franchisor a written request for such approval in accordance with procedures prescribed from time to time by Franchisor in the Confidential Operating Manual. Franchisor reserves the right to prohibit or withdraw its approval for the sale of any nonproprietary products and/or services which, in Franchisor's sole judgment, are or become incompatible or inconsistent with the Four Seasons System and image, fail to meet Franchisor's standards of quality and reliability, or which may create a higher than normal risk of liability or customer dissatisfaction. If Franchisee elects to sell or distribute Non-Competing Products or requests Franchisor's authorization to sell or distribute Competing Products, Franchisee may, in Franchisor's sole discretion, be required to comply with any or all of the following additional requirements in order to prevent customer deception or confusion and to adequately separate the promotion, display and/or sale of such nonproprietary products from the Four Seasons Product Line:

(i)    Franchisee shall submit to Franchisor all preliminary plans and final plans and specifications delineating the Premises and noting the physical separation of display areas for the Four Seasons Product Line and any nonproprietary products permitted by Franchisor to be distributed at, from or through the Premises. There shall be no liability on the part of Franchisor to Franchisee or to any present or future owner of the Franchised Business or to any party in interest because Franchisor has approved the plans and specifications to assure compliance with its standards.

- 11 -

FS/FA-3.00(#685943)

(ii)    Any nonproprietary products shall be displayed only in a distinct area of the Premises, separated from any displays of Four Seasons Products by partition or threshold which serves to adequately notify Franchisee's customers of the separate product sources. Franchisee shall post a sign at all entrances to the nonproprietary product showroom in form satisfactory to Franchisor, notifying the public that such nonproprietary products are neither manufactured, sponsored nor warranted by Franchisor. No display of nonproprietary products shall be combined with or compromise the separate integrity of Four Seasons Product displays.

(iii)    Franchisee shall allocate approximately the following interior square footage at the Premises to display of the Four Seasons Product Line:

750 square feet for a "Level 3 franchise";

500 square feet for a "Level 2 franchise"; or

200 square feet for a "Level 1 franchise".

Franchisee's failure to comply with the minimum display requirements of this subparagraph (iii) and its failure to cure such default within thirty (30) days of receipt of written notice from Franchisor shall be deemed a material breach of this Agreement.

(iv)    Franchisee shall not commingle promotion of the Four Seasons Product Line, or use the Licensed Marks in conjunction with the promotion of any nonproprietary products or services in any form of advertising media without the prior written approval of Franchisor.

(v)    Franchisee shall utilize a separate trade name and phone listing in connection with the operation and promotion of any business promoting the sale of nonproprietary products as well as distinct stationery, invoices, business cards, purchase orders and customer contracts.

(vi)    To avoid confusion and minimize potential customer dissatisfaction in any case in which nonproprietary products are sold by Franchisee, Franchisee will clearly distinguish such nonproprietary products from the Four Seasons Product Line and explain to its customers prior to execution of any order the extent of any warranty given by the manufacturer of such nonproprietary products. Franchisee shall bear sole responsibility to assure that any and all such nonproprietary products comply and are installed in accordance with all applicable building, engineering and safety codes and ordinances. Franchisor may require that Franchisee execute purchase orders with all purchasers or end-users of nonproprietary products in form approved by Franchisor which disclaim any liability on behalf of Franchisor arising from the sale or installation of nonproprietary products by Franchisee. Franchisor assumes no liability, either express or implied, to Franchisee or any purchaser or end-user of such nonproprietary products, as a consequence of any such approval or disapproval of any nonproprietary product, service or installation provided by Franchisee.

(vii)    Franchisee shall provide to Franchisor, in such form as Franchisor may from time to time require, a listing of any nonproprietary products or services which are offered or sold by Franchisee at, from or through the Premises.

(l)    Any and all products or services sold by or through Franchisor to Franchisee shall be sold by Franchisee in accordance with the terms expressly set forth in the Confidential Operating Manual or otherwise in writing by Franchisor or by the manufacturer of such products or services. Any

- 12 -

contract or agreement between Franchisee and any purchaser or end-user, whether or not for the Four Seasons Product Line, shall contain a disclaimer of Franchisor's liability and shall specifically provide that any claim, controversy or dispute arising from the sale or lease of such products or services shall be governed by the laws of the State of New York and shall be resolved exclusively through the Commercial Arbitration Rules of the American Arbitration Association. Franchisor does not authorize Franchisee to create any obligation or liability in connection with the sale of the Four Seasons Product Line. The Four Seasons Product Line is to be sold strictly in accordance with such warranties as Franchisor may issue for each specific product. Warranty claims arising from, through, or out of Four Seasons Products sold by Franchisee are to be submitted by the purchaser or end-user only through Franchisee. Franchisor may, in its sole discretion, provide for returns and credits in connection with such warranty claims in the manner specified in the Confidential Operating Manual from time to time. Franchisee shall bear any costs of labor to inspect, remove and/or replace any defective part or replacement part, as the case may be, of the Four Seasons Product Line within the term of any applicable warranty.

> EXCEPT AS EXCLUSIVELY SET FORTH IN WRITING, FRANCHISOR MAKES NO WARRANTIES, EITHER EXPRESS OR IMPLIED, WITH RESPECT TO THE FOUR SEASONS PRODUCT LINE, INCLUDING BUT NOT LIMITED TO THE IMPLIED WARRANTY OF TITLE AND THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

> FRANCHISOR WILL NOT BE LIABLE FOR PERSONAL INJURY OR PROPERTY DAMAGE (UNLESS CAUSED SOLELY BY FRANCHISOR'S NEGLIGENCE) LOSS OF PROFIT, OR OTHER INCIDENTAL, CONSEQUENTIAL OR SPECIAL DAMAGES ARISING OUT OF THE USE OR INABILITY TO USE THE PRODUCTS OR FOR ANY DAMAGES (REGARDLESS OF THEIR NATURE) CAUSED BY THE FRANCHISEE'S FAILURE TO FULFILL ITS RESPONSIBILITIES AS SET FORTH HEREIN. IN NO EVENT SHALL FRANCHISOR'S LIABILITY HEREUNDER EXCEED THE STATED SELLING PRICE OF THE PRODUCTS TO FRANCHISEE. THIS WARRANTY SHALL BE VOID AND OF NO FORCE AND EFFECT WITH RESPECT TO ANY PRODUCT WHICH IS DAMAGED AS A RESULT OF (A) NEGLECT, ALTERATION OR ACCIDENT, (B) IMPROPER USE, INCLUDING FAILURE TO FOLLOW OPERATING AND MAINTENANCE PRESCRIBED IN FRANCHISOR'S CONFIDENTIAL OPERATING MANUAL, (C) REPAIR BY OTHER THAN SERVICE REPRESENTATIVES QUALIFIED BY FRANCHISOR AND ACTING IN ACCORDANCE WITH FOUR SEASONS' SERVICE BULLETINS, OR (D) USE OF PARTS WHICH DO NOT MEET FRANCHISOR'S SPECIFICATIONS.

(m)     Franchisee shall provide pre-delivery inspection and service for all Four Seasons products ordered by Franchisee. In those instances where Four Seasons products are "drop-shipped" to a job site, Franchisee shall be on hand to inspect all goods for damage and completeness and make every effort to rectify any problems.

(n)     Franchisee shall maintain a parts inventory adequate to provide prompt and efficient service at Franchisee's normally experienced usage rates, or as may be reasonably prescribed by Franchisor and, in addition, any equipment as may be reasonably required by Franchisor in order to

- 13 -

service the Four Seasons Product Line.  Franchisee agrees to furnish each end-user of the Four Seasons Product Line with the printed form of warranty furnished by Franchisor.

(o)      Franchisee agrees that the Franchised Business shall only be operated under the direct supervision of Franchisee or a general manager who has previously been approved in writing by Franchisor and not thereafter disapproved.

(p)      Franchisee and/or such of its managerial personnel as designated by Franchisor shall complete, to Franchisor's reasonable satisfaction, any and all training programs as Franchisor may reasonably require.  Franchisor may at its option require others of Franchisee's initial and subsequent management employees to attend and satisfactorily complete all or any part of such training programs. All expenses incurred in training, including, without limitation, cost of travel, room, board and wages of the person(s) receiving such training shall be borne by Franchisee.

(q)      Franchisee hereby grants to Franchisor and its agents the right to enter upon the Premises at any reasonable time for the purpose of conducting inspections, and Franchisee agrees to render such assistance as may reasonably be requested and to take such steps as may be necessary immediately to correct any deficiencies detected during such an inspection upon the request of Franchisor or its agents.

(r)      Franchisee hereby grants to Franchisor a purchase money security interest in any and all Four Seasons products, and any proceeds thereof (including, but not limited to all accounts receivable and the proceeds of any insurance covering such products), purchased by Franchisee from or through Franchisor.  The security interest granted herein secures the payment to Franchisor of the purchase price of any Four Seasons products, all obligations of Franchisee to Franchisor relating to the purchase, and all costs, expenses, future advances and liabilities which may be made or incurred by Franchisor in the administration and collection of any such obligations.  This Agreement shall constitute a security agreement, and upon request by Franchisor, Franchisee shall execute any additional instruments required to perfect this security interest including, without limitation, a standard Uniform Commercial Code ("UCC") financing statement.  Franchisee authorizes Franchisor:

(i)      To file a copy of this Agreement, a UCC financing statement and any other documents that may be necessary to perfect the security interest granted herein; and

(ii)     To sign on behalf of Franchisee and to file in any jurisdiction, with or without signature of Franchisee, financing statements with respect to this security interest and security agreement.

(s)      Franchisee agrees to install and utilize in connection with the Franchised Business facsimile transmission equipment compatible with specifications published by Franchisor in the Confidential Operating Manual and which is continuously accessible to Franchisor during prescribed hours of operation.  Upon Franchisor's request, Franchisee agrees to install, update or replace any equipment (including computer equipment) and software designed to be used in connection with the operation of the Four Seasons Sunroom, and to utilize equipment and software of such kind and in such manner as specified by Franchisor from time to time.  Without limiting the generality of the foregoing, Franchisee agrees that it shall install and utilize in connection with the Four Seasons Sunroom such hardware and software as Franchisor may require from time to time, which is compatible with and accessible to Franchisor's central accounting system through modem or other manual or electronic access.  Franchisee shall establish and maintain Internet access and an electronic mail address and shall keep Franchisor informed of such address during the term of this Agreement.

- 14 -

FS/FA-3.OO(#685943)

Franchisee shall not, without the prior written approval of Franchisor, create, establish, operate or otherwise utilize an Internet web page that advertises the services of the Four Seasons Sunroom, or the Four Seasons Product Line.

## 8. CONFIDENTIAL OPERATING MANUAL

(a) To protect the reputation and goodwill of the businesses operating under the Four Seasons System and to maintain standards of operation under the Licensed Marks, Franchisee shall conduct the business operated under the Four Seasons System in accordance with various written instructions and confidential manuals (hereinafter and previously referred to as the "Confidential Operating Manual"), including such amendments thereto, as Franchisor may publish from time to time, all of which Franchisee acknowledges belong solely to Franchisor and shall be on loan from Franchisor during the term of this Agreement. When any provision in this Agreement requires that Franchisee comply with any standard, specification or requirement of Franchisor, unless otherwise indicated, such standard, specification or requirement shall be such as is set forth in this Agreement or as may, from time to time, be set forth by Franchisor in the Confidential Operating Manual.

(b) Franchisee shall at all times use its best efforts to keep the Confidential Operating Manual and any other manuals, materials, goods and information created or used by Franchisor and designated for confidential use within the Four Seasons System and the information contained therein as confidential and shall limit access to employees and independent contractors of Franchisee on a need-to-know basis. Franchisee acknowledges that the unauthorized use or disclosure of Franchisor's confidential information will cause irreparable injury to Franchisor and that damages are not an adequate remedy. Franchisee accordingly covenants that it shall not at any time, without Franchisor's prior written consent, disclose, use, permit the use thereof (except as may be required by applicable law or authorized by this Agreement), copy, duplicate, record, transfer, transmit or otherwise reproduce such information, in any form or by any means, in whole or in part, or otherwise make the same available to any unauthorized person or source. Any and all information, knowledge and know-how not generally known about the Four Seasons System and Franchisor's products, services, standards, procedures, techniques and such other information or material as Franchisor may designate as confidential shall be deemed confidential for purposes of this Agreement, except information which Franchisee can demonstrate legally came to its attention prior to disclosure by Franchisor, or which legally is or has become a part of the public domain by publication or communication by others.

(c) Franchisee understands and acknowledges that Franchisor may, from time to time, revise the contents of the Confidential Operating Manual to implement new or different requirements for Four Seasons System franchised businesses, and Franchisee expressly agrees to comply with all such changed requirements which are by their terms mandatory; provided that such requirements shall also be applied in a reasonably nondiscriminatory manner to comparable businesses operated under the Four Seasons System by other franchisees. This implementation of such requirements may require the expenditure of reasonable sums of money by Franchisee.

(d) Franchisee shall at all times insure that its copy of the Confidential Operating Manual is kept current and up to date and, in the event of any dispute as to the contents thereof, the terms and dates of the master copy thereof maintained by Franchisor at its principal place of business shall be controlling.

- 15 -

## 9.    ADVERTISING AND MARKETING

Recognizing the value of standardized advertising and marketing programs to the furtherance of the goodwill and public image of the Four Seasons System, the parties agree as follows:

(a)    Franchisor agrees to contribute an amount equal to five percent (5%) of Franchisee's purchases of the Four Seasons Product Line through Franchisor or any affiliate of Franchisor (exclusive of products purchased for Dealer sales) to a Franchisee Advertising Account (the "Advertising Account"). Franchisee may draw upon the Advertising Account for reimbursement of approved advertising expenditures incurred by Franchisee in accordance with the following terms and conditions:

(i)    Within ten (10) days of the last day of each month, Franchisor will credit the Advertising Account in an amount equal to five percent (5%) of the net proceeds of any components of the Four Seasons Product Line purchased by Franchisee through Franchisor or any affiliate of Franchisor and paid for during the prior month;

(ii)    Franchisor agrees to send to Franchisee not later than the fifteenth day of each month a statement setting forth on a monthly and cumulative basis any amounts credited by Franchisor to the Advertising Account on Franchisee's behalf;

(iii)    Any credit accrued by Franchisee in the Advertising Account during any calendar year must be fully expended by Franchisee no later than March 1 of the following year, or Franchisee shall be deemed to have forfeited its right to any such accrued but unexpended amounts. Franchisee shall not be entitled to be reimbursed from the Advertising Account in an amount greater than One Hundred Thousand Dollars ($100,000) during any one calendar year;

(iv)    Prior to the publication or dissemination of any advertisement for which reimbursement is sought from the Advertising Account, Franchisee shall submit by certified mail a copy of any such advertising for Franchisor's prior approval. Any advertising not specifically disapproved by Franchisor within ten (10) days of its receipt by Franchisor shall be deemed approved. All such advertising shall be limited to the promotion of the Four Seasons Product Line and Franchisee agrees to use its best efforts to cooperate with Franchisor's recommendations by expending the Advertising Account on advertising subject matter displayed at such frequencies and in such media, in a consistent and efficient program of advertising as may from time to time be recommended by Franchisor in newsletters or in the Confidential Operating Manual;

(v)    Any amounts in the Advertising Account to which Franchisee may be entitled may, in Franchisor's sole discretion, be utilized to offset any past due account balance of Franchisee before any reimbursement is made by Franchisor to Franchisee for any approved advertising expenditures; and

(vi)    Upon the prior written request of Franchisee, and in lieu of crediting Franchisee's Advertising Account as provided in subparagraph (i) above, Franchisor may, in its sole discretion, elect to discount the wholesale price of Franchisee's purchase of any components of the Four Seasons Product Line in the additional amount of five percent (5%) of such purchases provided Franchisee:

(A)    is and has continuously been in good standing and has never received any notice of default pursuant to this or any other Franchise Agreement with Franchisor;

- 16 -

FS/FA-3.00(#685943)

(B)    maintains a uniform advertising and marketing image promoting the Licensed Marks and the Four Seasons Product Line including, without limitation, the local advertising and marketing required pursuant to Paragraph 9(e) hereof; and

(C)    files the monthly reports required pursuant to Paragraph 10 hereof on a timely basis.  Such discounts shall be subject to the aggregate annual limitations set forth in subparagraph (iii) above.  Franchisor reserves the right to unilaterally discontinue such discounts without prior notice generally, or with respect only to Franchisee.

(b)    Within ten (10) days of the last day of each month, Franchisor agrees to contribute the additional amount of two and one-half percent (2-1/2%) of the net proceeds of purchases of the Four Seasons Product Line made by all Four Seasons franchisees from or through Franchisor or any affiliate of Franchisor during the prior month to the Four Seasons Advertising Fund.  Franchisor or its designee shall exclusively maintain and administer the Four Seasons Advertising Fund ("Fund") for national and regional advertising, public relations and marketing programs and market research ("Advertising"), and shall direct all such Advertising with sole discretion over the concepts, materials and media used therein.  Franchisee understands and acknowledges that the Fund is intended to maximize general public recognition and acceptance of the Licensed Marks for the benefit of the Four Seasons System as a whole and that Franchisor and its designee undertake no obligation in administering the Fund to insure that any particular franchisee benefits directly or pro rata from the Advertising.  Franchisee agrees that the Fund may otherwise be used to meet any and all costs incident to such Advertising, including the cost of producing and distributing catalogs and mailings in response to national advertisements, costs of telephone and data processing equipment and personnel to process leads, and costs of other promotional activities such as national shows.

(c)    For purpose of calculating Franchisor's obligation to credit Franchisee's Advertising Account pursuant to Paragraph 9(a) or to contribute to the Fund pursuant to Paragraph 9(b) hereof, Franchisor may, from time to time, in its sole discretion exclude from application of either advertising contribution any component of the Four Seasons Product Line other than greenhouses and solariums which Franchisor may list in the Confidential Operating Manual or otherwise publish to Franchisee from time to time.  The amount of any such credits or contributions shall be subject to verification and correction by Franchisor during the term hereof.

(d)    Franchisor may provide Franchisee, from time to time, with local advertising, marketing and customer training and educational plans and materials, including without limitation newspaper mats, radio commercial tapes, merchandising materials, sales aids, special promotions and similar advertising, marketing, training and educational materials, at a reasonable price, plus handling.

(e)    In addition to any expenditures from its Advertising Account, Franchisee, at its expense, shall:

(i)    Obtain at least the minimum size listings of the Center under listings for "Greenhouse Builders," "Patio and Sunroom Builders," and "Porch and Patio Enclosures" in the white and yellow pages of all local telephone directories within the Granted Territory.  Listings in telephone directories which do not serve markets within the Granted Territory are prohibited unless approved in writing by Franchisor.

- 17 -

(ii)     Obtain and maintain advertising signs at the Center and in addition any special promotional materials of the kind and size, and at such location in the Center, as Franchisor may from time to time require for comparable Four Seasons System Centers.

(iii)     Utilize the current "Four Seasons Lead Management Program" to diligently follow up all leads generated through national and local advertising programs and use its best efforts to maximize the sale of the Four Seasons Product Line through such efforts.

(f)     Any advertising placed by Franchisee shall prominently feature the Licensed Marks and shall be compatible with advertising approved by Franchisor. Franchisee shall submit (through the mail, return receipt requested) to Franchisor for its prior approval (except with respect to prices to be charged), samples of all signage, marketing materials and advertising to be used by Franchisee that have not been prepared or previously approved by Franchisor or its designated agents. If written disapproval thereof is not received by Franchisee within seven (7) days from the date of receipt by Franchisor of such materials, Franchisor shall be deemed to have given the required approval.

(g)     Franchisor in its absolute discretion may transfer up to ten percent (10%) of the contributions received by the Fund into another fund known as the Four Seasons Special Fund ("Special Fund"). Expenditures from the Special Fund shall be in the absolute discretion of and may be used by Franchisor: (1) to subsidize Franchisor's expenses for exhibiting in industry trade shows; (2) to perform warranty, maintenance and repair work on products sold by Four Seasons System franchisees; or (3) for legal, accounting or other professional fees incurred by Franchisor in the defense of claims brought by any third party against Franchisor, whether alone or jointly with any franchisee, which arises from any incident, act or omission by any franchisee. Expenditures from the Special Fund shall be in the absolute discretion of Franchisor. No person, firm or company is intended to be a third party beneficiary of the Special Fund nor is there any intention to create any kind of insurance for the benefit of any party. The establishment of the Special Fund gives no rights to any person to bring a claim against the Special Fund. Franchisor shall be entitled to reimburse itself out of the Special Fund for reasonable accounting, bookkeeping, reporting, legal and administrative expenses incurred with respect to the Special Fund. Unexpended funds in the Special Fund may either be retained in the Special Fund or returned to the Fund in the absolute discretion of Franchisor.

## 10.    STATEMENTS AND RECORDS

(a)     Franchisee shall maintain original, full and complete records, accounts, books, data, licenses, contracts and product supplier invoices which shall accurately reflect all particulars relating to Franchisee's business and such statistical and other information or records as Franchisor may require and shall keep all such information for not less than three (3) years. Upon Franchisor's request, from time to time, Franchisee shall furnish Franchisor with copies of any or all product supply invoices reflecting purchases by the Franchised Business. In addition, upon the request of Franchisor, Franchisee shall compile and provide to Franchisor any statistical or financial information regarding the operation of the Franchised Business, the products or services sold by it, or data of a similar nature as Franchisor may reasonably request for purposes of evaluating or promoting the Franchised Business or the Four Seasons System in general. Franchisor and its designated agents shall have the right to examine and audit such records, accounts, books and data at all reasonable times to insure that Franchisee is complying with the terms of this Agreement. If such inspection discloses that the Gross Volume of Business in any period exceeded the amount reported by Franchisee as its Gross Volume of Business by an amount equal to one percent (1%) or more of the Gross Volume of Business originally reported to Franchisor, Franchisee shall bear the cost of such inspection and audit and shall pay any

- 18 -

such deficiency with interest from the date due at the lesser of eighteen percent (18%) of such overdue amount or the highest rate permitted by applicable law, immediately upon the request of Franchisor.

(b)　　No later than the tenth (10th) day of each month, Franchisee shall deliver a monthly sales report and an unaudited profit and loss statement to Franchisor on forms prescribed by Franchisor, stating the fees due to Franchisor during the preceding month itemized by revenue producing activity as specified from time to time by Franchisor, the Gross Volume of Business at the Premises for the prior month, and such other information as Franchisor may require, all signed and certified as true and correct by an authorized agent of Franchisee.

(c)　　No later than the twentieth (20th) day of each month, Franchisee shall deliver a New Bookings Report to Franchisor on forms prescribed by Franchisor, identifying Four Seasons Product and nonproprietary Products sold and installed by Franchisee during the prior month, and such other information as Franchisor may require, all signed and certified as true and correct by an authorized agent of Franchisee.

(d)　　Franchisee shall furnish Franchisor with a copy of each of its reports and returns of sales, use and gross receipt taxes, which Franchisee shall certify as true and correct, by mailing such reports to Franchisor contemporaneously with the mailing of such reports and returns to the appropriate taxing authority.

(e)　　Franchisee shall deliver semiannually to Franchisor, no later than thirty (30) days from the end of Franchisee's fiscal mid-term year and no later than forty-five (45) days from the close of Franchisee's fiscal year, an unaudited profit and loss statement and balance sheet covering Franchisee's business for the first six (6) months of each fiscal year and the final six (6) months of each fiscal year, respectively, all of which shall be in a format prescribed by Franchisor and certified by Franchisee as true and correct. In addition, Franchisee, as well as any guarantor(s) of this Agreement, shall, within thirty (30) days after request from Franchisor, deliver to Franchisor a financial statement, certified as correct and current, in a form which is satisfactory to Franchisor and which fairly represents the total assets and liabilities of Franchisee and any such guarantor(s).

## 11.　COVENANTS

(a)　　During the term of this Agreement, Franchisee and any guarantor(s) hereof covenant, individually:

(i)　　To use their best efforts in operating the Franchised Business, in maximizing sales of the Four Seasons Product Line in the Granted Territory, and in recommending, promoting and encouraging the use of the Four Seasons Product Line and all Four Seasons System Centers;

(ii)　　Not to engage in any business, other than as a franchisee of the Four Seasons System, except as contemplated by this Agreement, within a twenty-five (25) mile radius of the Premises, which is the same as or similar to the Franchised Business or which sells any products similar to any component of the Four Seasons Product Line including any additions, modifications or enhancements to the Four Seasons Product Line introduced by Franchisor during the term hereof. The purpose of this subparagraph (ii) is to encourage Franchisee and any guarantor(s) hereof to use their best efforts to promote the Four Seasons System and the Four Seasons Product Line;

- 19 -

FS/FA-3.00(#685943)

(iii)    Not to offer or sell during the term of this Agreement any products or services which have not been approved by Franchisor for use or sale in Four Seasons System Centers; and

(iv)    Not to engage in any act. or practice which is dishonest or misleading to prospective or current customers or clients of businesses operated under the Four Seasons System or which may impair the goodwill associated with the Licensed Marks.

(b)    In the event this Agreement expires or is terminated pursuant to Paragraph 13 hereof, Franchisee covenants, for a period of two (2) years after such expiration or termination, not to operate any business at or within a one (1) mile radius of the former Premises which offers or sells greenhouses, conservatories, patio-sunrooms or solariums.

(c)    During the term of this Agreement and thereafter, Franchisee covenants not to communicate directly or indirectly, divulge to or use for its benefit or the benefit of any other person or legal entity, any trade secrets which are proprietary to Franchisor or any information, knowledge or know-how deemed confidential under Paragraph 8 hereof, except as permitted by Franchisor. The protection granted hereunder shall be in addition to and not in lieu of all other protections for such trade secrets and confidential information as may otherwise be afforded in law or in equity. .

(d)    During the term of this Agreement and for one (1) year thereafter, Franchisee covenants not to directly or indirectly, through any means request, solicit or induce any employee of Franchisor or its affiliates to terminate employment with Franchisor or its affiliates and accept employment with Franchisee, nor to hire or employ any such employee as an employee of Franchisee.

(e)    The parties agree that each of the foregoing covenants shall be construed as independent of any other covenant or provision of this Agreement. Should any part of these restrictions be found to be unenforceable by virtue of its scope in terms of area, business activity prohibited or length of time, and should such part be capable of being made enforceable by reduction of any or all thereof, Franchisee and Franchisor agree that the same shall be enforced to the fullest extent permissible under the law. The running of any period of time specified in this Paragraph 11 shall be tolled and suspended for any period of time in which the Franchisee is found by a court of competent jurisdiction to have been in violation of this restrictive covenant. Franchisor may, unilaterally, at any time, in its sole discretion, revise any of the covenants in this Paragraph 11 so as to reduce the obligations of Franchisee hereunder. Franchisee further expressly agrees that the existence of any claim it may have against Franchisor whether or not arising from this Agreement, shall not constitute a defense to the enforcement by Franchisor of the covenants in this Paragraph 11.

## 12.    TRANSFER AND ASSIGNMENT OF AGREEMENT

(a)    This Agreement and all rights and duties hereunder may be freely assigned or transferred by Franchisor at its sole discretion to any person or legal entity which agrees to assume Franchisor's obligations hereunder, and shall be binding upon and inure to the benefit of Franchisor's successors and assigns including, without limitation, any entity which acquires all or a portion of the capital stock of Franchisor or any entity resulting from or participating in a merger, consolidation or reorganization in which Franchisor is involved, and to which Franchisor's rights and duties hereunder are assigned or transferred.

(b)    Franchisee understands and acknowledges that the rights and duties set forth in this Agreement are personal to Franchisee and that Franchisor has granted the Franchise in reliance on

- 20 -

Franchisee's business skill and financial capacity. It is important to Franchisor that Franchisee be known to Franchisor and meet Franchisor's then current standards and requirements. Accordingly, neither Franchisee nor any person possessing an interest or holding shares of stock of any kind or nature in Franchisee ("Shareholder") shall be permitted or have the power, without the prior written consent of Franchisor, to give away, sell, assign, pledge, lease, sublease, devise or otherwise transfer, either directly or by operation of law or in any other manner, this Agreement, any of Franchisee's rights or obligations hereunder, or any interest or shares of stock of any kind or nature in Franchisee (any such transaction being referred to hereinafter as a "Transfer"). In order to assure compliance by Franchisee with the transfer restrictions contained in this Paragraph 12, all share or stock certificates of Franchisee shall at all times contain a legend sufficient under applicable law to constitute notice of the restrictions on such stock contained in this Agreement and to allow such restrictions to be enforceable. Such legend shall appear in substantially the following form:

> "The sale, transfer, pledge or hypothecation of this stock is restricted
> pursuant to an option, the terms of which are contained in Paragraph
> 12 of a Franchise Agreement dated $\underline{HON \ \ QS, \ QT)}$
> between Four Seasons Marketing Corp. and the issuer of these shares."

Any Transfer which does not comply with the terms of this Paragraph 12 shall be null and void.

(c)     If Franchisee or any Shareholder desires to make a Transfer, such person or entity must comply with the following terms, conditions and procedures in order to effectuate a valid Transfer:

(i)     Franchisee shall first notify Franchisor in writing of the proposed Transfer and set forth a complete description of all terms of the proposed Transfer including the prospective transferee's name, address, financial qualifications and previous five years' business experience;

(ii)     Franchisor or its assignee may, within thirty (30) days after receipt of such notice, exercise the right to purchase the interest being offered by Franchisee or any Shareholder ("Option") by matching the monetary purchase price and payment schedule terms (without having to match any other or non-monetary terms) of the proposed Transfer; provided, however, Franchisor's Option shall not apply to transfers by gift, bequest or inheritance or to transfers to the immediate family of any person listed in Paragraph 4 of Schedule B hereof;

(iii)     If Franchisor or its assignee fails to exercise the Option to purchase the interest, Franchisor shall, within thirty (30) days after the Option has expired, notify Franchisee in writing of its approval or disapproval of the prospective transferee;

(iv)     If Franchisor approves the proposed transferee, Franchisee or the Shareholder may transfer the interest to the proposed transferee at a price and under terms and conditions which are not more favorable than the terms offered to Franchisor, but only after the proposed transferee has completed (to the satisfaction of Franchisor) the training then currently required of similarly situated Four Seasons System franchisees;

(v)     Prior to the consummation of any such Transfer, Franchisee shall pay all amounts due to Franchisor and cure all other breaches of this Agreement and any other agreement with Franchisor;

(vi)     Franchisee shall comply with all other applicable transfer requirements as designated in the Confidential Operating Manual or otherwise in writing;

- 21 -

FS/FA-3.00(#685943)

(vii)    Franchisor may require any transferee of any interest or shares of stock of any kind or nature in Franchisee or the Premises to guarantee the obligations of Franchisee under this Agreement or under any new franchise agreement entered into pursuant to subparagraph (ix) below.

Furthermore, in the case of any assignment of any rights under this Agreement, or in the case of any other Transfer which, when aggregated with all previous Transfers, may in the reasonable opinion of Franchisor result in transferring effective control over the ownership and/or operation of the Premises or Franchisee the following additional Transfer requirements of Franchisor must be met:

(viii)    The transferee must apply for a Four Seasons System franchise and must meet all of Franchisor's then current standards and requirements for becoming a Four Seasons System franchisee (which standards and requirements need not be in writing);

(ix)    The transferee (or in the case of a transfer of shares or interest in Franchisee, then Franchisee with an unconditional guaranty by the transferee in form reasonably satisfactory to Franchisor) shall execute the then current form of franchise agreement generally issued by Franchisor with respect to comparable Four Seasons System franchisees. Such agreement shall generally provide for a term equal to the remaining term of this Agreement and may include, without limitation, different fee structures, increased fees or both;

(x)    Franchisor may, as a condition of any Transfer, require the payment to it of a fee by Franchisee in order to reimburse Franchisor for any expenses which may be incurred in review, analysis, and preparation of any documentation relating to the Transfer, including legal and accounting fees; provided, however, that in no event shall such fee exceed One Thousand Dollars ($1,000);

(xi)    Franchisee and the prospective transferee shall request Franchisor to make an inspection of the Center. As a result of such inspection, Franchisor may prepare a "Punch List" setting forth the necessary repairs, maintenance or other upgrading of the Premises and the Center which will be necessary in order for Franchisor to approve of the Transfer; and

(xii)    The transferee shall assume and agree to honor any warranties and/or other contractual or legal commitments with respect to any Four Seasons products sold by Franchisee prior to the date of such transfer.

(d)    Notwithstanding any other provision in this Paragraph 12, if a surviving spouse, heir or estate of any deceased person owning stock or other interest in Franchisee (the "Survivor") desires to acquire or retain the interest of the decedent and continue to operate a business pursuant to the Four Seasons System, the Survivor may do so under the terms of this Agreement subject only to the execution and delivery to Franchisor of a written agreement to be bound by the terms hereof and any guaranty of this Agreement, and the satisfactory completion of the initial training provided by Franchisor pursuant to Paragraph 4(a) hereof. If the Survivor does not desire to acquire or retain such interest, then the Survivor shall have a reasonable period of time to make a Transfer to a transferee acceptable to Franchisor, subject to compliance with the procedures set forth in subparagraphs (b) and (c) of this Paragraph 12; provided, however, that the Survivor shall, throughout such period, fulfill all duties of Franchisee under this Agreement.

(e)    Franchisor's consent to a Transfer hereunder shall not constitute a waiver of any claims Franchisor may have against Franchisee or the transferring party or Franchisor's right to demand exact compliance with any provision of this Agreement.

- 22 -

## 13.    DEFAULT AND TERMINATION

(a)      Franchisor may not terminate this Agreement prior to the expiration of its term except for "good cause," which shall mean the occurrence of any event of default described below. Upon the occurrence of any event of default, Franchisor may, at its option, and without waiving its rights hereunder or any other rights available at law or in equity, including its rights to damages, terminate this Agreement and all of Franchisee's rights hereunder effective immediately upon the date Franchisor gives written notice of termination, upon such other date as may be set forth in such notice of termination, or in those instances enumerated below, automatically upon the occurrence of, or the lapse of the specified period following, an event of default. The occurrence of any one or more of the following events shall constitute an event of default and grounds for termination of this Agreement by Franchisor:

(i)      Automatically, if Franchisee becomes insolvent or makes a general assignment for the benefit of creditors, or if a petition in bankruptcy is filed by Franchisee, or such a petition is filed against and consented to by Franchisee, or if a bill in equity or other proceeding for the appointment of a receiver of Franchisee or other custodian for Franchisee's business or assets is filed and consented to by Franchisee, or if a receiver or other custodian (permanent or temporary) of Franchisee's assets or property, or any part thereof, is appointed.

(ii)      If Franchisee fails to pay any financial obligation pursuant to this Agreement within thirty (30) days of the date on which Franchisor gives notice of such delinquency or immediately upon written notice if such payment has not been made within sixty (60) days after the date on which it is required to be paid, or immediately upon written notice if Franchisee is determined to have underreported its Gross Volume of Business during any month by one percent (1%) or more of the actual Gross Volume of Business during such month on two or more occasions during the term of this Agreement, whether or not Franchisee subsequently rectifies such deficiency.

(iii)      If Franchisee fails to perform or breaches any covenant, obligation, term, condition, warranty or certification herein and fails to cure such noncompliance within thirty (30) days after Franchisor gives written Notice to Cure.

(iv)      If Franchisee fails to open the Center and commence business within six (6) months of the Effective Date of this Agreement.

(v)      If Franchisee makes, or has made, any materially false statement or report to Franchisor in connection with this Agreement or application therefore.

(vi)      If Franchisee operates the Franchised Business in a manner contrary to or inconsistent with the Licensed Marks or as specified by Franchisor in the Confidential Operating Manual, and Franchisee fails to cure such deficiency within thirty (30) days after Franchisor gives a written Notice to Cure.

(vii)      If there is any violation of any transfer and assignment provision contained in Paragraph 12 of this Agreement.

(viii)      If Franchisee receives from Franchisor four (4) or more notices to cure defaults or violations of this Agreement in the same calendar year.

- 23 -

(ix) If Franchisee abandons or ceases to operate all or any part of the Franchised Business conducted under this Agreement or defaults under any mortgage, deed of trust or lease with any third party covering the Center, and such party treats such act or omission as a default, and Franchisee fails to cure such default to the satisfaction of such third party within any applicable cure period granted Franchisee by such party.

(x) If Franchisee or any person owning an interest in the Franchise is convicted of a felony, a crime of moral turpitude, or any other crime or offense relating to the operation of the Franchised Business.

(xi) If Franchisee shall fail to carry or allow to lapse any insurance coverage required pursuant to Paragraph 15 hereof or as may be required from time to time in the Confidential Operating Manual.

(xii) If Franchisee or any guarantor(s) hereof default in any other agreement with Franchisor and such default is not cured in accordance with the terms of such other agreement.

(xiii) If Franchisee fails, for a period of thirty (30) days after notification of noncompliance, to comply with any law or regulation applicable to the operation of the Franchised Business.

(xiv) If Franchisee fails to meet the minimum performance standards specified in Schedule C for two or more successive calendar quarters or fails to meet the minimum display requirements contained in Paragraph 7(k)(iii) hereof and fails to cure such non-compliance within thirty (30) days after Franchisor gives written notice to cure.

(b) Upon the occurrence of one or more of the events of default enumerated in Paragraph 13(a), Franchisor, in addition to any other rights and remedies to which it may be entitled, shall have all rights and remedies of a secured party under the UCC as enacted in the state where the Granted Territory is located, including but not limited to, the right to enter the Premises to remove and repossess any products and goods in which Franchisor has-been granted a security interest, without notice to Franchisee. Franchisee hereby waives and releases Franchisor from any and all claims in connection therewith and arising therefrom. At Franchisor's request following an event of default, Franchisee shall assemble and make available to Franchisor all products and goods in which Franchisor has been granted a security interest, at a place to be designated by Franchisor which is reasonably convenient to both parties.

(c) Franchisee may not terminate this Agreement prior to the expiration of its term except through legal process resulting from Franchisor's material breach of this Agreement or otherwise with Franchisor's consent. In the event that Franchisee shall claim that Franchisor has failed to meet any obligation under this Agreement, Franchisee shall provide Franchisor with written notice of such claim, within ninety (90) days of its occurrence, specifically enumerating all alleged deficiencies and providing Franchisor with an opportunity to cure, which shall in no event be less than thirty (30) days from the date of receipt of such notice by Franchisor from Franchisee. Failure to give such notice shall constitute a waiver of any such alleged default.

(d) Notwithstanding anything contained in this Agreement to the contrary, neither party shall be in default hereunder by reason of its delay in performance of, or failure to perform, any of its obligations hereunder, if such delay or failure is caused by:

- 24 -

(i)        strikes or other labor disturbance;

(ii)       acts of God, or the public enemy, riots or other civil disturbances, fire, or flood;

(iii)      interference by civil or military authorities;

(iv)       compliance with governmental laws, rules or regulations which were not in effect and could not be reasonably anticipated as of the date of this Agreement;

(v)        delays in transportation, failure of suppliers, or inability to secure necessary governmental priorities for materials; or

(vi)       any other fault beyond its control or without its fault or negligence. In any such event, the time required for performance of such obligation shall be extended for an additional period equal to the period of time caused by such unavoidable delay.

## 14.    POST TERM OBLIGATIONS

(a)        Upon the expiration or termination of this Agreement, Franchisee shall immediately:

(i)        Cease to be a franchisee of Franchisor and cease to operate the former Franchised Business under the Four Seasons System. Franchisee shall not thereafter, directly or indirectly, represent to the public that the former Franchised Business is or was operated or in any way connected with the Four Seasons System or hold itself out as a present or former franchisee of Franchisor;

(ii)       Pay all sums owing to Franchisor. Upon termination for any default by Franchisee, such sums shall include all actual and consequential damages, costs and expenses incurred by Franchisor as a result of the default;

(iii)      Return to Franchisor the Confidential Operating Manual and all trade secrets and confidential materials and other property owned by Franchisor to Franchisor and all copies thereof; Franchisee shall retain no copy or record of any of the foregoing; provided Franchisee may retain its copy of this Agreement, any correspondence between the parties, and any other document which Franchisee reasonably needs for compliance with any applicable provision of law;

(iv)       Upon Franchisor's request, provide Franchisor a complete list of Franchisee's employees, clients, customers, their respective addresses and any outstanding obligations Franchisee may have to any third parties;

(v)        Take such action as may be required by Franchisor to transfer and assign to Franchisor or its designee all telephone numbers, white and yellow page telephone references and advertisements, and all trade and similar name registrations and business licenses, and to cancel any interest which Franchisee may have in the same;

(vi)       Cease to use in advertising, or in any manner whatsoever, any methods, procedures or techniques associated with the Four Seasons System in which Franchisor has a proprietary right, title or interest; the Licensed Marks; and any other marks and indicia of operation

- 25 -

associated with the Four Seasons System and remove all trade dress and other indications of operation under the Four Seasons System from the Center; and

(vii)    Agree and undertake to provide to all end-users of the Four Seasons Product Line service, maintenance and repair of any products ordered through Franchisee hereunder for at least seven (7) years after the delivery and installation of each such product. Termination or cancellation of this Agreement shall not be construed to relieve Franchisee of such obligation, or from damages to Franchisor caused by Franchisee's failure to maintain any component of the Four Seasons Product Line sold or installed by Franchisee, unless Franchisor provides directly or by arrangements with third persons (including a potential successor to Franchisee) for such services.

## 15.    INSURANCE

(a)    Franchisee shall, at its expense and no later than upon commencement of the business contemplated by this Agreement, procure and maintain in full force and effect throughout the term of this Agreement the types of insurance enumerated in the Confidential Operating Manual which shall be in such amounts as may from time to time be required by Franchisor and which shall designate Franchisor as an additional named insured, including the following:

(i)    Employer's liability and workers' compensation insurance as prescribed by law;

(ii)    Comprehensive general liability insurance covering the operation of the Franchised Business; and

(iii)    Products liability and completed operation insurance.

(b)    Franchisee shall make timely delivery of certificates of all required insurance to Franchisor, each of which shall contain a statement by the insurer that the policy will not be canceled or materially altered without at least thirty (30) days' prior written notice to Franchisor.

(c)    The procurement and maintenance of such insurance shall not relieve Franchisee of any liability to Franchisor under any indemnity requirement of this Agreement.

## 16.    TAXES, PERMITS, AND INDEBTEDNESS

(a)    Franchisee shall promptly pay when due any and all federal, state and local taxes including without limitation unemployment and sales taxes, levied or assessed with respect to any services or products furnished, used or licensed pursuant to this Agreement and all accounts or other indebtedness of every kind incurred by Franchisee in the operation of the Franchised Business.

(b)    Franchisee shall comply with all federal, state and local laws, rules and regulations and timely obtain any and all permits, certificates and licenses for the full and proper conduct of the Franchised Business.

(c)    Franchisee hereby expressly covenants and agrees to accept full and sole responsibility for any and all debts and obligations incurred in the operation of the Franchised Business.

- 26 -

## 17.   INDEMNIFICATION AND INDEPENDENT CONTRACTOR

(a)   Franchisee agrees to protect, defend, indemnify, and hold Franchisor, its parent or any affiliate corporation, and their respective directors, officers and shareholders, jointly and severally, harmless from and against all claims, actions, proceedings, damages, costs, expenses and other losses and liabilities, consequently, directly or indirectly incurred (including without limitation attorneys' and accountants' fees) as a result of, arising out of, or connected with the operation of the Franchised Business, for which Franchisor is neither wholly nor contributorily responsible, including, without limitation:

(i)   any liability arising out of Franchisee's sale or installation of, or alteration or modification to any components of the Four Seasons Product Line which have been made from customized extrusions, and which modifications or alterations have not been previously approved by Franchisor;

(ii)   any liability arising out of Franchisee's sale or installation of any nonproprietary product(s) or service, whether or not permitted by Franchisor to be displayed and/or sold at, from or through the Premises.

Franchisee shall not be liable under these indemnifications for any portion of damages for which Franchisor is found by a court of law to be responsible.

(b)   In all dealings with third parties including, without limitation, employees, suppliers, clients and customers, Franchisee shall disclose in an appropriate manner acceptable to Franchisor that it is an independent entity licensed by Franchisor. Nothing in this Agreement is intended by the parties hereto to create a fiduciary relationship between them nor to constitute Franchisee an agent, legal representative, subsidiary, joint venturer, partner, employee or servant of Franchisor for any purpose whatsoever. It is understood and agreed that Franchisee is an independent contractor and is in no way authorized to make any contract, warranty or representation or to create any obligation on behalf of Franchisor.

## 18.   WRITTEN APPROVALS, WAIVERS, AND AMENDMENT

(a)   Whenever this Agreement requires Franchisor's prior approval, Franchisee shall make a timely written request. Unless a different time period is specified in this Agreement, Franchisor shall respond with its approval or disapproval within fifteen (15) days. In addition, Franchisor's approval shall not be unreasonably withheld.

(b)   No failure of Franchisor to exercise any power reserved to it by this Agreement and no custom or practice of the parties at variance with the terms hereof shall constitute a waiver of Franchisor's right to demand exact compliance with any of the terms herein. A waiver or approval by Franchisor of any particular default by Franchisee or acceptance by Franchisor of any payments due hereunder shall not be considered a waiver or approval by Franchisor of any preceding or subsequent breach by Franchisee of any term, covenant or condition of this Agreement.

(c)   No warranty or representation is made by Franchisor that all Four Seasons System franchise agreements heretofore or hereafter issued by Franchisor do or will contain terms substantially similar to those contained in this Agreement. Further, Franchisee recognizes and agrees that Franchisor may, in its reasonable business judgment, due to local business conditions or otherwise, waive or

- 27 -

FS/FA-3.00(#685943)

modify comparable provisions of other franchise agreements heretofore or hereafter granted to other Four Seasons System franchisees in a nonuniform manner, subject, however, to those provisions of this Agreement which require Franchisor to act toward its franchisees on a reasonably nondiscriminatory basis.

(d)    Except as otherwise provided in Paragraph 11(e) hereof, no amendment, change or variance from this Agreement shall be binding upon either Franchisor or Franchisee except by mutual written agreement. If an amendment of this Agreement is executed at Franchisee's request, any legal fees or costs of preparation in connection therewith shall be paid by Franchisee.

## 19.    ENFORCEMENT

(a)    To ensure compliance with this Agreement and to provide consultation with Franchisee, Franchisee agrees that Franchisor and its designated agent(s) shall, upon reasonable prior notice to Franchisee, be permitted full and complete access during business hours to inspect the Premises and all records thereof including, but not limited to, records relating to Franchisee's customers, clients, suppliers, employees and agents. Franchisee shall cooperate fully with Franchisor and its designated agents requesting such access.

(b)    Franchisor or its designee shall be entitled to apply for, without bond, declarations, temporary and permanent injunctions, and orders of specific performance, in order to enforce the provisions of this Agreement relating to Franchisee's use of the Licensed Marks, the obligations of Franchisee upon termination or expiration of this Agreement, and assignment of the Franchise and ownership interests in Franchisee or to prohibit any act or omission by Franchisee or its employees that constitutes a violation of any applicable law or regulation, is dishonest or misleading to prospective or current customers or clients of businesses operated under the Four Seasons System, constitutes a danger to other franchisees, employees, customers, clients or the public, or may impair the goodwill associated with the Licensed Marks.

(c)    If Franchisor secures any declaration, injunction or order of specific performance pursuant to Paragraph 19(b) hereof, if any provision of this Agreement is enforced at any time by Franchisor or if any amounts due from Franchisee to Franchisor are, at any time, collected by or through an attorney at law or collection agency, Franchisee shall be liable to Franchisor for all costs and expenses of enforcement and collection including, but not limited to, court costs and reasonable attorneys' fees.

## 20.    NOTICES

Any notice required to be given hereunder shall be in writing and shall be either mailed by certified mail, return receipt requested or delivered by a recognized courier service, receipt acknowledged. Notices to Franchisee shall be addressed to it at the address listed in Paragraph 1(a) of this Agreement. Notices to Franchisor shall be addressed to it at the address listed in Paragraph 1(a) of this Agreement, Attention: President. Any notice complying with the provisions hereof shall be deemed to be given three (3) days after mailing, or on the date of receipt, whichever is earlier. Each party shall have the right to designate any other address for such notices by giving notice thereof in the foregoing manner, and in such event all notices to be mailed after receipt of such notice shall be sent to such other address.

- 28 -

FS/FA-3.00(#685943)

21.    GOVERNING LAW

(a)    This Agreement is accepted by Franchisor in the State of New York and the terms and conditions thereof shall be governed by, enforced under and construed in accordance with the laws thereof.

(b)    The parties hereto agree that it is in their best interest to resolve disputes between them in an orderly fashion and in a consistent manner. Therefore, the parties hereby agree as follows:

(i)    Any controversy or claim arising out of or relating to this Agreement, or any breach thereof, including, without limitation, any claim that the Agreement, or any part of the Agreement, is invalid, illegal or otherwise voidable or void, or the enforcement of any right or obligation which by its nature survives the expiration or termination of the Agreement, shall be submitted to arbitration before and in accordance with the Commercial Rules of Arbitration of the American Arbitration Association and judgment upon the award may be entered in any court having jurisdiction thereof; provided, however, that this clause shall not be construed to limit Franchisor from bringing any action in any court of competent jurisdiction for injunctive or other provisional relief as Franchisor deems to be necessary or appropriate to protect its trademarks, trade names, service marks, logotypes, insignia, trade dress and designs, or to enjoin or restrain Franchisee from otherwise causing immediate and irreparable harm to Franchisor.

(ii)    Any award rendered in connection with an arbitration pursuant to this Paragraph shall be final and binding and judgment upon such an award may be entered and enforced in any court of competent jurisdiction.

(iii)    Any arbitration under this Paragraph shall be conducted by a single arbitrator selected jointly by the parties. If within thirty (30) days after a demand for arbitration is made, the parties are unable to agree on a single arbitrator, the arbitrator shall be selected by each party from a list obtained from the American Arbitration Association by a process of striking the name of one arbitrator alternatively until one name remains. Franchisor shall begin the process of striking names in all circumstances. If for some reason the arbitrator whose name is left is unavailable to arbitrate the dispute, the arbitrator shall be the last potential arbitrator whose name was stricken. If this alternate arbitrator is similarly unavailable, the arbitrator shall be selected by moving up the list of stricken arbitrators from the last to the first until an available arbitrator is found.

(iv)    Such arbitration shall take place in New York, New York.

This arbitration provision shall be deemed to be self-executing, and in the event that either party fails to appear at any properly noticed arbitration proceeding, an award may be entered against such party.

22.    SEVERABILITY AND CONSTRUCTION

(a)    Should any provision of this Agreement be for any reason held invalid, illegal or unenforceable by a court of competent jurisdiction, such provision shall be deemed restricted in application to the extent required to render it valid; and the remainder of this Agreement shall in no way be affected and shall remain valid and enforceable for all purposes, both parties hereto declaring that they would have executed this Agreement without inclusion of such provision. In the event such total or partial invalidity or unenforceability of any provision of this Agreement exists only with respect

- 29 -

to the laws of a particular jurisdiction, this subparagraph (a) shall operate upon such provision only to the extent that the laws of such jurisdiction are applicable to such provision. Each party agrees to execute and deliver to the other any further documents which may be reasonably required to effectuate fully the provisions hereof. Franchisee understands and acknowledges that Franchisor shall have the right, in its sole discretion, on a temporary or permanent basis, to reduce the scope of any covenant or provision of this Agreement binding upon Franchisee, or any portion hereof, without Franchisee's consent, effective immediately upon receipt by Franchisee of written notice thereof; and Franchisee agrees that it will comply forthwith with any covenant as so modified, which shall be fully enforceable.

(b)      This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original, but such counterparts together shall constitute one and the same instrument.

(c)      The headings and captions contained herein are for the purposes of convenience and reference only and are not to be construed as a part of this Agreement. All terms and words used herein shall be construed to include the number and gender as the context of this Agreement may require. The parties agree that each section of this Agreement shall be construed independently of any other section or provision of this Agreement.

## 23.  ACKNOWLEDGMENTS

Franchisee hereby acknowledges the following:

(a)      FRANCHISEE HAS CONDUCTED AN INDEPENDENT INVESTIGATION OF THE BUSINESS CONTEMPLATED BY THIS AGREEMENT AND UNDERSTANDS AND ACKNOWLEDGES THAT THE BUSINESS CONTEMPLATED BY THIS AGREEMENT INVOLVES BUSINESS RISKS MAKING THE SUCCESS OF THE VENTURE LARGELY DEPENDENT UPON THE BUSINESS ABILITIES AND PARTICIPATION OF FRANCHISEE AND ITS EFFORTS AS AN INDEPENDENT BUSINESS OPERATOR. FRANCHISOR EXPRESSLY DISCLAIMS THE MAKING OF, AND FRANCHISEE ACKNOWLEDGES THAT IT HAS NOT RECEIVED OR RELIED UPON ANY WARRANTY OR GUARANTEE, EXPRESS OR IMPLIED, AS TO THE POTENTIAL VOLUME, PROFITS OR SUCCESS OF THE BUSINESS VENTURE CONTEMPLATED BY THIS AGREEMENT EXCEPT AS SET FORTH IN ANY FRANCHISE OFFERING CIRCULAR PROVIDED TO FRANCHISEE, OR AS TO THE SUITABILITY OF THE PREMISES FOR THE CENTER AS A SUCCESSFUL LOCATION FOR THE CENTER.

(b)      FRANCHISEE HAS NO KNOWLEDGE OF ANY REPRESENTATIONS BY FRANCHISOR OR ITS OFFICERS, DIRECTORS, SHAREHOLDERS, EMPLOYEES, AGENTS OR SERVANTS, ABOUT THE BUSINESS CONTEMPLATED BY THIS AGREEMENT THAT ARE CONTRARY TO THE TERMS OF THIS AGREEMENT OR THE DOCUMENTS INCORPORATED HEREIN. FRANCHISEE REPRESENTS, AS AN INDUCEMENT TO FRANCHISOR'S ENTRY INTO THIS AGREEMENT, THAT IT HAS MADE NO MISREPRESENTATIONS IN OBTAINING THIS AGREEMENT.

(c)      FRANCHISEE ACKNOWLEDGES THAT FRANCHISOR'S APPROVAL OF FRANCHISEE'S PREMISES DOES NOT CONSTITUTE RECOMMENDATION OR ENDORSEMENT OF THE LOCATION OF THE CENTER, NOR ANY ASSURANCE BY FRANCHISOR THAT THE OPERATION OF A FOUR SEASONS SYSTEM CENTER AT THE PREMISES WILL BE SUCCESSFUL OR PROFITABLE.

(d)      FRANCHISEE ACKNOWLEDGES THAT FRANCHISOR OR ITS AGENT HAS PROVIDED FRANCHISEE WITH A FRANCHISE OFFERING CIRCULAR NOT LATER THAN THE EARLIER OF THE

- 30 -

FIRST PERSONAL MEETING HELD TO DISCUSS THE SALE OF A FRANCHISE, TEN (10) BUSINESS DAYS BEFORE THE EXECUTION OF THIS AGREEMENT, OR TEN (10) BUSINESS DAYS BEFORE ANY PAYMENT OF ANY CONSIDERATION. FRANCHISEE FURTHER ACKNOWLEDGES THAT FRANCHISEE HAS READ SUCH FRANCHISE OFFERING CIRCULAR AND UNDERSTANDS ITS CONTENTS.

(e)    FRANCHISEE ACKNOWLEDGES THAT FRANCHISOR HAS PROVIDED FRANCHISEE WITH A COPY OF THIS AGREEMENT AND ALL RELATED DOCUMENTS, FULLY COMPLETED, FOR AT LEAST FIVE (5) BUSINESS DAYS PRIOR TO FRANCHISEE'S EXECUTION HEREOF.

(f)    FRANCHISEE, TOGETHER WITH ITS ADVISERS, HAS SUFFICIENT KNOWLEDGE AND EXPERIENCE IN FINANCIAL AND BUSINESS MATTERS TO MAKE AN INFORMED INVESTMENT DECISION WITH RESPECT TO THE FRANCHISE.

(g) FRANCHISEE IS AWARE OF THE FACT THAT OTHER PRESENT OR FUTURE FRANCHISEES OF FRANCHISOR MAY OPERATE UNDER DIFFERENT FORMS OF AGREEMENT(S), AND CONSEQUENTLY THAT FRANCHISOR'S OBLIGATIONS AND RIGHTS WITH RESPECT TO ITS VARIOUS FRANCHISEES MAY DIFFER MATERIALLY IN CERTAIN CIRCUMSTANCES.

(h)    FRANCHISEE ACKNOWLEDGES THAT THIS INSTRUMENT CONSTITUTES THE ENTIRE AGREEMENT OF THE PARTIES. THIS AGREEMENT TERMINATES AND SUPERSEDES ANY PRIOR AGREEMENT BETWEEN THE PARTIES CONCERNING THE SAME SUBJECT MATTER.

(i)    FRANCHISEE ACKNOWLEDGES THAT IT IS NOT, NOR IS IT INTENDED TO BE, A THIRD PARTY BENEFICIARY OF THIS AGREEMENT OR ANY OTHER AGREEMENT OR CONTRACTUAL RELATIONSHIP TO WHICH FRANCHISOR IS A PARTY.

(j)    PRIOR TO THE EXECUTION HEREOF, FRANCHISEE HAS BEEN PROVIDED SUCH TECHNICAL PRODUCT INFORMATION AS FRANCHISEE HAS REQUESTED IN ORDER TO EVALUATE THE SUITABILITY OF THE FOUR SEASONS PRODUCT LINE AND ITS COMPONENTS FOR USE IN THE GRANTED TERRITORY, INCLUDING THE EXTENT TO WHICH SUCH PRODUCTS COMPLY WITH APPLICABLE BUILDING CODES OR OTHER REQUIREMENTS WHICH MAY BE IMPOSED UPON THE PRODUCTS SOLD BY FRANCHISOR AND INSTALLED BY FRANCHISEE. FRANCHISEE HEREBY ACKNOWLEDGES THAT FRANCHISOR HAS MADE NO REPRESENTATIONS THAT ANY OR ALL COMPONENTS OF THE FOUR SEASONS PRODUCT LINE MEET OR EXCEED SUCH LOCAL BUILDING CODES APPLICABLE TO THE OPERATION OF THE FRANCHISED BUSINESS IN THE GRANTED TERRITORY.

[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

FS/FA-3.00(#685943)

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement under seal on the date first written above.

FRANCHISOR:

FOUR SEASONS MARKETING CORP.

By: _____

Title: _____

Attest: _____

Title: _____

(Affix Corporate Seal)

FRANCHISEE:

GLASS STRUCTURES, INC.

By: _____

Title: _____

Attest: _____

Title: _____

(Affix Corporate Seal)

- 32 -

## GUARANTY OF FRANCHISEE'S UNDERTAKINGS

In consideration of, and as an inducement to, the execution of the foregoing Franchise Agreement ("Agreement") dated the ⟨25⟩ day of _April_ ,20 01 , by Four Seasons Marketing Corp. ("Franchisor"), each of the undersigned hereby guarantees unto Four Seasons Marketing Corp., and Four Seasons Solar Products Corp., their affiliates, successors and assigns that GLASS STRUCTURES, INC. ("Franchisee") will perform during the term of this Agreement each and every covenant, payment, agreement and undertaking on the part of Franchisee contained and set forth in such Agreement.

Franchisor, its affiliates, successors and assigns, may from time to time, after notice to the Franchisee, if any, required under the Franchise Agreement (a) resort to the undersigned for payment. of any of the financial obligations for which Franchisee is in default, whether or not it or its affiliates, successors and assigns have resorted to any property securing any of such obligations or proceeded. against any other of the undersigned or any party primarily or secondarily liable on any of such obligations, (b) release or compromise any obligation of any of the undersigned hereunder or any obligation of any party or parties primarily or secondarily liable on any obligation, and (c) extend, renew or credit any obligation for any period (whether or not longer than the original period); alter, amend or exchange any obligation; or give any other form of indulgence, whether under the Agreement or not.

The undersigned agrees to comply with and abide by the restrictive covenants and non-disclosure provisions contained in Paragraph 11 of the Agreement to the same extent as and for the same period of time as Franchisee is required to comply with and abide by such covenants and provisions. These obligations of the undersigned shall survive any expiration or termination of the Franchise Agreement or this Guaranty.

The undersigned further waives presentment, demand, notice of dishonor, protest, nonpayment and all other notices whatsoever, including without limitation: notice of acceptance hereof; notice of all contracts and commitments; notice of the existence or creation of any liabilities under the foregoing Agreement and of the amount and terms thereof; and notice of all defaults, disputes or controversies between Franchisee and Franchisor resulting from such Agreement or otherwise, and the settlement, compromise or adjustment thereof.

The undersigned agrees to pay all expenses paid or incurred by Franchisor, its affiliates, successors and assigns in attempting to enforce the foregoing Agreement and this Guaranty against Franchisee and against the undersigned and in attempting to collect any amounts due thereunder and hereunder, including reasonable attorneys' fees if such enforcement or collection is by or through an attorney-at-law. Any waiver, extension of time or other indulgence granted from time to time by Franchisor or its affiliates, successors or assigns, with respect to the foregoing Agreement, shall in no way modify or amend this Guaranty, which shall be continuing, absolute, unconditional and irrevocable.

If more than one person has executed this Guaranty, the term "the undersigned," as used herein shall refer to each such person, and the liability of each of the undersigned hereunder shall be joint and several and primary as sureties.

FS/FA-3.00(#685943)

IN WITNESS WHEREOF, each of the undersigned has executed this Guaranty under seal effective as of the date of the foregoing Agreement.

_____
Witness

_____
Witness

_____ (SEAL)
Guarantor

_____ (SEAL)
Guarantor

Subscribed and sworn to before me this

27 day of March, 2000

_____

Notary Public _____

County of Champaign

My Commission Expires:

4-6-04

```
OFFICIAL SEAL
TRACY BALLINGER
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 4/06/04
```

FS/FA-3.00(#685943)

FRANCHISE AGREEMENT DATED April 25, 2001
BETWEEN FOUR SEASONS MARKETING CORP. AND
GLASS STRUCTURES, INC.

## SCHEDULE A

Franchisor owns or has the right to license the following registered service marks:

FOUR SEASONS LOGO, Reg. No. 1,236,354
FOUR SEASONS (DESIGN AND REMODELING CENTERS),
  Reg. No. 1,392,366
FOUR SEASONS, Reg. No. 1,372,107
FOUR SEASONS GREENHOUSES, Reg. No. 1,401,197
POW-R-VENT, Reg. No. 1,414,129
SYSTEM 4, Reg. No. 1,379,179
CURV-ALONG, Reg. No. 1,312,351
REMODEL SEARCH, Reg. No. 1,505,065
TUNNEL OF HEAT, Reg. No. 1,538,172
FOUR SEASONS AND LOGO, Reg. No. 1,585,675
FOUR SEASONS DESIGN AND REMODELING CENTERS and design,
  Reg. No. 1,665,860
SUN SMART, Reg. No. 1,687,148

In addition (and without limitation), Franchisor may from time to time authorize any one or more of the following marks and names in connection with the Four Seasons System:

Outdoor Living . . . Indoors
Georgian Extension
Mit-R-Lock
Four Seasons Skylights
We Recycle the Sun
Interlocking Panels
Outdoorable
Texcoat
Weatherlock
Sunsmart Plus
Sunsmart Max
Steel Classic
Kleencoat
A Sunroom for every Budget

FS/FA-3.00(#685943)

## SCHEDULE B

1.    Legal Description of Premises:

2.    Name(s) and address(es) of holder(s) of record fee title to Premises:

3.    If Franchisee is not holder of record fee title:

(a)    Interest of Franchisee in Premises, whether leasehold or other written contract of tenancy leasehold

(b)    Name and address of Franchisee's landlord or person through whom Franchisee occupies Premises

(c)    Term of lease or other written contract of tenancy (attach copy of lease or of appropriate documents)

FS/FA-3.00(#685943)

4. <u>Acknowledgment Regarding Controlling Persons</u>. Franchisee hereby acknowledges that Franchisee is a(n):

       _____ individual
       _____ partnership
       _____ joint venture
       _____ corporation
       _____ other business form_____
       (check one)             (describe)

Franchisee hereby warrants and represents that the following persons own, either legally or beneficially, voting control of Franchisee:

| NAME | TYPE OF OWNERSHIP (LEGAL OR BENEFICIAL) | PERCENTAGE OF INTEREST OWNED |
|------|------------------------------------------|------------------------------|

5. Attach certified copy of Articles of Incorporation, by-laws and all corporate documents authorizing Franchisee to enter into this Agreement, including references to transfer restrictions shown on stock certificates.

\

FS/FA-3.00(#685943)

6.    Franchisee is granted a

[   ] Level 3 Franchise
[✕] Level 2 Franchise
[   ] Level 1 Franchise

comprised of the following listed zip codes/postal districts (the "Granted Territory"):

## A

| ZIP CODE | LOCATION | POPULATION |
|----------|----------|------------|
| 61815 | BONDVILLE | 356 |
| 61820 | CHAMPAIGN | 35,085 |
| 61801 | URBANA | 47,404 |
| 61874 | SAVOY | 3,151 |
| | | |
| | TOTAL STIPULATED POPULATION | 85,996 |

## SCHEDULE C

## MINIMUM PERFORMANCE STANDARDS

At all times after the first full calendar quarter following the Effective Date, and thereafter during the term hereof, Franchisee shall be required to purchase through Franchisor or any affiliate of Franchisor during each calendar quarter, Four Seasons Products having an aggregate wholesale value equal to not less than an amount calculated by multiplying the population of the Granted Territory stipulated in Paragraph 6 of Schedule B times Fifteen Cents ($0.15).

**E-FILED**
Monday, 10 September, 2007 01:35:57 PM
Clerk, U.S. District Court, ILCD

*SATELLITE TERRITORY*

*SPECIAL STIPULATION TO*
*FOUR SEASONS FRANCHISE AGREEMENT*
*DATED* 4/28/01
*BY AND BETWEEN*
*FOUR SEASONS MARKETING CORP.*
*AND*
GLASS STRUCTURES, INC
*(the "Franchise Agreement")*

This Special Stipulation to Franchise Agreement ("Special Stipulation") is made and entered into as of the 28 day of APRIL , 20 01 by and between Four Seasons Marketing Corp., a Nevada corporation with its principal place of business at 5005 Veterans Memorial Highway, Holbrook, New York 11741 ("Franchisor") and GLASS STRUCTURES, INC with a principal place of business at 505 EAST CHESTNUT CHAMPAIGN, IL 61826 ("Franchisee".

This Special Stipulation is intended to be a modification of and amendment to the Franchise Agreement. Defined terms shall have the same meaning in this Special Stipulation as in the Franchise Agreement. To the extent of any conflict between the following and the printed provisions of the Franchise Agreement, these Special Stipulations shall control.

Whereas, Franchisee desires to obtain the supplemental right to operate a business utilizing the Four Seasons System and the Licensed Marks from within the additional territory more particularly described in Paragraph 4 below (the "Satellite Territory"); and

Whereas, Franchisor is willing to grant Franchisee such supplemental rights subject to Franchisee's compliance with the following terms, covenants and conditions.

Now, therefore, in consideration of the mutual covenants and conditions hereinafter set forth, the parties hereto agree as follows:

1.    *Good Standing.* Franchisee hereby acknowledges and agrees that Franchisor, as of the date hereof, is in full compliance with all of its obligations under the Franchise Agreement. Except as set forth in this Special Stipulation, the Franchise Agreement remains in full force and effect.

2.    *Term.* This Special Stipulation shall take effect upon the date first set forth above and shall remain in effect during the term of the Franchise Agreement unless terminated by either party pursuant to Paragraph 6 hereof.

3.    *Grant of Satellite Territory.* Subject to the reservation of rights contained in Paragraph 2 of the Franchise Agreement, Franchisor hereby grants to Franchisee the supplemental right to operate the Franchised Business both in the Granted Territory and the Satellite Territory pursuant to the Four Seasons System and in accordance with the Franchise Agreement and Franchisor's Confidential Operating Manual. Unless otherwise specifically authorized by Franchisor in writing, Franchisee shall have no right to construct, open or operate a Center in the Satellite Territory. Provided that Franchisee is in good standing

PLAINTIFF'S
EXHIBIT
2

pursuant to the terms of this Special Stipulation, Franchisor will grant no other party the right to operate a Four Seasons System Franchised Business from within the Satellite Territory during the term hereof.

4.    *Description of Satellite Territory*. The Satellite Territory shall be comprised of the following listed zip codes/postal districts (the "Satellite Territory"):

Location                                                                    Zip Code Population

TERRITORY C

ATTACHED

Total Stipulated Population
of Satellite Territory                                              229,499

5.    *Incremental Performance Standards*. At all times after the first full month following the date first set forth above, and thereafter throughout the term of this Special Stipulation, Franchisee shall be required to purchase from or through Franchisor or an affiliate of Franchisor on a monthly basis for distribution in the Satellite Territory, Four Seasons Products having an aggregate wholesale value equal to not less than an amount calculated by multiplying the Total Stipulated Population of the Satellite Territory set forth in Paragraph 4 above times Five cents ($.05).

6.    *Termination of Satellite Territory Rights*. Franchisor may terminate this Special Stipulation and Franchisee's rights hereunder to operate from within the Satellite Territory effective immediately upon the date Franchisor gives written notice of termination upon the occurrence of any event of default described below:

*SCHEDULE D-2*
*Page 2*

*FS/FA-3.00(#685943)*

(a)    If Franchisee fails to achieve the Incremental Performance Standards specified in Paragraph 5 hereof during any month; or

(b)    If Franchisee commits any event of default specified in Paragraph 13 of the Franchise Agreement and fails to cure such default in accordance with the terms thereof.

7.    _Grant of Satellite Business Rights._ Upon the request of Franchisor, Franchisee may obtain the supplemental right to offer the Four Seasons Product Line either from premises other than the Center which are owned or operated by a third party retailer, or in conjunction with the direct marketing of Four Seasons Products by or through a third party retailer (the "Satellite Business"). Except as otherwise provided herein, the Satellite Business and Franchisee's rights hereunder shall be governed by and subject to the terms of the Franchise Agreement and Franchisor's Confidential Operating Manual. If Franchisee is granted the right to operate a Satellite Business, such Satellite Business shall be conducted only from those premises listed in Paragraph 1 of Exhibit A and/or pursuant to a lease, license agreement or other contract with the third party retailer ("Retailer") designated in Paragraph 2 of Exhibit A.

8.    _Approval of Satellite Business by Franchisor._  Prior to execution of any lease, license agreement or other contract with Retailer, Franchisee shall, at its expense, furnish to Franchisor, for its approval, the following (if applicable):

(a)    A proposed site plan for the operation of the Satellite Business and specifications for any display fixtures, leasehold improvements or similar structures proposed to be utilized by Franchisee in connection with the Satellite Business. Franchisee agrees to install display fixtures of the kind and size as may be required by Franchisor.

(b)    A copy of the proposed lease, license agreement or other contracts to be executed between Franchisee and Retailer, which must be approved by Franchisor;

(c)    If the Satellite Business will be operated from or through premises located outside of Franchisee's Granted Territory:

(i)    the right of Franchisor to act as the prime lessee/party-in-interest under the lease, license agreement or other contract with Retailer and to sub-lease or assign such interest to Franchisee. In such event Franchisor may "mark-up" the lease payment or license fee in order to compensate Franchisor for the liability and expenses associated with such arrangement, or

(ii)    a "Collateral Assignment" and a "Consent and Agreement of Retailer" in substantially the form attached hereto as Exhibit B, executed by Franchisee and the Retailer, providing Franchisor notice of Franchisee's default of the lease, license agreement or other contract, a right to cure such default and the right to assume Franchisee's interest thereunder with the right to sublease or assign such rights to another Four Seasons System franchisee in the event of any default by Franchisee under the Franchise Agreement or the lease, license agreement or other contract(s) with Retailer. If Franchisor exercises its rights under the Collateral Assignment, Franchisor shall have the option to acquire all fixtures, equipment and other leasehold improvements utilized by Franchisee in connection with the Satellite Business at fair market value.

SCHEDULE D-2
Page 3

9.    *Continuing Fees on Satellite Business*. Franchisee agrees that the term "Gross Volume of Business" as used in the Franchise Agreement shall also be deemed to include the aggregate gross amount of all revenues derived from the operation of any Satellite Business. Franchisee shall maintain full, accurate and complete records of the Satellite Business. If any lease, license agreement or contract between Franchisee and Retailer provides that Franchisee shall provide periodic reports of sales, income, gross receipts or other financial and operating data to Retailer, Franchisee shall also contemporaneously provide complete copies of any such reports to Franchisor.

10.    *Additional Obligations of Franchisee*. Upon the request of Franchisor, Franchisee shall (if applicable):

(a)    Maintain in stock and display in connection with the Satellite Business such amounts of all standard advertising and marketing materials and referral cards promoting the Four Seasons Product Line as Franchisor may require from time to time, and shall use only marketing, advertising and printed materials which have been approved in advance, in writing, by Franchisor;

(b)    Clean and maintain the appearance of any display fixtures at the Satellite Business as may be required by Retailer or by Franchisor from time to time in the Confidential Operating Manual;

(c)    Upon the request of Retailer, "man" the Satellite Business on weekends or at special sales or promotional events.

11.    *Termination of Satellite Business Rights*. Franchisor may terminate any rights of Franchisee to operate a Satellite Business effective immediately upon the date Franchisor gives written notice of termination upon the occurrence of any event of default described below:

(a)    If Franchisee defaults in any lease, license agreement or other contract with Retailer affecting Franchisee's right to operate the Satellite Business and such default is not cured in accordance with the terms thereof;

(b)    If Franchisee commits any event of default specified in Paragraph 13 of the Franchise Agreement and fails to cure such default in accordance with the terms thereof.

12.    *Post-Termination Covenants*.

(a)    Upon the termination, expiration or nonrenewal of Franchisee's rights to operate any Satellite Business outside of the Granted Territory:

(i)    Franchisee hereby collaterally assigns to Franchisor any interest of Franchisee in and to any lease, license agreement or other contract with Retailer and grants Franchisor an irrevocable power of attorney coupled with an interest for the purpose of executing such assignments if Franchisee fails or refuses to do so. In any such event, Franchisor may operate the Satellite Business itself or assign such rights to another Four Seasons franchisee.

(ii)    Franchisor may, at its option, terminate the exclusive rights of Franchisee to operate from within the Satellite Territory.

(b)    Upon the termination, expiration or nonrenewal of Franchisee's rights to operate the Satellite Business, Franchisee agrees for a period of one year thereafter not to engage as an owner, operator, licensee or in any managerial capacity, in any remodeling or home improvement business with Retailer at, from or associated with the former Satellite Business identified in Exhibit A hereto.

FS/FA-3.00(#685943)

*IN WITNESS WHEREOF, Franchisor and Franchisee have duly executed this Special Stipulation under seal on the date first written above.*

FRANCHISOR

Four Seasons Marketing Corp.

By: _____

Title: _____

Attest: _____

Title: _____

*(Affix Corporate Seal)*

FRANCHISEE

GLASS STRUCTURES, INC.

By: _____

Title: _____

Attest: _____

Title: _____

*(Affix Corporate Seal)*

Guarantor _____

Guarantor _____

SCHEDULE D-2
Page 5

*FS/FA-3.00 (#685943)*

6.    Franchisee is granted a

[   ] Level 3 Franchise

[   ] Level 2 Franchise

[   ] Level 1 Franchise

comprised of the following listed zip codes/postal districts (the "Granted Territory"):

## C

| ZIP CODE | LOCATION | POPULATION |
|----------|----------|------------|
| 61516 | BENSON | 967 |
| 61522 | N/L | |
| 61535 | N/L | |
| 61545 | LOWPOINT | 1308 |
| 61548 | METAMORA | 11006 |
| 61550 | MORTON | 16351 |
| 61561 | ROANOKE | 2996 |
| 61568 | TREMONT | 4792 |
| 61570 | WASHBURN | 1967 |
| 61571 | WASHINGTON | 20398 |
| 61701 | BLOOMINGTON | 38499 |
| 61721 | ARMINGTON | 1176 |
| 61723 | ATLANTA | 1939 |
| 61725 | CARLOCK | 1153 |
| 61727 | CLINTON | 10048 |
| 61729 | CONGERVILLE | 902 |
| 61730 | COOKSVILLE | 505 |
| 61732 | DANVERS | 2056 |
| 61733 | DEER CREEK | 2481 |
| 61734 | DELAVAN | 2424 |
| 61736 | DOWNS | 1121 |
| 61737 | ELLSWORTH | 707 |
| 61738 | EL PASO | 3803 |
| 61740 | FLANAGAN | 1441 |
| 61743 | GRAYMONT | 180 |
| 61744 | GRIDLEY | 2355 |
| 61745 | HEYWORTH | 3257 |
| 61747 | HOPEDALE | 1429 |
| 61748 | HUDSON | 2065 |
| 61749 | KENNEY | 817 |
| 61751 | N/L | |
| 61752 | LEROY | 3659 |
| 61753 | LEXINGTON | 3349 |
| 61754 | MCLEAN | 1584 |
| 61755 | MACKINAW | 3038 |
| 61759 | MINIER | 1567 |
| 61760 | MINONK | 2908 |
| 61761 | NORMAL | 47376 |
| 61771 | SECOR | 1067 |

| | | |
|---|---|---|
| 61772 | SHIRLEY | 377 |
| 61774 | STANFORD | 1098 |
| 61777 | WAPELLA | 1033 |
| 61778 | WAYNESVILLE | 770 |
| 62512 | BEASON | 458 |
| 62518 | CHESTNUT | 417 |
| 62623 | N/L | |
| 62635 | EMDEN | 1096 |
| 62643 | HARTSBURG | 577 |
| 62656 | LINCOLN | 19782 |
| 62666 | MIDDLETOWN | 564 |
| 62671 | NEW HOLLAND | 636 |
| | | |
| | | |
| | | |
| | TOTAL STIPULATED POPULATION | **229,499** |

**E-FILED**
Monday, 10 September, 2007 01:36:23 PM
Clerk, U.S. District Court, ILCD

*SATELLITE TERRITORY*

*SPECIAL STIPULATION TO*
*FOUR SEASONS FRANCHISE AGREEMENT*
*DATED* 4/25/01
*BY AND BETWEEN*
*FOUR SEASONS MARKETING CORP.*
*AND*
GLASS STRUCTURES, INC.
*(the "Franchise Agreement")*

This Special Stipulation to Franchise Agreement ("Special Stipulation") is made and entered into as of the 25 day of APRIL ,20 01 by and between Four Seasons Marketing Corp., a Nevada corporation with its principal place of business at 5005 Veterans Memorial Highway, Holbrook, New York 11741 ("Franchisor") and GLASS STRUCTURES, INC. with a principal place of business at 505 EAST CHESTNUT CHAMPAIGN, IL. 61826 ("Franchisee".

This Special Stipulation is intended to be a modification of and amendment to the Franchise Agreement. Defined terms shall have the same meaning in this Special Stipulation as in the Franchise Agreement. To the extent of any conflict between the following and the printed provisions of the Franchise Agreement, these Special Stipulations shall control.

Whereas, Franchisee desires to obtain the supplemental right to operate a business utilizing the Four Seasons System and the Licensed Marks from within the additional territory more particularly described in Paragraph 4 below (the "Satellite Territory"); and

Whereas, Franchisor is willing to grant Franchisee such supplemental rights subject to Franchisee's compliance with the following terms, covenants and conditions.

Now, therefore, in consideration of the mutual covenants and conditions hereinafter set forth, the parties hereto agree as follows:

1.    *Good Standing*. Franchisee hereby acknowledges and agrees that Franchisor, as of the date hereof, is in full compliance with all of its obligations under the Franchise Agreement. Except as set forth in this Special Stipulation, the Franchise Agreement remains in full force and effect.

2.    *Term*. This Special Stipulation shall take effect upon the date first set forth above and shall remain in effect during the term of the Franchise Agreement unless terminated by either party pursuant to Paragraph 6 hereof.

3.    *Grant of Satellite Territory*. Subject to the reservation of rights contained in Paragraph 2 of the Franchise Agreement, Franchisor hereby grants to Franchisee the supplemental right to operate the Franchised Business both in the Granted Territory and the Satellite Territory pursuant to the Four Seasons System and in accordance with the Franchise Agreement and Franchisor's Confidential Operating Manual. Unless otherwise specifically authorized by Franchisor in writing, Franchisee shall have no right to construct, open or operate a Center in the Satellite Territory. Provided that Franchisee is in good standing

FS/FA-3.00(#685943)

PLAINTIFF'S
EXHIBIT
3

pursuant to the terms of this Special Stipulation, Franchisor will grant no other party the right to operate a Four Seasons System Franchised Business from within the Satellite Territory during the term hereof.

4.     _Description of Satellite Territory_. The Satellite Territory shall be comprised of the following listed zip codes/postal districts (the "Satellite Territory"):

Location                                                    Zip Code Population

TERRITORY "E"

ATTACHED

Total Stipulated Population          _183,116_
of Satellite Territory

5.     _Incremental Performance Standards_. At all times after the first full month following the date first set forth above, and thereafter throughout the term of this Special Stipulation, Franchisee shall be required to purchase from or through Franchisor or an affiliate of Franchisor on a monthly basis for distribution in the Satellite Territory, Four Seasons Products having an aggregate wholesale value equal to not less than an amount calculated by multiplying the Total Stipulated Population of the Satellite Territory set forth in Paragraph 4 above times Five cents ($.05).

6.     _Termination of Satellite Territory Rights_. Franchisor may terminate this Special Stipulation and Franchisee's rights hereunder to operate from within the Satellite Territory effective immediately upon the date Franchisor gives written notice of termination upon the occurrence of any event of default described below:

SCHEDULE D-2
Page 2

(a)    If Franchisee fails to achieve the Incremental Performance Standards specified in Paragraph 5 hereof during any month; or

(b)    If Franchisee commits any event of default specified in Paragraph 13 of the Franchise Agreement and fails to cure such default in accordance with the terms thereof.

7.    *Grant of Satellite Business Rights.* Upon the request of Franchisor, Franchisee may obtain the supplemental right to offer the Four Seasons Product Line either from premises other than the Center which are owned or operated by a third party retailer, or in conjunction with the direct marketing of Four Seasons Products by or through a third party retailer (the "Satellite Business"). Except as otherwise provided herein, the Satellite Business and Franchisee's rights hereunder shall be governed by and subject to the terms of the Franchise Agreement and Franchisor's Confidential Operating Manual. If Franchisee is granted the right to operate a Satellite Business, such Satellite Business shall be conducted only from those premises listed in Paragraph 1 of Exhibit A and/or pursuant to a lease, license agreement or other contract with the third party retailer ("Retailer") designated in Paragraph 2 of Exhibit A.

8.    *Approval of Satellite Business by Franchisor.* Prior to execution of any lease, license agreement or other contract with Retailer, Franchisee shall, at its expense, furnish to Franchisor, for its approval, the following (if applicable):

(a)    A proposed site plan for the operation of the Satellite Business and specifications for any display fixtures, leasehold improvements or similar structures proposed to be utilized by Franchisee in connection with the Satellite Business. Franchisee agrees to install display fixtures of the kind and size as may be required by Franchisor.

(b)    A copy of the proposed lease, license agreement or other contracts to be executed between Franchisee and Retailer, which must be approved by Franchisor;

(c)    If the Satellite Business will be operated from or through premises located outside of Franchisee's Granted Territory:

(i)    the right of Franchisor to act as the prime lessee/party-in-interest under the lease, license agreement or other contract with Retailer and to sub-lease or assign such interest to Franchisee. In such event Franchisor may "mark-up" the lease payment or license fee in order to compensate Franchisor for the liability and expenses associated with such arrangement, or

(ii)    a "Collateral Assignment" and a "Consent and Agreement of Retailer" in substantially the form attached hereto as Exhibit B, executed by Franchisee and the Retailer, providing Franchisor notice of Franchisee's default of the lease, license agreement or other contract, a right to cure such default and the right to assume Franchisee's interest thereunder with the right to sublease or assign such rights to another Four Seasons System franchisee in the event of any default by Franchisee under the Franchise Agreement or the lease, license agreement or other contract(s) with Retailer. If Franchisor exercises its rights under the Collateral Assignment, Franchisor shall have the option to acquire all fixtures, equipment and other leasehold improvements utilized by Franchisee in connection with the Satellite Business at fair market value.

*SCHEDULE D-2*
*Page 3*

9.      _Continuing Fees on Satellite Business._ Franchisee agrees that the term "Gross Volume of Business" as used in the Franchise Agreement shall also be deemed to include the aggregate gross amount of all revenues derived from the operation of any Satellite Business. Franchisee shall maintain full, accurate and complete records of the Satellite Business. If any lease, license agreement or contract between Franchisee and Retailer provides that Franchisee shall provide periodic reports of sales, income, gross receipts or other financial and operating data to Retailer, Franchisee shall also contemporaneously provide complete copies of any such reports to Franchisor.

10.     _Additional Obligations of Franchisee._ Upon the request of Franchisor, Franchisee shall (if applicable):

(a)     Maintain in stock and display in connection with the Satellite Business such amounts of all standard advertising and marketing materials and referral cards promoting the Four Seasons Product Line as Franchisor may require from time to time, and shall use only marketing, advertising and printed materials which have been approved in advance, in writing, by Franchisor;

(b)     Clean and maintain the appearance of any display fixtures at the Satellite Business as may be required by Retailer or by Franchisor from time to time in the Confidential Operating Manual;

(c)     Upon the request of Retailer, "man" the Satellite Business on weekends or at special sales or promotional events.

11.     _Termination of Satellite Business Rights._ Franchisor may terminate any rights of Franchisee to operate a Satellite Business effective immediately upon the date Franchisor gives written notice of termination upon the occurrence of any event of default described below:

(a)     If Franchisee defaults in any lease, license agreement or other contract with Retailer affecting Franchisee's right to operate the Satellite Business and such default is not cured in accordance with the terms thereof;

(b)     If Franchisee commits any event of default specified in Paragraph 13 of the Franchise Agreement and fails to cure such default in accordance with the terms thereof.

12.     _Post-Termination Covenants._

(a)     Upon the termination, expiration or nonrenewal of Franchisee's rights to operate any Satellite Business outside of the Granted Territory:

(i)     Franchisee hereby collaterally assigns to Franchisor any interest of Franchisee in and to any lease, license agreement or other contract with Retailer and grants Franchisor an irrevocable power of attorney coupled with an interest for the purpose of executing such assignments if Franchisee fails or refuses to do so. In any such event, Franchisor may operate the Satellite Business itself or assign such rights to another Four Seasons franchisee.

(ii)    Franchisor may, at its option, terminate the exclusive rights of Franchisee to operate from within the Satellite Territory.

(b)     Upon the termination, expiration or nonrenewal of Franchisee's rights to operate the Satellite Business, Franchisee agrees for a period of one year thereafter not to engage as an owner, operator, licensee or in any managerial capacity, in any remodeling or home improvement business with Retailer at, from or associated with the former Satellite Business identified in Exhibit A hereto.

FS/FA-3.00(#685943)

IN WITNESS WHEREOF, Franchisor and Franchisee have duly executed this Special Stipulation under seal on the date first written above.

FRANCHISOR

Four Seasons Marketing Corp.

By: _____

Title: _____

Attest: _____

Title: _____

(Affix Corporate Seal)

FRANCHISEE

GLASS STRUCTURES, INC.

By: _____

Title: _____

Attest: _____

Title: _____

(Affix Corporate Seal)

_____

Guarantor

_____

Guarantor

SCHEDULE D-2
Page 5

FS/FA-3.00(#685943)

6.    Franchisee is granted a

[  ] Level 3 Franchise
[  ] Level 2 Franchise
[  ] Level 1 Franchise

comprised of the following listed zip codes/postal districts (the "Granted Territory"):

## E

| ZIP CODE | LOCATION | POPULATION |
|----------|----------|------------|
| 62513 | BLUE MOUND | 1487 |
| 62515 | BUFFALO | 848 |
| 62520 | DAWSON | 579 |
| 62519 | N/L | |
| 62530 | DIVERNON | 1557 |
| 62531 | EDINBURG | 1874 |
| 62533 | FARMERSVILLE | 985 |
| 62536 | GLENARM | 817 |
| 62538 | HARVEL | 377 |
| 62539 | ILLIOPOLIS | 1423 |
| 62541 | N/L | |
| 62540 | N/L | |
| 62545 | MECHANICSBURG | 2329 |
| 62546 | MORRISONVILLE | 1475 |
| 62548 | MT. PULASKI | 2472 |
| 62547 | MT. AUBURN | 972 |
| 62555 | OWANECO | 517 |
| 62556 | PALMER | 738 |
| 62558 | PAWNEE | 2998 |
| 62561 | RIVERTON | 4337 |
| 62563 | ROCHESTER | 9545 |
| 62567 | STONINGTON | 1216 |
| 62568 | TAYLOR | 16943 |
| 62572 | WAGGONER | 552 |
| 62570 | N/L | |
| 62613 | ATHENS | 2823 |
| 62615 | AUBURN | 4149 |
| 62625 | CANTRALL | 2024 |
| 62629 | CHATAM | 5290 |
| 62634 | ELKHART | 882 |
| 62637 | N/L | |
| 62684 | SHERMAN | 2323 |
| 62687 | N/L | |
| 62693 | WILLIAMSVILLE | 2566 |
| 62701 | SPRINGFIELD | 1488 |
| 62702 | SPRINGFIELD | 43865 |
| 62704 | SPRINGFIELD | 45004 |
| 62707 | SPRINGFIELD | 18661 |
| | TOTAL STIPULATED POPULATION | 183,116 |

*SATELLITE TERRITORY*

*SPECIAL STIPULATION TO*
*FOUR SEASONS FRANCHISE AGREEMENT*
*DATED* 4/25/01
*BY AND BETWEEN*
*FOUR SEASONS MARKETING CORP.*
*AND*
GLASS STRUCTURES, INC.
*(the "Franchise Agreement")*

This Special Stipulation to Franchise Agreement ("Special Stipulation") is made and entered into as of the 25 day of APRIL, 20 01 by and between Four Seasons Marketing Corp., a Nevada corporation with its principal place of business at 5005 Veterans Memorial Highway, Holbrook, New York 11741 ("Franchisor") and GLASS STRUCTURES, INC. with a principal place of business at 505 EAST CHESTNUT CHAMPAIGN, IL. 61826

("Franchisee".

This Special Stipulation is intended to be a modification of and amendment to the Franchise Agreement. Defined terms shall have the same meaning in this Special Stipulation as in the Franchise Agreement. To the extent of any conflict between the following and the printed provisions of the Franchise Agreement, these Special Stipulations shall control.

Whereas, Franchisee desires to obtain the supplemental right to operate a business utilizing the Four Seasons System and the Licensed Marks from within the additional territory more particularly described in Paragraph 4 below (the "Satellite Territory"); and

Whereas, Franchisor is willing to grant Franchisee such supplemental rights subject to Franchisee's compliance with the following terms, covenants and conditions.

Now, therefore, in consideration of the mutual covenants and conditions hereinafter set forth, the parties hereto agree as follows:

1.     *Good Standing.* Franchisee hereby acknowledges and agrees that Franchisor, as of the date hereof, is in full compliance with all of its obligations under the Franchise Agreement. Except as set forth in this Special Stipulation, the Franchise Agreement remains in full force and effect.

2.     *Term.* This Special Stipulation shall take effect upon the date first set forth above and shall remain in effect during the term of the Franchise Agreement unless terminated by either party pursuant to Paragraph 6 hereof.

3.     *Grant of Satellite Territory.* Subject to the reservation of rights contained in Paragraph 2 of the Franchise Agreement, Franchisor hereby grants to Franchisee the supplemental right to operate the Franchised Business both in the Granted Territory and the Satellite Territory pursuant to the Four Seasons System and in accordance with the Franchise Agreement and Franchisor's Confidential Operating Manual. Unless otherwise specifically authorized by Franchisor in writing, Franchisee shall have no right to construct, open or operate a Center in the Satellite Territory. Provided that Franchisee is in good standing

*SCHEDULE D-2*
*Page 1*

**PLAINTIFF'S EXHIBIT**
4

pursuant to the terms of this Special Stipulation, Franchisor will grant no other party the right to operate a Four Seasons System Franchised Business from within the Satellite Territory during the term hereof.

4.    *Description of Satellite Territory.* The Satellite Territory shall be comprised of the following listed zip codes/postal districts (the "Satellite Territory"):

Location                                        Zip Code Population


TERRITORY "F"

(ATTACHED)


Total Stipulated Population                    267,605
of Satellite Territory

5.    *Incremental Performance Standards.* At all times after the first full month following the date first set forth above, and thereafter throughout the term of this Special Stipulation, Franchisee shall be required to purchase from or through Franchisor or an affiliate of Franchisor on a monthly basis for distribution in the Satellite Territory, Four Seasons Products having an aggregate wholesale value equal to not less than an amount calculated by multiplying the Total Stipulated Population of the Satellite Territory set forth in Paragraph 4 above, times Five cents ($.05).

6.    *Termination of Satellite Territory Rights.* Franchisor may terminate this Special Stipulation and Franchisee's rights hereunder to operate from within the Satellite Territory effective immediately upon the date Franchisor gives written notice of termination upon the occurrence of any event of default described below:

FS/FA-3.00(#685943)

     (a)      *If Franchisee fails to achieve the Incremental Performance Standards specified in Paragraph 5 hereof during any month; or*

     (b)      *If Franchisee commits any event of default specified in Paragraph 13 of the Franchise Agreement and fails to cure such default in accordance with the terms thereof.*

     7.      <u>*Grant of Satellite Business Rights.*</u> *Upon the request of Franchisor, Franchisee may obtain the supplemental right to offer the Four Seasons Product Line either from premises other than the Center which are owned or operated by a third party retailer, or in conjunction with the direct marketing of Four Seasons Products by or through a third party retailer (the "Satellite Business"). Except as otherwise provided herein, the Satellite Business and Franchisee's rights hereunder shall be governed by and subject to the terms of the Franchise Agreement and Franchisor's Confidential Operating Manual. If Franchisee is granted the right to operate a Satellite Business, such Satellite Business shall be conducted only from those premises listed in Paragraph 1 of Exhibit A and/or pursuant to a lease, license agreement or other contract with the third party retailer ("Retailer") designated in Paragraph 2 of Exhibit A.*

     8.      <u>*Approval of Satellite Business by Franchisor.*</u> *Prior to execution of any lease, license agreement or other contract with Retailer, Franchisee shall, at its expense, furnish to Franchisor, for its approval, the following (if applicable):*

     (a)      *A proposed site plan for the operation of the Satellite Business and specifications for any display fixtures, leasehold improvements or similar structures proposed to be utilized by Franchisee in connection with the Satellite Business. Franchisee agrees to install display fixtures of the kind and size as may be required by Franchisor.*

     (b)      *A copy of the proposed lease, license agreement or other contracts to be executed between Franchisee and Retailer, which must be approved by Franchisor;*

     (c)      *If the Satellite Business will be operated from or through premises located outside of Franchisee's Granted Territory:*

     (i)      *the right of Franchisor to act as the prime lessee/party-in-interest under the lease, license agreement or other contract with Retailer and to sub-lease or assign such interest to Franchisee. In such event Franchisor may "mark-up" the lease payment or license fee in order to compensate Franchisor for the liability and expenses associated with such arrangement, or*

     (ii)      *a "Collateral Assignment" and a "Consent and Agreement of Retailer" in substantially the form attached hereto as Exhibit B, executed by Franchisee and the Retailer, providing Franchisor notice of Franchisee's default of the lease, license agreement or other contract, a right to cure such default and the right to assume Franchisee's interest thereunder with the right to sublease or assign such rights to another Four Seasons System franchisee in the event of any default by Franchisee under the Franchise Agreement or the lease, license agreement or other contract(s) with Retailer. If Franchisor exercises its rights under the Collateral Assignment, Franchisor shall have the option to acquire all fixtures, equipment and other leasehold improvements utilized by Franchisee in connection with the Satellite Business at fair market value.*

9.    *Continuing Fees on Satellite Business.* Franchisee agrees that the term "Gross Volume of Business" as used in the Franchise Agreement shall also be deemed to include the aggregate gross amount of all revenues derived from the operation of any Satellite Business. Franchisee shall maintain full, accurate and complete records of the Satellite Business. If any lease, license agreement or contract between Franchisee and Retailer provides that Franchisee shall provide periodic reports of sales, income, gross receipts or other financial and operating data to Retailer, Franchisee shall also contemporaneously provide complete copies of any such reports to Franchisor.

10.    *Additional Obligations of Franchisee.* Upon the request of Franchisor, Franchisee shall (if applicable):

(a)    Maintain in stock and display in connection with the Satellite Business such amounts of all standard advertising and marketing materials and referral cards promoting the Four Seasons Product Line as Franchisor may require from time to time, and shall use only marketing, advertising and printed materials which have been approved in advance, in writing, by Franchisor;

(b)    Clean and maintain the appearance of any display fixtures at the Satellite Business as may be required by Retailer or by Franchisor from time to time in the Confidential Operating Manual;

(c)    Upon the request of Retailer, "man" the Satellite Business on weekends or at special sales or promotional events.

11.    *Termination of Satellite Business Rights.* Franchisor may terminate any rights of Franchisee to operate a Satellite Business effective immediately upon the date Franchisor gives written notice of termination upon the occurrence of any event of default described below:

(a)    If Franchisee defaults in any lease, license agreement or other contract with Retailer affecting Franchisee's right to operate the Satellite Business and such default is not cured in accordance with the terms thereof;

(b)    If Franchisee commits any event of default specified in Paragraph 13 of the Franchise Agreement and fails to cure such default in accordance with the terms thereof.

12.    *Post-Termination Covenants.*

(a)    Upon the termination, expiration or nonrenewal of Franchisee's rights to operate any Satellite Business outside of the Granted Territory:

(i)    Franchisee hereby collaterally assigns to Franchisor any interest of Franchisee in and to any lease, license agreement or other contract with Retailer and grants Franchisor an irrevocable power of attorney coupled with an interest for the purpose of executing such assignments if Franchisee fails or refuses to do so. In any such event, Franchisor may operate the Satellite Business itself or assign such rights to another Four Seasons franchisee.

(ii)    Franchisor may, at its option, terminate the exclusive rights of Franchisee to operate from within the Satellite Territory.

(b)    Upon the termination, expiration or nonrenewal of Franchisee's rights to operate the Satellite Business, Franchisee agrees for a period of one year thereafter not to engage as an owner, operator, licensee or in any managerial capacity, in any remodeling or home improvement business with Retailer at, from or associated with the former Satellite Business identified in Exhibit A hereto.

FS/FA-3.00(#685943)

IN WITNESS WHEREOF, Franchisor and Franchisee have duly executed this Special Stipulation under seal on the date first written above.

FRANCHISOR

Four Seasons Marketing Corp.

By: _____

Title: _____

Attest: _____

Title: _____

(Affix Corporate Seal)

FRANCHISEE

GLASS STRUCTURES, INK

By: _____

Title: _____

Attest: _____

Title: _____

(Affix Corporate Seal)

_____
Guarantor

_____
Guarantor

SCHEDULE D-2
Page 5

FS/FA-3.00(#685943)

6.    Franchisee is granted a

[  ] Level 3 Franchise

[  ] Level 2 Franchise

[  ] Level 1 Franchise

comprised of the following listed zip codes/postal districts (the "Granted Territory"):

## F

| ZIP CODE | LOCATION | POPULATION |
|---|---|---|
| 61810 | ALLERTON | 393 |
| 61813 | BEMET | 1946 |
| 61818 | CERRO GORDO | 2094 |
| 61816 | BROAD LANDS | 496 |
| 61830 | CISCO | 758 |
| 61841 | FAIRMOUNT | 1272 |
| 61849 | HOMER | 1677 |
| 61850 | INDIANOLA | 693 |
| 61851 | IVESDALE | 607 |
| 61852 | LONGVILLE | 566 |
| 61855 | MILMINE | 152 |
| 61856 | MONTICELLO | 5533 |
| 61863 | PESOTUM | 789 |
| 61864 | PHILO | 1403 |
| 61870 | RIDGE FARM | 2061 |
| 61872 | SADORUS | 1042 |
| 61876 | SIDELL | 686 |
| 61877 | SIDNEY | 1567 |
| 61880 | TOLONO | 2892 |
| 61910 | ARCOLA | 3057 |
| 61911 | ARTHUR | 5047 |
| 61912 | ASHMORE | 1450 |
| 61913 | ATWOOD | 2528 |
| 61914 | BETHANY | 1938 |
| 61917 | BROCTON | 698 |
| 61920 | CHARLESTON | 23050 |
| 61923 | N/L | |
| 61924 | CHRISMAN | 2139 |
| 61925 | DALTON CITY | 706 |
| 61928 | GAYS | 690 |
| 61929 | HAMMOND | 804 |
| 61930 | HINOLSBORO | 816 |
| 61931 | HUMBOLDT | 858 |
| 61932 | HUME | 553 |
| 61933 | KANSAS | 1058 |
| 61936 | N/L | |
| 61938 | MATTOON | 23155 |
| 61940 | METCALF | 518 |
| 61941 | N/L | |
| 61942 | NEWMAN | 1593 |
| 61943 | OAKLAND | 1407 |
| 61444 | PARIS | 11852 |

| 61937 | LOVINGTON | 1987 |
|---|---|---|
| 61949 | N/L | |
| 61951 | SULLIVAN | 6888 |
| 61953 | TUSCOLA | 5084 |
| 61955 | N/L | |
| 61956 | VILLA GROVE | 3332 |
| 61957 | WINDSOR | 2028 |
| 62501 | ARGENTA | 1447 |
| 62510 | ASSUMPTION | 1918 |
| 62521 | DECATUR | 39465 |
| 62622 | DECATUR | 19131 |
| 62523 | DECATUR | 841 |
| 62532 | N/L | |
| 62534 | FINDLAY | 1385 |
| 62535 | N/L | |
| 32526 | DECATUR | 39805 |
| 62537 | N/L | |
| 62543 | LATHAM | 855 |
| 62544 | MACON | 1742 |
| 62549 | MT. ZION | 5768 |
| 62550 | MOWEAQUA | 3071 |
| 62551 | NIANTIC | 848 |
| 62552 | OAKLEY | 797 |
| 62554 | OREANA | 1567 |
| 62565 | SHELBYVILLE | 7479 |
| 62573 | WARRENSBURG | 1775 |
| 62574 | N/L | |
| 62440 | LERNA | 1342 |
| 62441 | MARSHALL | 8054 |
| 62465 | STRASBURG | 746 |
| 62474 | WESTFIELD | 1606 |
| | | |
| | TOTAL STIPULATED POPULATION | 267,605 |

E-FILED
Monday, 10 September, 2007 01:36:53 PM
Clerk, U.S. District Court, ILCD

*SATELLITE TERRITORY*

*SPECIAL STIPULATION TO*
*FOUR SEASONS FRANCHISE AGREEMENT*
*DATED* 4/28/01
*BY AND BETWEEN*
*FOUR SEASONS MARKETING CORP.*
*AND*
GLASS STRUCTURES, INC.
*(the "Franchise Agreement")*

This Special Stipulation to Franchise Agreement ("Special Stipulation") is made and entered into as of the 28 day
of APRIL , 20 01 by and between Four Seasons Marketing Corp., a Nevada corporation with its
principal place of business at 5005 Veterans Memorial Highway, Holbrook, New York 11741 ("Franchisor") and
GLASS STRUCTURES, INC.
with a principal place of business at 505 EAST CHESTNUT
CHAMPAIGN, IL 61826
("Franchisee".

    This Special Stipulation is intended to be a modification of and amendment to the Franchise Agreement. Defined terms
shall have the same meaning in this Special Stipulation as in the Franchise Agreement. To the extent of any conflict between
the following and the printed provisions of the Franchise Agreement, these Special Stipulations shall control.

    Whereas, Franchisee desires to obtain the supplemental right to operate a business utilizing the Four Seasons System
and the Licensed Marks from within the additional territory more particularly described in Paragraph 4 below (the "Satellite
Territory"); and

    Whereas, Franchisor is willing to grant Franchisee such supplemental rights subject to Franchisee's compliance with
the following terms, covenants and conditions.

    Now, therefore, in consideration of the mutual covenants and conditions hereinafter set forth, the parties hereto agree
as follows:

    1.    <u>Good Standing</u>. Franchisee hereby acknowledges and agrees that Franchisor, as of the date hereof, is in full
compliance with all of its obligations under the Franchise Agreement. Except as set forth in this Special Stipulation, the Franchise
Agreement remains in full force and effect.

    2.    <u>Term</u>. This Special Stipulation shall take effect upon the date first set forth above and shall remain in effect
during the term of the Franchise Agreement unless terminated by either party pursuant to Paragraph 6 hereof.

    3.    <u>Grant of Satellite Territory</u>. Subject to the reservation of rights contained in Paragraph 2 of the Franchise
Agreement, Franchisor hereby grants to Franchisee the supplemental right to operate the Franchised Business both in the Granted
Territory and the Satellite Territory pursuant to the Four Seasons System and in accordance with the Franchise Agreement and
Franchisor's Confidential Operating Manual. Unless otherwise specifically authorized by Franchisor in writing, Franchisee shall
have no right to construct, open or operate a Center in the Satellite Territory. Provided that Franchisee is in good standing

FS/FA-3.00(#685943)

PLAINTIFF'S
EXHIBIT
5

pursuant to the terms of this Special Stipulation, Franchisor will grant no other party the right to operate a Four Seasons System Franchised Business from within the Satellite Territory during the term hereof.

    4.    <u>Description of Satellite Territory</u>. The Satellite Territory shall be comprised of the following listed zip codes/postal districts (the "Satellite Territory"):

Location                      Zip Code Population

TERRITORY "G"

(ATTACHED)

Total Stipulated Population
of Satellite Territory         249,031

    5.    <u>Incremental Performance Standards</u>. At all times after the first full month following the date first set forth above, and thereafter throughout the term of this Special Stipulation, Franchisee shall be required to purchase from or through Franchisor or an affiliate of Franchisor on a monthly basis for distribution in the Satellite Territory, Four Seasons Products having an aggregate wholesale value equal to not less than an amount calculated by multiplying the Total Stipulated Population of the Satellite Territory set forth in Paragraph 4 above times Five cents ($.05).

    6.    <u>Termination of Satellite Territory Rights</u>. Franchisor may terminate this Special Stipulation and Franchisee's rights hereunder to operate from within the Satellite Territory effective immediately upon the date Franchisor gives written notice of termination upon the occurrence of any event of default described below:

FS/FA-3.00(#685943)

    (a)     If Franchisee fails to achieve the Incremental Performance Standards specified in Paragraph 5 hereof during any month; or

    (b)     If Franchisee commits any event of default specified in Paragraph 13 of the Franchise Agreement and fails to cure such default in accordance with the terms thereof.

7.     <u>Grant of Satellite Business Rights</u>. Upon the request of Franchisor, Franchisee may obtain the supplemental right to offer the Four Seasons Product Line either from premises other than the Center which are owned or operated by a third party retailer, or in conjunction with the direct marketing of Four Seasons Products by or through a third party retailer (the "Satellite Business"). Except as otherwise provided herein, the Satellite Business and Franchisee's rights hereunder shall be governed by and subject to the terms of the Franchise Agreement and Franchisor's Confidential Operating Manual. If Franchisee is granted the right to operate a Satellite Business, such Satellite Business shall be conducted only from those premises listed in Paragraph 1 of Exhibit A and/or pursuant to a lease, license agreement or other contract with the third party retailer ("Retailer") designated in Paragraph 2 of Exhibit A.

8.     <u>Approval of Satellite Business by Franchisor</u>. Prior to execution of any lease, license agreement or other contract with Retailer, Franchisee shall, at its expense, furnish to Franchisor, for its approval, the following (if applicable):

    (a)     A proposed site plan for the operation of the Satellite Business and specifications for any display fixtures, leasehold improvements or similar structures proposed to be utilized by Franchisee in connection with the Satellite Business. Franchisee agrees to install display fixtures of the kind and size as may be required by Franchisor.

    (b)     A copy of the proposed lease, license agreement or other contracts to be executed between Franchisee and Retailer, which must be approved by Franchisor;

    (c)     If the Satellite Business will be operated from or through premises located outside of Franchisee's Granted Territory:

        (i)     the right of Franchisor to act as the prime lessee/party-in-interest under the lease, license agreement or other contract with Retailer and to sub-lease or assign such interest to Franchisee. In such event Franchisor may "mark-up" the lease payment or license fee in order to compensate Franchisor for the liability and expenses associated with such arrangement, or

        (ii)     a "Collateral Assignment" and a "Consent and Agreement of Retailer" in substantially the form attached hereto as Exhibit B, executed by Franchisee and the Retailer, providing Franchisor notice of Franchisee's default of the lease, license agreement or other contract, a right to cure such default and the right to assume Franchisee's interest thereunder with the right to sublease or assign such rights to another Four Seasons System franchisee in the event of any default by Franchisee under the Franchise Agreement or the lease, license agreement or other contract(s) with Retailer. If Franchisor exercises its rights under the Collateral Assignment, Franchisor shall have the option to acquire all fixtures, equipment and other leasehold improvements utilized by Franchisee in connection with the Satellite Business at fair market value.

9.    *Continuing Fees on Satellite Business.* Franchisee agrees that the term "Gross Volume of Business" as used in the Franchise Agreement shall also be deemed to include the aggregate gross amount of all revenues derived from the operation of any Satellite Business. Franchisee shall maintain full, accurate and complete records of the Satellite Business. If any lease, license agreement or contract between Franchisee and Retailer provides that Franchisee shall provide periodic reports of sales, income, gross receipts or other financial and operating data to Retailer, Franchisee shall also contemporaneously provide complete copies of any such reports to Franchisor.

10.    *Additional Obligations of Franchisee.* Upon the request of Franchisor, Franchisee shall (if applicable):

(a)    Maintain in stock and display in connection with the Satellite Business such amounts of all standard advertising and marketing materials and referral cards promoting the Four Seasons Product Line as Franchisor may require from time to time, and shall use only marketing, advertising and printed materials which have been approved in advance, in writing, by Franchisor;

(b)    Clean and maintain the appearance of any display fixtures at the Satellite Business as may be required by Retailer or by Franchisor from time to time in the Confidential Operating Manual;

(c)    Upon the request of Retailer, "man" the Satellite Business on weekends or at special sales or promotional events.

11.    *Termination of Satellite Business Rights.* Franchisor may terminate any rights of Franchisee to operate a Satellite Business effective immediately upon the date Franchisor gives written notice of termination upon the occurrence of any event of default described below:

(a)    If Franchisee defaults in any lease, license agreement or other contract with Retailer affecting Franchisee's right to operate the Satellite Business and such default is not cured in accordance with the terms thereof;

(b)    If Franchisee commits any event of default specified in Paragraph 13 of the Franchise Agreement and fails to cure such default in accordance with the terms thereof.

12.    *Post-Termination Covenants.*

(a)    Upon the termination, expiration or nonrenewal of Franchisee's rights to operate any Satellite Business outside of the Granted Territory:

(i)    Franchisee hereby collaterally assigns to Franchisor any interest of Franchisee in and to any lease, license agreement or other contract with Retailer and grants Franchisor an irrevocable power of attorney coupled with an interest for the purpose of executing such assignments if Franchisee fails or refuses to do so. In any such event, Franchisor may operate the Satellite Business itself or assign such rights to another Four Seasons franchisee.

(ii)    Franchisor may, at its option, terminate the exclusive rights of Franchisee to operate from within the Satellite Territory.

(b)    Upon the termination, expiration or nonrenewal of Franchisee's rights to operate the Satellite Business, Franchisee agrees for a period of one year thereafter not to engage as an owner, operator, licensee or in any managerial capacity, in any remodeling or home improvement business with Retailer at, from or associated with the former Satellite Business identified in Exhibit A hereto.

IN WITNESS WHEREOF, Franchisor and Franchisee have duly executed this Special Stipulation under seal on the date first written above.

FRANCHISOR

Four Seasons Marketing Corp.

By: _____

Title: _____

Attest: _____

Title: VP Bus. Development

(Affix Corporate Seal)

FRANCHISEE

GLASS STRUCTURES, INC.

By: _____

Title: V.P. _____

Attest: _____

Title: Pres. _____

(Affix Corporate Seal)

Guarantor _____

Guarantor _____

FS/FA-3.00(#685943)



6.    Franchisee is granted a

[   ] Level 3 Franchise

[   ] Level 2 Franchise

[   ] Level 1 Franchise

comprised of the following listed zip codes/postal districts (the "Granted Territory"):

## G

| ZIP CODE | LOCATION | POPULATION |
|---|---|---|
| 61517 | BRIMFORD | 1,242 |
| 61520 | CANTON | 15,743 |
| 61525 | DUNLAP | 5,725 |
| 61526 | EDELSTEIN | 1,803 |
| 61528 | EDWARDS | 3,191 |
| 61529 | ELMWOOD | 2,764 |
| 61531 | FARMINGTON | 3,494 |
| 61533 | GLASFORD | 2,726 |
| 61536 | HANNA CITY | 3,370 |
| 61547 | MAPLETON | 2,711 |
| 61552 | N/L | |
| 61553 | N/L | |
| 61554 | PEKIN | 48,093 |
| 61559 | PRINCEVILLE | 3,402 |
| 61562 | N/L | |
| 61569 | TRIVOLI | 1,347 |
| 61572 | YATES CITY | 1,401 |
| 61603 | PEORIA | 2,1133 |
| 61604 | PEORIA | 35,617 |
| 61607 | PEORIA | 11,108 |
| 61611 | E. PEORIA | 30,987 |
| 61614 | PEORIA | 37,502 |
| 61615 | PEORIA | 15,672 |
| | TOTAL STIPULATED POPULATION | 249,031 |

E-FILED
Monday, 10 September, 2007  01:37:09 PM
Clerk, U.S. District Court, ILCD

FROM : FOUR SEASONS DESIGN CENTER      PHONE NO. : 217 351 8205                          P0'

DEC & 1:1 1:04 F.S.O.R. SERVICE          TO          02173510205      P.01

**FOUR SEASONS**
Design & Remodeling Centers

Four Seasons Marketing Corp.

## FAX TRANSMITTAL SHEET

TO: __JIM__

FROM: __Dominick__

DATE: __12/9/92__

TIME: __11:15__

DESTINATION FAX NO.: __217 - 351 - 8205__

NO. OF PAGES (including transmittal sheet): __2__

Special Instructions: __GRanted territory, chompAign__
__96,000 X .60 = 58,000 Annual wholesale purch.__
__AreA A = 242,871 X .40 = 97,148__
__ea B = 231,377 X .40 = 92,550__
__Area = 285,641 X .40 = 114,256__
__AreA D = 208,771 X .40 = 83,508__
__total = 445,46?__

IF YOU DON'T RECEIVE ALL OF THE PAGES INDICATED OR IF THE JOB
IS NOT ...  PLEASE CALL

PH: ... EXT.

PLAINTIFF'S
EXHIBIT
__6__

★ Not: addit' ...                      ... on a monthly basis

E-FILED
Monday, 10 September, 2007 01:37:25 PM
Clerk, U.S. District Court, ILCD



**FOUR SEASONS SUNROOMS**

SOLAR GREENHOUSES •SUNROOMS •PATIO ROOMS
SOLARIUMS •WINDOWS • DOORS •SKYLIGHTS
*Outdoor Living...Indoors*™

---

**FOUR SEASONS MARKETING CORP.**                5005 Veterans Memorial Highway, Holbrook, New York 11741
                                        Tel (516) 563-4000 • Fax (516) 563-4010 • Telex 971324

---

May 18, 1993


Jim Scott
Sunstructure Design, Inc.
107 South Walnut
Champaign, IL 61820


RE: <u>Satellite Territory Agreements</u>


Dear Jim:

Enclosed are four (4) executed Satellite Agreements for your file.

Your new Minimum Purchase Requirements for these territories are as follows:

| Territory | Population | | Monthly Purchase | | 12 Months | | Annual Total |
|-----------|------------|---|------------------|---|-----------|---|--------------|
| A | 242,871 | X | .0335 | X | 12 | = | $97,634.00 |
| B | 235,871 | X | .0335 | X | 12 | = | $94,811.00 |
| C | 285,641 | X | .0335 | X | 12 | = | $114,828.00 |
| D | 208,771 | X | .0335 | X | 12 | = | $83,926.00 |
| | | | | | | | $391,199.00 |
| Original "Granted Territory | | | | | | | 57,782.00 |
| | | | | | | | $448,981.00 |

Should you have any questions please feel free to contact me.

Very truly yours,

Tony Russo,
Vice President of Franchise


cc: Bruce Connally

PLAINTIFF'S
EXHIBIT
7



E-FILED
Monday, 10 September, 2007 01:37:41 PM
Clerk, U.S. District Court, ILCD

**Four Seasons Marketing Corp.**

RECEIVED

JUN 2 9 2007

June 25, 2007

RECEIVED JUN 2 8 2007

Joseph O'Bryan
Glass Structures, Inc.
PO Box 11146
Champaign, IL 61826

Re:    Default and Termination Notices for Satellite territories

Dear Joe:

As requested enclosed are copies of the letters and Satellite Territory Agreements we mailed to you previously. Also enclosed are copies of the Certified letters we mailed which Jim Scott or you never picked up.

Should you have any questions regarding this matter please contact us.

Very truly yours,

Tony Russo

PLAINTIFF'S EXHIBIT

8

       

5005 Veterans Memorial Highway • Holbrook, NY 11741 • Telephone (631) 563-4000 • Facsimile (631) 563-4010



## FOUR SEASONS SUNROOMS

**Four Seasons Marketing Corp.**

5005 Veterans Memorial Highway
Holbrook, NY 11741

Telephone (631) 563-4000
Fax (631) 563-4010
www.FourSeasonsSunrooms.com

More Reasons for Four Seasons



RECEIVED

Mr. James D. Scott
Glass Structures, Inc.
505 East C
Champaig



UNITED STATES POSTAGE $00.41⁰
02 1M
0004224584    MAY 17 2007
MAILED FROM ZIP CODE 11741
PITNEY BOWES

517    1    00 06/01/07

NIXIE        517    1    00 06/01/07

RETURN TO SENDER
ATTEMPTED - NOT KNOWN
UNABLE TO FORWARD

BC: 117414S0799    *0502-03669-17-36

---



CERTIFIED MAIL

7004 2510 000b 9858 5958



## FOUR SEASONS SUNROOMS

**Four Seasons Marketing Corp.**

5005 Veterans Memorial Highway
Holbrook, NY 11741

Telephone (631) 563-4000
Fax (631) 563-4010
www.FourSeasonsSunrooms.com

More Reasons for Four Seasons

Mr. James D. Scott
Glass Structures, Inc.
505 East Chestnut
Champaign, Illinois 61826




UNITED STATES POSTAGE $05.21⁰
02 1M
0004224584    MAY 17 2007
MAILED FROM ZIP CODE 11741
PITNEY BOWES

ATTEMPTED, NOT KNOWN

RETURNED TO SENDER










Made in America for Over 30 Years

**FOUR SEASONS SUNROOMS**

Four Seasons Marketing Corp.

MORE REASONS FOR FOUR SEASONS

June 18, 2007

**CERTIFIED MAIL RETURN RECEIPT REQUESTED AND REGULAR MAIL**

Mr. James D. Scott
Glass Structures, Inc.
505 East Chestnut
Champaign, IL 61826

**RE:**    *Termination of the Special Stipulation to Franchise Agreement Dated April 25, 2001 for Satellite Territories C, D,E, F, G, and H and Material Provision for Special Stipulation to Franchise Agreement dated September 3, 2002 for Satellite Territory designated as Sectionals 420, 636, 637, 638 and 639*

Dear Mr. Scott:

I am Director of Franchise Compliance to Four Seasons Marketing Corp. ("Four Seasons") and it is my obligation to notify you that you are in default of your obligations to Four Seasons under the referenced Franchise Agreement.

The termination results from your failure to comply the terms and conditions under Paragraph 5 of the Special Stipulation to Franchise Agreement. Each Special Stipulation to Franchise Agreement referenced above contains an identical Paragraph 5, which is provided below for your convenience:

*"At all times after the first full month following the date first set forth above, and hereafter throughout the term of this Special Stipulation, Franchisee shall be required to purchase from or through Franchisor or an affiliate of Franchisor on a monthly basis for distribution in the Satellite Territory, Four Seasons Products having an aggregate wholesale value equal to not less than an amount calculated by multiplying the Total Stipulated Population of the Satellite Territory set forth in Paragraph 4 above times Five cents ($.05)"*

Franchisor hereby terminates the above referenced Special Stipulations to Franchise Agreement.

In order to ensure that you have received a copy of this letter, we have also sent a copy by regular mail.

Very truly yours,
**Four Seasons Marketing Corp**

Tony Russo
Director of Franchise Compliance

CC:    Cliff Nonnenmacher
       Randall Firmin









- 1 -



Made in America for Over 30 Years

**FOUR SEASONS SUNROOMS**

Four Seasons Marketing Corp.

**CERTIFIED MAIL/RETURN RECEIPT REQUESTED AND REGULAR MAIL**

May 17, 2007

Mr. James D. Scott
Glass Structures, Inc.
505 East Chestnut
Champaign, Illinois 61826

Re:    *NOTICE TO CURE - Default of Material Provision of Special Stipulation to Franchise Agreements Dated April 25, 2001 for Satellite Territories C, D, E, F, F, G and H and Material Provision for Special Stipulation to Franchise Agreement Dated September 3, 2002 for Satellite Territory designated as Sectionals 420, 636, 637, 638 and 639*

Dear Mr. Scott:

I am the Director of Franchise Compliance to Four Seasons Marketing Corp ("Four Seasons") and it is my obligation to notify you that you are in default of your obligations to Four Seasons under the above referenced Special Stipulation to Franchise Agreements.

The default results from your failure to comply with Paragraph 5 of the Special Stipulation to Franchise Agreements. Each Special Stipulation to Franchise Agreement referenced above contains an identical Paragraph 5, which is provided below for your convenience:

> *"At all times after the first full month following the date first set forth above, and hereafter throughout the term of this Special Stipulation, Franchisee shall be required to purchase from or through Franchisor or an affiliate of Franchisor on a monthly basis for distribution in the Satellite Territory, Four Seasons Products having an aggregate wholesale value equal to not less than an amount calculated by multiplying the Total Stipulated Population of the Satellite Territory set forth in Paragraph 4 above times Five cents ($.05)"*

Accordingly, we hereby provide you with written notice of said default for each Special Stipulation to Franchise Agreement referenced above. You have thirty (30) days from the date of this notice to cure such defaults. Failure to cure the aforementioned defaults within thirty (30) days shall constitute good cause grounds for terminating the corresponding Special Stipulation to Franchise Agreement and any rights granted under that Special Stipulation to Franchise Agreement. If you continue to sell the Four Seasons Product Line within a Satellite Territory










your receipt of this letter, we strongly urge that any deposits or other monies received from end users/consumers be segregated and applied only against performance of those contracts. You are advised that in the event of a termination of a Special Stipulation to Franchise Agreement, your obligations to comply with the post-termination provisions imposed by that Special Stipulation to Franchise Agreement and/or by law shall remain in full force and effect. Four Seasons will insist upon strict performance of such obligations and may take action to recover damages incurred by it as a result of your early termination of that Special Stipulation to Franchise Agreement.

In order to ensure that you have received a copy of this letter, we have also sent a copy by regular mail.

Very truly yours,
**FOUR SEASONS MARKETING CORP**

Tony Russo
Sr. Director of New Business


Cc:    Cliff Nonnenmacher
       Randall Firmin

**E-FILED**
Monday, 10 September, 2007   01:37:57 PM
Clerk, U.S. District Court, ILCD



Law Offices of
# MEYER CAPEL
A PROFESSIONAL CORPORATION

| | | |
|---|---|---|
| Telephone:  217/352-1800 | 306 West Church Street | James L. Capel, Jr (1933-1991) |
| Facsimile:  217/352-1083 | P.O. Box 6750 | |
| http://www.meyercapel.com | Champaign, Illinois 61826-6750 | |

LORNA K. GEILER
lgeiler@meyercapel.com

July 18, 2007

**BY CERTIFIED MAIL 7004 0550 0000 0770 7068 AND REGULAR U.S. MAIL**

Four Seasons Marketing Corporation
Attn: Mitch Pisik, President
5005 Veterans Memorial Highway
Holbrook, New York 11741

> **RE:**   *Invalid termination of the Special Stipulation to Franchise Agreement Dated April 25, 2001 for Satellite Territories C, D, E, F, G and H and Material Provision for Special Stipulation to Franchise Agreement dates September 3, 2002 for Satellite Territory designated as Sectionals 420, 636, 637, 638 and 639*

Dear Mr. Pisik,

My client, Sun Structures Designs, Inc. a/k/a Glass Structures, Inc., ("Sun Structures") has retained my law firm to respond to a June 25, 2007 letter from Four Seasons Marketing Corporation's ("Four Seasons") Director of Franchise Compliance, Tony Russo, which Joe O'Bryan received on June 29, 2007. As you know, the June 25, 2007 letter included letters from Four Seasons Sunrooms signed by you dated May 17, 2007 and June 18, 2007 concerning an attempt to terminate several of the Satellite Territory Special Stipulations to the Four Seasons Franchise Agreement Dated April 25, 2001 which are all referenced above.

This letter is to inform you that the notice provided in the May, 17, 2007 letter was inadequate and improper pursuant to the terms of Sun Structure's franchise agreement's notice provisions in that it was sent to the incorrect address and no default has occurred as alleged. Unless you reinstate Sun Structures Satellite Territory agreements immediately, Sun Structures will be forced to take action to protect its contractual rights.

Since 1991, Four Seasons has that the correct address for Sun Structures is 505 East Chestnut, *Bondville, Illinois, 61815*, yet Mr. Russo chose to send the notice of default to an incorrect address located in Champaign, Illinois. That notice was never received until Mr. Russo forwarded it to Joe O'Bryan with a June 25, 2007 letter. Mr. O'Bryan did not receive any notice of default until after the default period had run. Therefore, Four Season's attempt to terminate those portions of the franchise agreements is invalid.

**PLAINTIFF'S
EXHIBIT
9**

Mitch Pisik, President
Page 2
July 18, 2007

Four Seasons has known for over a decade that 505 Chestnut is located in Bondville, Illinois. I have enclosed for your information the copy of the first page of two of the Satellite Territory agreements from 1991 which clearly indicate 505 Chestnut is located in Bondville, Illinois. In addition, your delivery drivers have been coming to 505 Chestnut in Bondville to drop off sun room materials for over fifteen (15) years. Also, Sun Structures has received monthly sales reports from Peter Allen, your V.P. of Sales and Marketing, which indicate a Bondville location and includes letters addressed to a P.O. Box in Champaign, Illinois which Sun Structures currently receives mail and to which your company has communicated within the last six months.

In addition, while Mr. Russo's letter indicates he sent it regular mail, he failed to send it to an address he has repeatedly used to communicate with Mr. O'Bryan before this dispute arose. Mr. Russo has sent several recent letters to Joe O'Bryan to P.O. Box 11146 in Champaign, Illinois, 61826 but inexplicably failed to copy the default notice there.

Finally, it is rather suspicious that the Four Seasons improper notice was addressed to Jim Scott rather than Joe O'Bryan when Mr. Russo knew that Jim Scott is no longer in Central Illinois and does not take an active role in the day-to-day operations of Sun Structure.

It appears that Four Seasons has operated in bad faith in relation to your attempt to terminate the franchise agreement with Sun Structure. As such, we must ask that you immediately reinstate Sun Structures franchisee status in all the locations previously in existence before your improper termination of the Satellite Territory agreements. Sun Structure is prepared to file suit against you immediately to enjoin you from giving away franchises in territories that have been wrongfully taken.

Pursuant to the current franchise agreement, Paragraph 13.c, this letter shall serve as notice of your default of the franchise agreement with Sun Structures. You are in default due to your wrongful termination of the satellite territories. If you fail to reinstate Sun Structures status as a franchise in the Satellite Territories located in C, D, E, F, and G within 30 days, we will have no choice but to expand the injunction suit to include claims for breach of contract and for violation of the Illinois Franchise Act, 815 ILCS 705/19 & 705/41.

A further explanation of our position as to each territory in dispute is contained below.

**Territories A, B, C, E, F, G** (1,254,618)
The populations you assert in these areas are inaccurate. Therefore, Sun Structures disputes the amount you have asserted to be in arrearage. In addition, there are no payment terms for the fees you have stated are due and owing. In a facsimile dated December 12, 1992 and a

*SATELLITE TERRITORY*

*SPECIAL STIPULATION TO*
*FOUR SEASONS FRANCHISE AGREEMENT*
*DATED*  March 15, 1991
*BY AND BETWEEN*
*FOUR SEASONS MARKETING CORP.*
*AND*
Sun Structure Designs, Inc.
*(the "Franchise Agreement")*

This Special Stipulation to Franchise Agreement ("Special Stipulation") is made and entered into as of the _____ day of _____, 19_____ by and between Four Seasons Marketing Corp., a Nevada corporation with its principal place of business at 5005 Veterans Memorial Highway, Holbrook, New York 11741 ("Franchisor") and _____ with a principal place of business at _____ 505 East Chestnut, Bondville, IL 61815 _____

("Franchisee".

This Special Stipulation is intended to be a modification of and amendment to the Franchise Agreement. Defined terms shall have the same meaning in this Special Stipulation as in the Franchise Agreement. To the extent of any conflict between the following and the printed provisions of the Franchise Agreement, these Special Stipulations shall control.

Whereas, Franchisee desires to obtain the supplemental right to operate a business utilizing the Four Seasons System and the Licensed Marks from within the additional territory more particularly described in Paragraph 4 below (the "Satellite Territory"); and

Whereas, Franchisor is willing to grant Franchisee such supplemental rights subject to Franchisee's compliance with the following terms, covenants and conditions.

Now, therefore, in consideration of the mutual covenants and conditions hereinafter set forth, the parties hereto agree as follows:

1.    *Good Standing.*  Franchisee hereby acknowledges and agrees that Franchisor, as of the date hereof, is in full compliance with all of its obligations under the Franchise Agreement. Except as set forth in this Special Stipulation, the Franchise Agreement remains in full force and effect.

2.    *Term.*  This Special Stipulation shall take effect upon the date first set forth above and shall remain in effect during the term of the Franchise Agreement unless terminated by either party pursuant to Paragraph 6 hereof.

3.    *Grant of Satellite Territory.*  Subject to the reservation of rights contained in Paragraph 2 of the Franchise Agreement, Franchisor hereby grants to Franchisee the supplemental right to operate the Franchised Business both in the Granted Territory and the Satellite Territory pursuant to the Four Seasons System and in accordance with the Franchise Agreement and Franchisor's Confidential Operating Manual. Unless

*SCHEDULE D-2*
*Page 1*

*FS/FA-4.97*



*SATELLITE TERRITORY*

*SPECIAL STIPULATION TO*
*FOUR SEASONS FRANCHISE AGREEMENT*
*DATED   March 15, 1991*
*BY AND BETWEEN*
*FOUR SEASONS MARKETING CORP.*
*AND*
Sun Structure Designs, Inc.
*(the "Franchise Agreement")*

This Special Stipulation to Franchise Agreement ("Special Stipulation") is made and entered into as of the _____ day of _____, 19_____ by and between Four Seasons Marketing Corp., a Nevada corporation with its principal place of business at 5005 Veterans Memorial Highway, Holbrook, New York 11741 ("Franchisor") and _____
with a principal place of business at   505 East Chestnut, Bondville, IL 61815 _____
_____

("Franchisee".

This Special Stipulation is intended to be a modification of and amendment to the Franchise Agreement. Defined terms shall have the same meaning in this Special Stipulation as in the Franchise Agreement. To the extent of any conflict between the following and the printed provisions of the Franchise Agreement, these Special Stipulations shall control.

Whereas, Franchisee desires to obtain the supplemental right to operate a business utilizing the Four Seasons System and the Licensed Marks from within the additional territory more particularly described in Paragraph 4 below (the "Satellite Territory"); and

Whereas, Franchisor is willing to grant Franchisee such supplemental rights subject to Franchisee's compliance with the following terms, covenants and conditions.

Now, therefore, in consideration of the mutual covenants and conditions hereinafter set forth, the parties hereto agree as follows:

1.    *Good Standing.*  Franchisee hereby acknowledges and agrees that Franchisor, as of the date hereof, is in full compliance with all of its obligations under the Franchise Agreement. Except as set forth in this Special Stipulation, the Franchise Agreement remains in full force and effect.

2.    *Term.*  This Special Stipulation shall take effect upon the date first set forth above and shall remain in effect during the term of the Franchise Agreement unless terminated by either party pursuant to Paragraph 6 hereof.

3.    *Grant of Satellite Territory.*  Subject to the reservation of rights contained in Paragraph 2 of the Franchise Agreement, Franchisor hereby grants to Franchisee the supplemental right to operate the Franchised Business both in the Granted Territory and the Satellite Territory pursuant to the Four Seasons System and in accordance with the Franchise Agreement and Franchisor's Confidential Operating Manual. Unless

*SCHEDULE D-2*
*Page 1*

FS/FA-4.97

**E-FILED**
Monday, 10 September, 2007 01:38:23 PM
Clerk, U.S. District Court, ILCD

# IN THE CIRCUIT COURT FOR THE SIXTH JUDICIAL CIRCUIT
## CHAMPAIGN COUNTY, ILLINOIS

AUG -3 2007

CLERK OF THE CIRCUIT COURT
CHAMPAIGN COUNTY, ILLINOIS

| | | |
|---|---|---|
| SUN STRUCTURE DESIGNS, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 07-CH-240 |
| | ) | |
| FOUR SEASONS MARKETING CORP. | ) | |
| | ) | |
| Defendant. | ) | |

## NOTICE OF HEARING

**TO:** Four Seasons Marketing Corp.
c/o CT Corporation, Its Registered Agent
111 Eighth Avenue
13th Floor
New York, NY   10011

YOU ARE HEREBY NOTIFIED that on the 20th day of September, 2007, at the hour of 9:00 a.m., I shall appear before the Honorable Michael Q. Jones in Courtroom "H" of the Champaign County Courthouse, 101 E. Main Street, Urbana, Illinois, and then and there will proceed with a hearing on Petitioner's Motion for Preliminary Injunction.

Dated this  _3rd_  day of August, 2007.

SUN STRUCTURE DESIGNS, INC., Plaintiff

By:    Meyer Capel, A Professional Corporation

By:    _____
Steven A. Amjad, One of Its Attorneys

Lorna K. Geiler
Steven A. Amjad
MEYER CAPEL, A Professional Corporation
306 W. Church Street
P.O. Box 6750
Champaign, IL  61826-6750
Telephone:    217/352-1800
Facsimile:    217/352-1083

R:\saa\Sun Structure/Four Seasons\PLEADINGS - NOT OF HRG - MOT FOR PREL INJ

**IN THE CIRCUIT COURT FOR THE SIXTH JUDICIAL CIRCUIT
CHAMPAIGN COUNTY, ILLINOIS**

| | | |
|---|---|---|
| SUN STRUCTURE DESIGNS, INC. | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 07-CH-240 |
| | ) | |
| FOUR SEASONS MARKETING CORP. | ) | |
| Defendant. | ) | |

**SUMMONS**

To the Defendant:    FOUR SEASONS MARKETING CORP. –
*Serve CT Corporation, Its Registered Agent*
*111 Eighth Avenue, 13th Floor, New York, NY  10011*

YOU ARE SUMMONED and required to file a written answer or other pleading in the office of the clerk of this court on the second floor of the Courthouse, 101 E. Main Street, Urbana, Illinois 61801, within 30 days after service of this summons, not counting the day of service.

**IF YOU FAIL TO DO SO, A JUDGMENT BY DEFAULT MAY BE TAKEN AGAINST YOU FOR THE RELIEF ASKED IN THE COMPLAINT.**

To the Officer:        This summons must be returned by the officer or other person to whom it was given for service, with indorsement of service and fees, if any, immediately after service.  If service cannot be made, this summons shall be returned so indorsed.

This summons may not be served later than 30 days after its date.

Witness: _Aug. 7_____, 2007.

_Linda S. Frank_____
Clerk of Court (Seal of the Court)

Steven A. Amjad
Attorney for Plaintiff
Meyer Capel, A Professional Corporation
306 W. Church Street
Champaign, IL 61820
Telephone: (217) 352-1800
Fax: (217) 352-1083

Date of Service: _Aug. 9_____, 2007.
(To be inserted by server on copy left with defendant or other person)

## AFFIDAVIT OF SERVICE

I certify that I served this summons on defendants as follows:

(a.)    (Individual Defendant--personal):

By leaving a copy and a copy of the complaint with each individual defendant personally, as follows:

| Name and Address of Defendant | Date of Service |
|---|---|
|  |  |

(b.)    (Individual defendants--abode):

By leaving a copy and a copy of the complaint at the usual place of abode of each individual defendant with a person of his family, of the age of 13 years or upwards, informing that person of the contents of the summons, and also be sending a copy of the summons and of the complaint in a sealed envelope with postage fully prepaid, addressed to each individual defendant at his usual place of abode, as follows:

| Name of Defendant | Person and Address with Whom Left | Date of Service | Date of Mailing |
|---|---|---|---|
| FOUR SEASONS MARKETING CORP | PAULA KASH | AUG. 9, 2007 12:30PM |  |

(c.)    (Corporation defendants):

By leaving a copy and a copy of the Complaint, Motion for Preliminary Injunction and Notice of Hearing on Motion for Preliminary Injunction with the registered agent, officer or agent of each defendant corporation, as follows:

| Defendant Corporation | Registered Agent, Officer or Agent and Address | Date of Service |
|---|---|---|
| FOUR SEASONS MARKETING CORP | CT CORP REGISTERED AGENT 111 8TH AVE. 13FL, NEW YORK, NY |  |

(d.)    That the person served with Summons as stated in either sub-paragraph (a), (b) or (c) above was    FEMALE, of the    WHITE    race, and approximately 45    years of age.

I am over 18 years of age and not a party to the action.

COUNTY OF *NEW YORK*        )
                                             ) SS
STATE OF *NEW YORK*          )

Subscribed and sworn to before me this
9th  day of  AUGUST        , A.D. 2007.

_____
Notary Public

Date Commission Expires:   *3/30/2010*

Signature Of Process Server

License No.   123922

R:\ssa\Sun Structure/Four Seasons\PLEADINGS - SUMMONS - AFF OF SERV

KENNETH WISSNER
Notary Public, State of New York
No. 01-6
Qualified in New York County
Commission Expires March 30   *2010*